## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS, BOSTON

| | | |
|---|---|---|
| **HEANG OUCH, DIEU TRUONG,** | ) | |
| **VITH CHRORM & NIENG YERN,** | ) | |
| **SAVAI SAN, SAVONN SAN,** | ) | |
| **SUSAN SORSBY RANDY FOLLETT** | ) | |
| **& SUZANNE FOLLETT,** | ) | |
| **SONG KIM ROS & NHIEP** | ) | |
| **HOUT ROS, MARLENA DAVIS,** | ) | |
| **NEANG LIM, SAROEUN ROM, KOLAP** | ) | **C.A. NO.** |
| **IM, VANDY & DAOVANNEY DUCH,** | ) | |
| **MOISE FILS, CHHEANG & IN THY,** | ) | **CLASS ACTION COMPLAINT** |
| **AND CHANTHA OUM,** | ) | |
| on behalf of themselves and | ) | **JURY TRIAL DEMANDED** |
| all others similarly situated | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **FEDERAL NATIONAL** | ) | |
| **MORTGAGE ASSOCIATION** | ) | |
| *also known as* **FNMA** *and/or* **Fannie Mae,** | ) | |
| **INDEPENDENT NATIONAL** | ) | |
| **MORTGAGE CORPORATION** | ) | |
| *also known as* **INDYMAC BANK,** | ) | |
| **ONEWEST BANK, IMB HOLDCO,** | ) | |
| **LLC, IMB MANAGEMENT** | ) | |
| **HOLDINGS, LP, DUNE CAPITAL,** | ) | |
| **LLC, J.C. FLOWERS & CO., MSD** | ) | |
| **CAPITAL, LP, STONE POINT** | ) | |
| **CAPITAL, SOROS FUND** | ) | |
| **MANAGEMENT, LLC, SSP** | ) | |
| **OFFSHORE, LLC, PAULSON & CO.,** | ) | |
| **SILAR ADVISORS, LP, SILAR MCF-1,** | ) | |
| **LLC, WELLS FARGO BANK, N.A.,** | ) | |
| **AMERICAS SERVICING COMPANY** | ) | |
| *also known as* **ASC, WACHOVIA** | ) | |
| **MORTGAGE, BARCLAYS CAPITAL** | ) | |
| **REAL ESTATE, INC. doing business as** | ) | |
| **HOMEQ SERVICING,** | ) | |
| **JPMORGAN CHASE BANK, N.A.,** | ) | |
| **CHASE HOME FINANCE, LLC,** | ) | |
| **EMC MORTGAGE,** | ) | |

**OCWEN LOAN SERVICING, LLC,**     )
**AMERICAN HOME MORTGAGE**     )
**SERVICING, INC.** *also known as*     )
**A.H.M.S.I., CAPITAL ONE**     )
**TAYLOR BEN & WHITAKER,**     )
**COUNTRYWIDE FINANCIAL**     )
**CORPORATION, COUNTRYWIDE**     )
**HOME LOANS, INC.,**     )
**BAC HOME LOANS SERVICING, LP,**     )
**BANK OF AMERICA, N.A.,**     )
**WELLS FARGO BANK, N.A. as trustee for**     )
**certificate holders of**     )
**THE VARIOUS TRUSTS NOTED HEREIN,**  )
**DEUTSCHE BANK NATIONAL TRUST**     )
**COMPANY, as trustee for**     )
**THE VARIOUS TRUSTS NOTED HEREIN,**  )
**U.S. BANK NATIONAL ASSOCIATION**     )
**as Trustee for THE VARIOUS TRUSTS**     )
**NOTED HEREIN, DOONAN, GRAVES**     )
**& LONGORIA, LLC, ORLAN MORAN,**     )
**PLLC, ABLITT SCOFIELD, and**     )
**HARMON LAW OFFICES, P.C.**     )

      **Defendants.**

_____

## INTRODUCTION

1.     Plaintiffs Heang Ouch**,** Dieu Truong, Vith Chrom & Nieng Yern, Savai San, Savonn San, Susan Sorsby, Randy Follett & Suzanne Follett, and Song Kim Ros & Nhiep Hout Ros, Marlena Davis, Neang Lim, Saroeun Rom, Kolap Im, Daovanney & Vandy Duch, Moise Fils, Chheang & In Thy, and Chantha Oum, on behalf of themselves and all other similarly-situated individuals ("Plaintiffs") bring this class action as described in the paragraphs set forth herein.

2.     This complaint arises from the acts and/or intentional omissions of multiple Defendants, acting independently and through their subsidiaries, owners and/or predecessors in interest  as follows;

2

a.      Defendants Independent National Mortgage Corporation also known as IndyMac Bank, Countrywide, Bank of America, (collectively referred to as "Originator Defendants");

b.      Defendants OneWest Bank and its consortium of Investors; IMB HoldCo, LLC, IMB Management Holdings, LP, Dune Capital, LLC, J.C. Flowers & Co., MSD Capital, L.P., Stone Point Capital, Soros Fund Management, LLC, SSP Offshore, LLC, Paulson & Co., Silar Advisors, LP,  SILAR MCF-1, LLC (collectively referred as the "OneWest Servicer Defendants" where not otherwise described in their individual capacities), Bank of America, N.A. & BAC Home Loans Servicing, LP (collectively referred to as the "BOA Servicer Defendants"), JPMorgan Chase Bank, Chase Home Finance, LLC & EMC Mortgage Servicing, (collectively referred to as the "Chase Servicer Defendants"),Wells Fargo Bank, Wachovia & Americas Servicing Company (collectively referred to as the "Wells Fargo Servicer Defendants"), Ocwen Loan Servicing, LLC, American Home Loan Servicing, Inc., Barclays Capital Real Estate, Inc., d.b.a., HomEq Servicing, Taylor Bean & Whitaker, and Capital One, (all collectively referred to as "Servicer Defendants");

c.      Federal National Mortgage Association, a.k.a. FNMA and/or Fannie Mae, in its capacity as Trustee for various, as yet identified FNMA Trusts, Deutsche Bank National Trust Co., Wells Fargo Bank, N.A., U.S. Bank, N.A., Doonan, Graves & Longoria , LLC, Orlans Moran, PLLC., Ablitt Scofield, and Harmon Law, P.C. (collectively referred to as "Trustee Defendants")

as a result of:

a.      the Originator Defendants; by deceptively lowering mortgage underwriting standards and misrepresenting the financial soundness of their mortgages products with full knowledge that Plaintiffs and others obtaining said mortgages as a result would likely be unable to perform;

    b.    the Servicer Defendants; by deceptively misleading Plaintiffs and others by exploiting homeowners attempts to modify their mortgages as part of an overall scheme to maximize mortgage servicing profitability;

    c.    the Trustee Defendants; by attempting foreclosure and/or foreclosing on Plaintiffs' on others property when no actual default existed to the Holder of Plaintiffs' and others Notes.

3.    Plaintiff's claims are threefold:

    a.    Defendants IndyMac, Countrywide, Bank of America, , (collectively referred to as "Originator Defendants") were/are leading financial institutions and mortgage originators on which Plaintiffs' and others thought they could and did rely. The Originator Defendants did willfully perpetrate a fraudulent scheme to enrich themselves by significantly lowering their underwriting standards, creating high risk lending instruments, and the employment of predatory lending practices in order to make mortgage loans to borrowers they knew had an extremely high probability of non-performance.

    b.    The OneWest Servicer Defendants, the BOA Servicer Defendants, the Chase Servicer Defendants, the Wells Fargo Servicer Defendants, Ocwen Loan Servicing, LLC, American Home Loan Servicing, Inc., Barclays Capital Real Estate, Inc., d.b.a., HomEq Servicing, Taylor Bean & Whitaker, and Capital One, (collectively referred to as "Servicer Defendants") employed deceptive and misleading business practices by encouraging homeowner borrowers to apply for modification of their mortgages under the Federal Government's Home Affordable Modification Program (HAMP), knowing that Plaintiffs and others would not be able to modify their mortgages due to contractual obligations the Servicer Defendants were bound to adhere to, as specified in the pooling and servicing agreements governing the Servicer Defendants and the Trusts for which they serviced mortgages for. These deceptive and misleading business practices allowed the Servicer Defendants to use borrowers as unwitting

pawns in a scheme to exploit and manipulate the complexities of said pooling and servicing agreements and the HAMP program's Guidelines and Supplemental Directives to significantly enrich themselves. The Servicer Defendants did so willfully, deceptively and purposefully resulting in Plaintiffs and tens of thousands of other Massachusetts homeowners having their modification attempts hindered, strung along and otherwise stalled for months and/or years only to later discover that the Servicer Defendants could not modify their mortgages. The fact that the Servicer Defendants were contractually restricted and/or prohibited from modifying borrowers mortgages to begin with was deceptively withheld from Plaintiffs and other Massachusetts homeowners and borrowers on an unprecedented scale;

c.    The Trustee Defendants violated Massachusetts Commercial Code by attempting to foreclose on and/or foreclosing on Plaintiffs property when no actual default existed to the Holder of Plaintiffs' and others Notes. The Trustee Defendants knew that no default existed and purposefully, willfully and fraudulently foreclosed on Plaintiffs anyway.

## JURISDICTION AND VENUE

4.    This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) in that this complaint is a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are 100 or more members in the proposed class and the Named Plaintiffs are citizens of a State different from the majority of Defendants.

5.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because Plaintiffs are residents of Massachusetts and Defendants transact substantial business in this district.

## PARTIES

6.    Individual and Representative Plaintiff Susan Sorsby is a citizen of Massachusetts residing at 2 Fremont Road, Marshfield, MA 02050 which is one of the subject properties referenced herein.

5

7.      Individual and Representative Plaintiff Heang Ouch is a citizen of Massachusetts residing at 43 Inland Street, Lowell, MA 01851 which is one of the subject properties referenced herein.

8.      Individual and Representative Plaintiff Dieu Truong is a citizen of Massachusetts residing at and owner of that property located at 162-164 Glendale Road, Quincy, MA 02169 which is one of the subject properties referred to herein.

9.      Married Couple and Representative Plaintiffs Vith Chrorm and Nieng Yern are citizens of Massachusetts residing at and owner of that property located at 12 Zarek Drive, Attleboro, MA 02703 which is one of the subject properties referred to herein.

10.     Individual and Representative Plaintiff Savai San is a citizen of Massachusetts residing at and owner of that property located at 476 Jefferson Street, Fall River, MA 02721 which is one of the subject properties referred to herein.

11.     Individual and Representative Plaintiff Savonn San is a citizen of Massachusetts residing at and owner of that property located at 476 Jefferson Street, Fall River, MA 02721 which is one of the subject properties referred to herein.

12.     Married Couple and Representative Plaintiffs Randy Follett & Suzanne Follett are citizens of Massachusetts residing at and owners of that property located at 57 Mayflower Lane, Wareham, MA 02538 which is one of the subject properties referred to herein.

13.     Married Couple and Representative Plaintiffs Song Kim Ros and Nhiep Hout Ros are citizens of Massachusetts residing at and owner of that property located at 65 Parker Street, Brockton, MA 02302 which is one of the subject properties referred to herein.

14.     Individual and Representative Plaintiff Marlena Davis is a citizen of Massachusetts residing at and owner of that property located at 66 Osceola Street, Mattapan, MA 02126 which is one of the subject properties referred to herein.

15.     Individual and Representative Plaintiff Neang Lim is a citizen of Massachusetts residing at and owner of that property located at 200 Trotting Park Road, Lowell, MA 02154 which is one of the subject properties referred to herein.

16.     Individual and Representative Plaintiff Saroeun Rom is a citizen of Massachusetts residing at and owner of that property located at 819 Chelmsford Street, Lowell, MA 02151 which is one of the subject properties referred to herein.

17.     Individual and Representative Plaintiff Kolap Im is a citizen of Massachusetts residing at and owner of that property located at 21 Hillside Street, Lowell, MA 02151 which is one of the subject properties referred to herein.

18.     Married Couple and Representative Plaintiffs Daovanney & Vandy Duch are citizens of Massachusetts residing at and owner of that property located at 335 Walker Street, Lowell, MA 01851 which is one of the subject properties referred to herein.

19.     Individual and Representative Plaintiff Moise Fils is a citizen of the state of Georgia and owner of that property located at 18A Business Terrace, Unit 18A, Hyde Park, MA 02368 which is one of the subject properties referred to herein.

20.     Married Couple and Representative Plaintiffs Randy & Suzanne Follett are citizens of Massachusetts residing at and owner of that property located at 57 Mayflower Lane, Wareham, MA  which is one of the subject properties referred to herein.

21.     Married Couple and Representative Plaintiffs Chheang & In Thy are citizens of Massachusetts residing at and owner of that property located at 55 Geneva Street, Revere, MA 02151 which is one of the subject properties referred to herein

22.     Individual and Representative Plaintiff Chantha Oum is a citizen of Massachusetts residing at and owner of that property located 18 Bourne Street, Lowell, MA 02152 which is one of the subject properties referred to herein.

23.     Defendant Bank of America, N.A. is a mortgage lender with headquarters at 101 Tryon Street, Charlotte, North Carolina 28255.

24.     Defendant BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A., located at 4500 Park Granada, Calabasas, California 91302.

25.     Defendant Countrywide Home Loans, Inc. was a mortgage servicing subsidiary of Countrywide Financial Corporation and was located at 4500 Park Granada, Calabasas, California 91302.

26.     Defendant Countrywide Financial Corporation was a financial services holding company that was purchased by Bank of America in 2008 and was located at 4500 Park Granada, Calabasas, California 91302.

27.     Defendant Wells Fargo Bank, N.A. is a company which is the trustee for the certificate holders of various Trusts as noted herein. Upon information and belief Defendant Wells Fargo Bank, N.A. is located at 420 Montgomery Street, San Francisco, CA 94163.

28.     Defendant, Deutsche Bank National Trust Company ("Deutsche Bank") is located at 7575 Irvine Center Drive, Irvine, CA 92618.  Deutsche Bank is the Trustee for the certificate holders of various Trusts as noted herein.

29.     Defendant U.S. Bank, N.A. is a company which is the trustee for the certificate holders of various Trusts as noted herein. Upon information and belief Defendant U.S. Bank, N.A. is located at 209 S. LaSalle Street, Suite 300, Chicago, IL 60604.

30.

31.      Defendant Harmon Law, PC is a law firm which represents various Defendants in the foreclosure matters regarding various Plaintiffs' subject property referenced herein. Said foreclosure matters numbering in the hundreds if not thousands in the State of Massachusetts. Upon information and belief Defendant Harmon Law is located at 150 California Street, Newton, MA 02458.

32.     Defendant Ablitt Scofield is a law firm which represents various Defendants in the foreclosure matters regarding various Plaintiffs' subject property referenced herein. Upon information and belief Defendant Ablitt Scofield is located at 304 Cambridge Road, Woburn, MA 01801.

33.     Defendant Doonan Graves & Longoria, LLC is a law firm which represents various Defendants in the foreclosure matters regarding various Plaintiffs' subject property referenced

herein. Upon information and belief Defendant Doonan Graves & Longoria, LLC is located at 100 Cummings Center, Suite 225D, Beverly, MA 01915.

34.     Defendant Orlans Moran, PLLC is a law firm which represents various Defendants in the foreclosure matters regarding various Plaintiffs' subject property referenced herein. Upon information and belief Defendant Orlans Moran, PLLC is located at 45 School Street, #2F, Boston, MA 02108.

35.     Defendant Independent National Mortgage Corporation (also known as IndyMac Bank was a banking and mortgage lending/servicing entity which was taken over by the FDIC in July of 2008 and was purchased from the FDIC by IMB HoldCo, Inc., at which time its headquarters were located in the state of California.

36.     Defendant OneWest Bank is a banking and mortgage lending/servicing entity which is a wholly owned subsidiary of IMB HoldCo, LLC, located at 888 East Walnut Street, Pasadena, California 91101.

37.     Defendant IMB HoldCo, LLC is a financial services holding company which is owned by IMB Management Holdings, LP, which upon information and belief is located at 888 East Walnut Street, Pasadena, California 91101.

38.     Defendant IMB Management Holdings, LP is a limited partnership is owned by a consortium of private equity investors, which controls and/or owns IMB HoldCo, LLC, which upon information and belief is located at 888 East Walnut Street, Pasadena, California 91101.

39.     Defendant Dune Capital, LLC is a limited liability company, which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 623 Fifth Avenue, 30th Floor, New York, NY 10022.

40.     Defendant J.C. Flowers & Co. is a company, which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 717 Fifth Avenue, 26th Floor, New York, NY 10022.

41.     Defendant MSD Capital, L.P. is a limited partnership which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 645 Fifth Avenue, 21st Floor, New York, NY 10022.

42.     Defendant Stone Point Capital is a company which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 919 Third Avenue, Suite 39314, New York, NY 39314.

43.     Defendant SSP Offshore, LLC is a limited liability company which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 888 Seventh Avenue, 33rd Floor, New York, NY 10106.

44.     Defendant Soros Fund Management, LLC is a limited liability company that controls and/or owns SSP Offshore, LLC, which upon information and belief is located at 888 Seventh Avenue, 33rd Floor, New York, NY 10106.

45.     Defendant SILAR MCF-1, LLC is a limited liability company which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 333 Seventh Avenue, FL3, New York, NY 10001.

46.     Defendant Silar Advisors, LP is a limited partnership that controls and/or owns SILAR MCF-1, LLC, which upon information and belief is located at 333 Seventh Avenue, FL3, New York, NY 10001.

47.     Defendant Paulson & Co is a company which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 1251 Avenue of the Americas, 50th Floor, New York, NY 10020.

48.     Defendant Federal National Mortgage Association is a mortgage servicing company which upon information and belief is located at 3900 Wisconsin Avenue, NW, Washington, DC 20016.

49.     Defendant Barclays Capital Real Estate, Inc, d.b.a., HomEq Servicing is a mortgage servicing company which upon information and belief is located at 4837 Watt Avenue, North Highlands, CA 95660.

50.     Defendant JP Morgan Chase Bank, N.A., d.b.a., Chase Home Finance, LLC, and EMC Mortgage, are banking and mortgage servicing companies which upon information and belief has headquarters located at 270 Park Avenue, New York, NY.

51.     Defendant Wells Fargo Bank, N.A., d.b.a., Wachovia, and Americas Servicing Company, are banking and mortgage servicing companies which upon information and belief has headquarters located at 420 Montgomery Street, San Francisco, CA 94104.

52.     Defendant Ocwen Loan Servicing, LLC, is a mortgage servicing company which upon information and belief has headquarters located at 1661 Worthington Road, West Palm Beach, FL 33409.

53.     Defendant American Home Mortgage Servicing, Inc., is a mortgage servicing company which upon information and belief has headquarters located at 1525 South Beltline Road, Coppell, TX 75019.

54.     Defendant Capital One, is a mortgage servicing and personal banking services company which upon information and belief has headquarters located at 1680 Capital One Drive, McLean, VA 22102.

55.     Defendant Taylor Bean & Whitaker., was a mortgage servicing company which upon information and belief had headquarters located at 315 NE 14th Street, Ocala, FL 34470.

56.  In March 2009 the FDIC held an auction for IndyMac Bank, which it had seized in 2008, and sold it as New IndyMac Bank to Defendant IMB HoldCo, LLC.  On March 19, 2009 One West Bank began operations as a newly formed Pasadena, California based federal savings bank.  From and after its acquisition of IndyMac in March 2009 and continuing to the present, both as a successor in interest to IndyMac and as principals, IMB HoldCo, LLC, Dune Capital, LLC, J.C. Flowers & Co., MSD Capital, L.P., Stone Point Capital, Soros Fund Management, LLC, SSP Offshore, LLC, Paulson & Co., Silar Advisors, LP,  SILAR MCF-1, LLC (often referred to jointly as the "OneWest Servicer Defendants" where not otherwise described in their individual capacities) have engaged in and continued the wrongful conduct complained of herein. Each of these Servicer Defendants had actual and/or constructive

knowledge of the acts of the other OneWest Defendants as described herein, and ratified, approved, joined in, acquiesced in, and/or authorized the acts of the other, and/or retained the benefits of said acts.

57.     In 2007, Defendant Bank of America commenced negotiations to acquire Countrywide Home Loans, Inc. and Countrywide Financial Corporation (hereinafter referred to as "Countrywide").  By late 2007, Bank of America began merging its operations with Countrywide and adopting some of Countrywide's practices.  From and after its acquisition of Countrywide in July 2008 and continuing to the present, both as a successor in interest to Countrywide and as a principal, Bank of America has engaged in and continued the wrongful conduct complained of herein.

58.     Many of the Defendants had actual and/or constructive knowledge of the acts of other Defendants as described herein, and ratified, approved, joined in, acquiesced in, and/or authorized the acts of the other, and/or retained the benefits of said acts.

## FACTUAL BACKGROUND

### A.     Fraudulent Scheme Designed and Executed by the Originator Defendants

59.     The Originator Defendants were/are among the leading providers of residential real estate mortgages in Massachusetts and in the United States during all times relevant to this complaint.

60.     The fraud perpetrated by the Originator Defendants from 2000 through 2009, was willful and pervasive.  It began with simple greed and then accelerated when said Defendants discovered they could not sustain their businesses, unless they systematically and significantly reduced their underwriting standards and created increasingly complex, esoteric, and high risk loan products to induce Plaintiffs and other borrowers into ever larger loans on increasingly risky terms.  As the Originator Defendants knew from no later than 2004, these loans were unsustainable for the borrowers and to a certainty would result in a crash that would destroy the equity invested by Plaintiffs and other Massachusetts borrowers.  Further, those actions would cause the high risk pools of mortgages the Originator Defendants had sold to Real

Estate Mortgage Investment Conduits (REMICs) and/or Trusts to default on a nationwide scale.

61.     With their fraudulently obtained mortgages, the Originator Defendants executed their plan to continue the practice of "pooling" the foregoing mortgages and sell the pools for inflated value to REMIC/Trusts that would pay for the mortgages by issuing Bonds (mortgage backed securities/MBS) to investors on a global scale (securitizing).  The Originator Defendants knew that these mortgages had been made by significantly reducing credible underwriting standards to the point where they knew that, regardless of their representations to the contrary, the likelihood of borrower non-performance on these mortgages was extremely high.

62.     Rapidly, the Originator Defendants scheme grew into a brazen plan to disregard underwriting standards and create high risk lending instruments – county-by-county, city-by-city, person-by-person – in order to take business from legitimate mortgage providers, and moved on to massive securities fraud hand-in-hand with concealment from, and deception of, Plaintiffs and other mortgagors on an unprecedented scale.

63.     The Originator Defendants senior management teams knew the scheme would cause a liquidity crisis that would devastate Plaintiffs' home values and net worth.

64.     At the very least, at the time of entering into the Notes referenced herein with respect to Plaintiffs, the Originator Defendants, and each Defendant in the chain of title of the foregoing mortgages and the successors to each of the foregoing, were bound and obligated to fully and accurately disclose to each borrower, including each Plaintiff herein, that the mortgages being offered to the Plaintiffs were, in fact, part of a massive fraud that the Originator Defendants knew would result in the loss of the Plaintiffs' and others home equity, would cause severe impairment to the Plaintiffs' and others credit ratings, and eventually the potential loss of Plaintiffs' and others homes through foreclosure.

65.     It is now all too clear that this was one of the ultimate high-stakes fraudulent investment schemes of the last decade.  Couched in banking and securities jargon, the

Originator Defendants deceptive gamble with consumers' primary assets –their homes- was (and still is) nothing more than a financial fraud perpetrated by the Originator Defendants and others on a scale never before seen.

66.      This scheme was a significant contributing factor which led directly to a mortgage meltdown in Massachusetts (and nationwide) causing home values to decrease significantly. The Originator Defendants' business premise was to leave the borrowers, including Plaintiffs, and the Trusts they sold their mortgages to, responsible once the Originator Defendants and their executives had received huge salaries, bonuses, and sold their respective companies stock options or shares, while investors were still buying the Mortgage Backed Securities in increasingly overpriced and high risk mortgage pools and before the inevitable market collapse.

67.      As a result, Plaintiffs' and others have lost equity in their homes, their credit ratings and histories were damaged or destroyed, and Plaintiffs' incurred material costs and expenses. At the same time, Defendants took from Plaintiffs' and other borrowers billions of dollars in principal and interest payments and fees, thereby generating billions of dollars in servicing profits.

## B.      The Foreclosure Crisis

68.      Over the last four years, the United States has been in a foreclosure crisis.  In late 2009, a congressional oversight panel noted that one in eight U.S. mortgages was in foreclosure or default.[1]

69.      For the third quarter of 2010, national foreclosure filings -- default notices, scheduled auctions and bank repossessions -- were reported on 930,437 properties in the 3rd quarter. One in every 139 U.S. housing units received a foreclosure filing in that quarter.[2]

---

[1] Congressional Oversight Panel, Oct. 9, 2009 report at 3.  *Available at* http://cop.senate.gov/reports/library/report100909-cop.cfin.
[2] Reality Trac Staff, *Foreclosure Activity Increases 4% in Third Quarter* (October 14, 2010). *Available at* http://www.realtytrac.com/content/press-releases/q3-2010-and-september-2010-foreclosure-reports-6108.

70.     Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

71.     The foreclosure crisis is not over.  Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011or 2012.  *See* Eric Tymoigne, *Securitization, Deregulation, Economic Stability, and Financial Crisis*, Working Paper No. 573.2 at 9, Figure 30,[3] (citing a Credit Suisse study showing monthly mortgage rate resets).

### C.     Creation of the Home Affordable Modification Program

72.     Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act").  12 U.S.C. § 5201 *et seq.* (2009).

73.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."

74.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP.  12 U.S.C. § 5211.  Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions.

75.     Congress allocated up to $700 billion to the United States Department of the Treasury for TARP.  12 U.S.C. § 5225.

76.     In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities."  12 U.S.C. § 5213(3).

77.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to

---

[3] *Available at* http://papers.ssrn.com/so13/papers.cfm?abstract_id=1458413

maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures."

78.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures.  12 U.S.C. § 5220.

79.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

80.     The Making Home Affordable program consists of two subprograms.  The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

81.     The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP.  It is the exploitation of this subprogram that is one of the issues in this case.

82.     HAMP is funded by the federal government, primarily with TARP funds.  The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

**D.   Duties of a Participating Servicer Under HAMP**

83.     On various dates, the Servicer Defendants each became a participating servicer of the United States Treasury Department's Making Home Affordable Program (of which HAMP is a subsidiary program) and executed Servicer Participation Agreements (SPA) agreeing to follow the guidelines and supplemental directives of the aforementioned programs (an example of a HAMP Program Servicer Participation Agreement is attached as Exhibit 1).

84.     When each Servicer Defendant signed a SPA with the U.S. Treasury it agreed in its capacity as loan servicer[4] to participate in HAMP, to abide by HAMP's requirements, and to perform loan modification and other foreclosure prevention services described in the program guidelines and supplemental directives and amounts to a public proclamation of its intention to do so.

85.     As a Congressional Oversight Panel evaluating HAMP noted, "participation in the program by servicers is voluntary, but once a servicer elects to participate, adherence to the program standards is mandatory for all the servicer's loans."  Congressional Oversight Panel, December 14, 2010 report –*Id. at pp. at 4*.[5]

86.     The SPAs executed by each Servicer Defendant incorporate all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications," referred to as "Supplemental Directives" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers.  These documents together are known as the "Program Documentation," *see* SPA § 1.A, and are incorporated by reference herein.  The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."  SPA §§ 1.A., 2.A.[6]

87.     The first Supplemental Directive ("SD") was issued on April 6, 2009, and states that the national mortgage modification program was "aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels."  SD 09-01 (Exhibit 2 *Id. at pp.1*).  This

---

[4] "Servicer" is the industry term for a financial institution that acts as agent for the owner of a loan to perform many of the functions that deal directly with the homeowner, including processing of payment, loss mitigation and overseeing foreclosure.

[5] *Available at* http://cop.senate.gov/reports/library/report-121410-cop.cfm.

[6] The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 3), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications and Supplemental Documentation-Frequently Asked, Supplemental Directive 09-08.  The Program Documentation has been consolidated by the U.S. Treasury Department into a single document known as the Making Home Affordable Handbook.  These documents together describe the basic activities required under HAMP and are incorporated by reference and are available at http://www.hmpadmin.com.

directive and the directives to follow were issued to provide guidance for adoption and implementation of HAMP "to provide a borrower with sustainable monthly payments."

88.     The Program Documentation requires Participating Servicers to evaluate all loans that are 60 or more days delinquent or appear to be in imminent default (as defined by the Program Documentation), to determine which loans meet the HAMP eligibility criteria.  SD 09-01 (Exhibit 2 *Id. at pp. 4*).  In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the borrower is eligible for a HAMP modification (Exhibit 2 *Id. at pp. 3-4*).

89.     A HAMP Modification consists of two stages.  First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP") agreement.  Second, upon successful completion of the TPP, the Servicer must offer the homeowner a permanent modification.  Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income.

90.     A mortgage is eligible for HAMP if threshold criteria enumerated in the Program Documentation are met.  Aside from criteria that require the loan to be a first lien mortgage originated before 2009, that the property be occupied, and that it be the borrower's principal residence, the most salient conditions are that the loan is delinquent or default is reasonably foreseeable; that the borrower documents a financial hardship (as defined in the Program Documentation); and that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income.

91.     HAMP Guidelines and Supplemental Directives thoroughly cover everything required of each Servicer participating in HAMP. These guidelines were designed to give homeowners a fair shot at maintaining their homeownership even in the face of a nationwide economic set back precipitated by the Originator Defendants' actions and the resultant crash of the real estate market that destroyed the equity of Plaintiffs and others.

92.     Many of HAMP's guidelines and directives spell out specific timelines that participating servicers must adhere to in order to make the process proceed in a timely fashion. As stated in Supplemental Directive 10-01(Exhibit 3 –*id. at pp. 2-3*) participating servicers have only 10 business days following receipt of an initial request to notify the applicant in writing that the package was received. Further, within 30 calendar days from the date initial request is received, the servicer must review the submitted documentation, and if complete, send a Trial Period Plan Notice (acceptance into the program) or make a determination that the applicant is not eligible for the program . These timelines are further reinforced in Supplemental Directive 10-02 (Exhibit 4 –*id. at pp. 4*).

93.     There are also guidelines designed to protect applicants from foreclosure during the application process.  Supplemental Directive 09-01, (Exhibit 2 *Id. at pp.14*), states that participating servicers should not proceed with a foreclosure sale until a borrower has been evaluated for HAMP and that servicers must use reasonable efforts to contact borrowers to determine their eligibility. Supplemental Directive 10-02 (Exhibit 4), was issued to improve program effectiveness by amending policies and procedures related to initiation and continuation of foreclosure actions. Page 5 (Exhibit 4) of this Directive states that a servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale unless and until at least one of five circumstances exist.  Page 6 (Exhibit 4) of this Directive also sets a minimum time frame threshold in which a homeowner must request HAMP consideration in order to be entitled to such protection from foreclosure of 7 business days prior to a scheduled foreclosure date. Page 7 (Exhibit 4) of this Directive further states that servicers must implement written procedures applicable to all loans that are potentially eligible for HAMP and requires that the servicer provide a written certification to the foreclosure attorney/trustee that at least one of the five circumstances under the Directive (Exhibit 4), and that all other available loss mitigation alternatives were exhausted and that a non-foreclosure outcome could not be reached. Furthermore said certification must be provided no sooner than 7

business days prior to the scheduled foreclosure sale date.  Servicer participants in the HAMP Program do not have discretion in applying these directives when it suits them.

94.     When the HAMP Program was introduced, the Servicer Defendants recognized right away that it could become an integral part of an overall scheme to unfairly earn billions of dollars in illicit profits from servicing income by exploiting the HAMP Program and using it as an excuse to keep millions of mortgages in a perpetual default status that should have been rightfully modified or foreclosed upon if good servicing practices were applied. In this scheme the applicant Plaintiffs and other homeowners are mentally and emotionally tortured during their attempts at modification and used as unwitting pawns, and in the end the Plaintiffs, other homeowners, and the Trusts (and ultimately the bond holders of those Trusts) that own the Mortgages and Notes are left holding the proverbial "bag".

95.     While each of the Servicer Defendants executed a HAMP SPA agreeing to follow the rules of the program, their actions demonstrate that they systematically ignore HAMP Guidelines and Supplemental Directives on a routine basis. Guidelines regarding timely review of applications are disregarded. Guidelines regarding deadlines for the request and return of documentation are ignored. Guidelines prohibiting foreclosure against applicants are summarily overlooked. Guidelines regarding written notifications during the process are sporadically applied, at best.

96.     The Plaintiffs and other applicants are met with a daunting challenge of misinformation, lost document claims, repetitive requests for documents already supplied and all manner of tactics designed to stall or otherwise hinder the application process by the Servicer Defendants.

97.     The aforementioned actions by the Servicer Defendants are all by intention, with the primary goal of keeping as many applications for modification (HAMP or otherwise) in a perpetual state of limbo, for as long as possible a period of time, in an effort to maximize servicing income for the Servicer Defendants. This is accomplished by the combined exploitation of the HAMP Program, and the Pooling and Servicing Agreements governing the

conduct of the Servicer Defendants regarding the pools of mortgages they service for the Trusts that own said pools.

       **E.**    **The Servicer Defendants' Financial Incentives Against Modification**

98.     The residential mortgage servicing industry was created decades ago when mortgage lenders designed a standardized system by which they could securitize mortgages and thereby recapitalize their lending capability, after having lent out the majority of their capital, much faster than waiting years for borrowers to pay off their mortgages. The premise was simple enough; A mortgage originator makes a large number of loans. That originator pools the loans into one large grouping known as a "pool of mortgages". That pool of mortgages is then sold to a Real Estate Mortgage Investment Conduit (REMIC). These REMICs are called Trusts. They are legal entities registered with the Securities and Exchange Commission. However, they are merely shells created for the sole purpose of acquiring the pools of mortgages, which become assets of the respective Trusts.

99.     The creation of this "mortgaged backed Trust" concept allows mortgage originators to get the loans it recently made off their books. They no longer have ownership of the mortgages and notes they pooled together and consequently become recapitalized, giving originators the ability to lend again, in months as opposed to years. Originators also receive the added benefit that should mortgages default and eventually fail, they suffer no financial consequences as they no longer retain any ownership interest in those mortgages and notes that have been pooled and sold to Trusts.

100.    Trusts are inherently faced with two problems from the moment of their creations. First, because they are just shells (they have no physical address, no communications capability, and no personnel), they have no capital to pay for the pools of mortgages, and secondly, for the same reason as aforementioned, they have no personnel to service the mortgage accounts. The first problem is solved by the securitization of the Trust's assets. This is done by selling bonds (sometimes referred to as certificates) commonly called Residential Mortgage Backed Securities (RMBS) or simply Mortgage Backed Securities (MBS) to big

investors such as pension funds, retirement funds, etc. The second problem is solved by paying companies (i.e. the Servicer Defendants) to deal with the day to day handling of mortgage servicing related matters such as collecting monthly principal and interest payments, paying taxes and insurance, etc.  Thus the necessity of keeping the Trusts as separate entities, in order for the recapitalization of mortgage originators to be accomplished through securitization, gave rise to the mortgage servicing industry.

101.    When a securitization of mortgages takes place many documents are created to outline the duties of the various participants of each securitization. These documents include required forms that must be filed with the SEC and those that are not. Those documents relevant to this complaint are the Prospectus and/or Prospectus Supplement.

102.    The Prospectus and/or Prospectus Supplement are documents, registered with the SEC, outlining the entire structure of a mortgage backed Trust's securitization. It's topics range from descriptions of the mortgages in the pool, who originated those mortgages and under what circumstances, who the Trustee of said Trust shall be and their duties, the delivery of the mortgages and notes to the Trust, The certificates (bonds) offered for sale, monthly payments to the certificate holders (bond holders), and who the servicer will be at the inception of the Trust as well as the servicer's duties. The Prospectus and/or Prospectus Supplement is the document given to potential purchasers of the MBSs being offered for sale by the Trust in much the same manner that a company going public issues a prospectus prior to the issuance of its stock on a public exchange.

103.    In a Prospectus and/or Prospectus Supplement another document is referenced called a Pooling and Servicing Agreement (PSA). The majority of the clauses contained in the PSA are contained in the Prospectus and/or Prospectus Supplement as the PSA is a contract between the Trust and the servicer and is not necessarily required to be registered with the SEC, so long as its relative content, as it relates to the financial impact it has on said Trust, is disclosed in full within the Prospectus and/or Prospectus Supplement.

104.    As stated in all Prospectus and/or Prospectus Supplements, mortgage servicers are paid by Trusts to service the Trust's mortgages and part of payment for the performance of those services is based as a percentage of the total amount of principal balance of all the loans in a given pool of mortgages the servicer services (i.e. $1,000,000,000 in pool principal balance @ .005% monthly = $5,000,000 monthly servicing fee).

105.    Under HAMP, the federal government incentivizes participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable.  Servicers receive $1,000.00 for each HAMP modification.  However, this incentive is obviously countered by a number of financial factors that make it far more profitable for the Servicer Defendants to avoid modification, continue to keep a mortgage in a state of default or distress and to eventually push loans toward foreclosure or short sale.

106.    By purposefully hindering the modification process and delaying foreclosure, the Servicer Defendants are able to exploit a given pool of mortgages for maximal profitability, by keeping the total amount of principal balance of the pool artificially inflated so that they are able to maximize the amount of the servicing fee of said pool.

107.    Were the Servicer Defendants to simply foreclose on all borrowers as soon as good servicing practices would dictate, the servicing fees they collect would drop as suddenly and dramatically as the principal balance of the mortgages in said pools. Instead they purposefully and willfully delay foreclosure, by manipulating and hindering homeowner's attempts at modification, even when the Servicer Defendants know it is impossible for the majority homeowners to be modified, so as to lower servicing income in a controlled manner and maximize profits from servicing income for as long a time as is possible.

108.    This is of course, done at the expense of the borrowers applying for modifications who are given false hope and suffer the indignities of significant emotional and mental distress. The borrowers and the bond-holders of the various Trusts are left holding the bag in the end, when foreclosure finally takes place and the property is liquidated for a fraction of the mortgage's value, while the Servicer Defendants reap billions of dollars in profits derived

23

from illicit servicing fees based on values of pools of mortgages that have been artificially inflated by the Servicer Defendants' willful and purposeful false representations to be attempting to assist borrower requests for modifications they cannot possibly comply with or agree to (see section F  - The Servicer Defendants Contractual Restrictions against Modification).

109.    Also stipulated in all Prospectus and/or Prospectus Supplements is a requirement that servicers must forward, from their own funds, monthly payments of principal and interest, less the servicing fees, to the Trusts on all mortgages in a given pool of mortgages, including those payments of non-performing loans and REO properties. These payments are called periodic advances or simply "advances". This is evidenced in the Prospectus and/or Prospectus Supplement governing Plaintiff Truong's mortgage (Exhibit 5) at *Article 1, section 1.01 defined terms, periodic advance and again at sections 3.08, 3.20 and 3.14*. There are also other types of servicing advances required to be made by servicers stated in Prospectus' and/or Prospectus Supplements including, but not limited to, property inspections, broker price opinions, appraisals, property management and maintenance, legal fees, service processing, etc.

110.    Further stated in all Prospectus' and/or Prospectus Supplements, advances made by a servicer are recoverable by the servicer through either standard collection practices (from the borrower) or once a property, as security for a mortgage in the pool, is foreclosed on and the property (now considered Real Estate Owned or REO property) is eventually liquidated. In the case of a liquidation of a property, the servicer is paid as first order of priority from the proceeds of said liquidation. Furthermore, recovery of advances often includes interest on the funds advanced enabling the Servicer Defendants to actually earn interest income from their advances made.

111.    Entering into a permanent modification will often significantly delay a servicer's ability to recover advances it is required to make to a Trust as compared to the aforementioned foreclosure/liquidation scenario.  Also, a servicer's right to recover expenses from a Trust in a

loan modification, rather than a foreclosure, is less clear and less generous. Considering that the Servicing Defendants are only interested in their own respective profitability (having no ownership interest in the Trust's assets), they are greatly incentivized against modification even further by these pooling and servicing agreement requirements.

112.    Moreover, by exploiting loopholes in pooling and servicing agreements, the Servicer Defendants profit handsomely by routinely using the "borrower has applied for a HAMP modification excuse" to justify delaying the foreclosure of defaulted mortgages to Trusts, for a time lengthily enough to incur a significant amount of aforementioned servicing advances, and foreclosing when defaults have effectively "ripened", making full recovery of said advances, often with interest. This is done by stringing along borrowers' attempts at modification, as aforementioned in preceding paragraphs, so as to justify the time delay to the Trusts, used primarily to allow the bill for servicing advances to pile up. Furthermore, this reimbursement structure limits the Servicer Defendants' incentive to rein in foreclosure costs and actually incentives them to increase and pad the costs of foreclosure.

113.    Servicers will charge for unnecessary work and/or work that was never done (referred to in the mortgage securitization industry as "Junk Fees"; see-*Written Testimony of Adam J. Levitin Associate Professor of Law Georgetown University Law Center Before the House Financial Services Committee Subcommittee on Housing and Community Opportunity "Robo-Singing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing" November 18, 2010*- attached as Exhibit 6) in an effort to increase the costs of foreclosure and subsequently the amount of servicing advance fees recovered when a foreclosure and liquidation of property eventually takes place.

114.    This is all a clever, misleading and deceptive balancing act employed by the Servicer Defendants to maximize profits using Plaintiff borrowers and others as unwitting pawns. While the Defendant Servicer is making servicing advances, it appears to be losing money on the foreclosure process, yet this is offset later when recovery is made (after foreclosure and final liquidation of property) and profit is realized from the recovery of all the necessary and