unnecessary servicing advances claimed to be paid out by the Defendant Servicer, plus interest. These advances are recovered by the Defendant Servicer as the first order of payment priority from sale proceeds upon liquidation (sale by the Trust) of a foreclosed property. To the Servicer Defendants, advances they are required to make with respect to defaulted mortgages, as stated in the pooling and servicing agreements with the Trusts for which they service mortgages for, are quite literally like "money in the bank".

114.    It is by employing these types of deceptive and misleading business practices, exploiting loopholes in the pooling and servicing agreements they are contractually bound to adhere to, and while using the HAMP Program in tandem to cover their tracks, the Servicer Defendants have made obscene profits from the servicing of residential mortgage loans while knowingly causing significant harm to the named Plaintiffs and tens, if not hundreds, of thousands of other Massachusetts homeowners, the bond-holders of the Trusts for which they service mortgages for, and the public's economic well being at large.

115.    Additionally, the case of the OneWest Servicer Defendants, their conduct is particularly egregious. Servicer Defendant IMB HoldCo, LLC negotiated a loss sharing arrangement (Exhibit 7) as part of its agreement with the FDIC to purchase the assets of IndyMac Bank guaranteeing that they would be partially compensated for losses from qualifying loans as follows;

      a.    New IndyMac *(i.e. OneWest Bank)* assuming the first 20% of losses after which the FDIC will share losses 80/20 for the next 10% of losses and 95/5 thereafter.

116.    This aforementioned loss sharing agreement with the FDIC additionally insulates the OneWest Servicer Defendants from the losses normally associated with defaulted mortgages and/or mortgage pools, not yet or just recently sold to Trusts in the securitization process at the time the FDIC halted IndyMac's business. This enabled the OneWest Servicer Defendants to foreclose (or facilitate short sales) on borrower's property and ultimately realize a profit on

foreclosed properties and/or short sales of "qualified" loans as defined in said loss sharing agreement (and if necessary, enabling them to repurchase other mortgages and/or pools of mortgages, with minimal financial consequence). The OneWest Servicer Defendants knew they would be able to make significant profits by, ignoring their obligations and public proclamations to assist homeowners nationwide under a Federal Government program they agreed to abide by, and instead foreclose and/or facilitate short sales on as many FDIC "qualified" non-performing mortgages as possible.

117.    As the records pertaining to "qualified loans" under said loss sharing agreement are in the control of the OneWest Servicer Defendants, information regarding the scope of their actions regarding foreclosures of "qualified loans" as defined by the loss sharing agreement with the FDIC can only be obtained through discovery. However, it is upon information and belief that the OneWest Servicer Defendants exploited and manipulated said agreement and willfully denied homeowners the ability to pursue modification of their mortgages under the HAMP program in an effort to instead enrich themselves.

118.    As the records regarding servicing advances and periodic advances and/or advances made and recovered by the Servicer Defendants as a whole are in the control of each Servicer Defendant, specific information regarding the scope of their actions regarding the manipulation of HAMP program in conjunction with their exploitation of their pooling and servicing agreements can only be obtained through discovery. However, it is upon information and belief, based on the facts presented herein, the Servicer Defendants routinely utilized these aforementioned deceptive and misleading tactics to willfully deny homeowners the ability to pursue modification of their mortgages under the HAMP program, deceptively mislead homeowners of their ability to obtain a modification at all,  in an effort to instead enrich themselves, from the illicit servicing activities of residential mortgage loans while knowingly causing significant harm to the named Plaintiffs herein and tens, if not hundreds, of thousands of other Massachusetts homeowners, the bond-holders of the Trusts for which they service mortgages for, and the public's economic well being at large.

27

**F.**    **The Servicer Defendant's Contractual Restrictions Against Modification**

119.    The Servicer Defendants violations of Massachusetts Law are compounded by their deceptive and misleading representations, statements and actions in dragging out the processing of Plaintiffs' and other homeowners HAMP applications over months and even years, while full well knowing that they could not possibly modify those homeowners mortgages due to mortgage modification restrictions and/or prohibitions against modifications as specified in the Prospectus' and Prospectus Supplements governing the mortgages in the Trusts they serviced mortgages for.

120.    The aforementioned restrictions are typically part of every securitization of residential real estate mortgages as a method of protecting the integrity of the revenue stream paid to investors which purchased the Residential Mortgage Backed Securities (RMBSs) of given securitization. If a large enough percentage of mortgages in a given pool are modified then there will not be enough revenue to cover the payments due RMBS holders.

121.    Such a restriction, given by way of example and made part of this complaint herein, is the Prospectus Supplement governing the securitization of the Lehman XS Trust Mortgage Pass-Through Certificates Series 2007-12N (Exhibit 8 *Id. at pp. S-140 "Waiver on Modification of Mortgage Loan Terms."*) This section (clause) restricts the ability of the servicer to modify a given mortgage in the pool if the modification is "*materially adverse to the Trust Fund.*"

122.    After a certain number of modifications are performed in said pool of mortgages (as governed by the terms of its PSA) there becomes less and less money to pay the bond holders. When this begins to happen it becomes materially adverse to said Trust to modify any other mortgages in the pool. As a modification of borrower's mortgages as allowed by the aforementioned federal modification program would result in a violation of the section of the aforementioned PSA regarding modifications, any mortgage governed by the aforementioned PSA is highly unlikely to be modified after the materially adverse mathematical tipping point is reached.

123.    Moreover, the securitization of the Lehman XS Trust Mortgage Pass-Through
Certificates Series 2007-12N is extremely complex. The mortgage pools and Servicers are of
the multi-party variety. This Trust was created and purchased several mortgage sub-pools
consisting of loans originated by IndyMac Bank, Residential Funding, Bank of America,
Countrywide, Paul Financial, GreenPoint Mortgage Funding, and Aurora Loan Services (at
the time a subsidiary of Lehman Brothers Bank).

124.    The loans were placed into three different pools all governed by the same Prospectus.
The companies originating these loans were given the servicing rights to the loans they
originated with the exception of GreenPoint loans which transferred all of its servicing rights
to Aurora in August 2007.

125.    This Trust was made up of approximately $1,304,325,000.00 worth of mortgage loans
of the sub-prime variety, all of which had an expected high non-performance rate as noted in
said Prospectus Supplement. The Mortgaged Backed Securities issued by this Trust to pay for
said pools of mortgages were purchased by Lehman Brothers which, upon information and
belief, repackaged said Mortgage Backed Securities in a second securities offering through
another Trust backed, not by the original pools of mortgages, but by the Mortgaged Backed
Securities of the original Trust themselves. This would mean that modifications of mortgages
in any of the three pools of mortgages combined in this Trust would not only be materially
adverse to the original Trust and its Bond-holders but also to the second Trust backed by the
Bonds of the First Trust as well.

126.    This "synthetic" type of Mortgage Backed Securities offering not only makes it more
complex but creates a situation whereby most, if not all mortgages in a Trust of this type are
impossible to modify due to the small and/or non-existent margin of loss allowed to cash
flows of each Trust in order to ensure payments can be made to bond-holders. As such,
modifying a given mortgage would create the *"materially adverse"* condition to the Trust, as
stated in the foregoing Prospectus Supplement, making modification of mortgages in the pools
a practical impossibility.

127.    Moreover, given as examples and made part of this complaint herein, are the Prospectus Supplements of Trusts serviced by the OneWest Defendants identified as the IndyMac INDX Mortgage Loan Trust 2006-AR15, Mortgage Pass-Through Certificates series 2006-AR15 (Exhibit 9 *Id. at pp. S-49 "Certain Modifications and Refinancings"* )*,* and the Home Equity Mortgage Loan Asset-Backed Trust Series INABS 2007-B, Home Equity Mortgage Loan Asset-Backed Certificates Series INABS 2007-B (Exhibit 10 *Id. at section titled "Servicing of Mortgage Loans" paragraphs headed "Certain Modifications"* ).

128.    These aforementioned sections (clauses) restrict the ability of the servicer to modify a given mortgage in those pools unless the servicer repurchases the loan from the Trust which owns it. This event is highly unlikely to take place, given the Servicer Defendants' proclivity for selling mortgages to recover capital to begin with.  Furthermore, the Servicer Defendants would almost certainly not willingly repurchase a loan that would be in default (or one whereby a reasonably foreseeable default is predicted) and as a result the OneWest Defendants, as servicer of the loans in those aforementioned Trusts, would not modify any of the loans held in those Trusts, as the repurchase of those loans would not be profitable.

129.    As additional example and made part of this complaint herein, is the Prospectus Supplement of governing the servicing of Plaintiff Dieu Truong's mortgage (Exhibit 5 *Id. at section 3.21(b)(i)* under the heading *Modifications, Waivers, Amendments and Consents at 45*).

130.    This aforementioned section (clause) restricts the ability of the servicer to modify a given mortgage in the pool if the interest rate of the mortgage is permanently lowered. As example, the mortgage of Plaintiff Truong as referenced herein has an interest rate of 6.25%, fixed rate for 30 years. A modification of said Plaintiff's mortgage as allowed by the aforementioned federal modification program would initially reduce the rate of his mortgage over a five year time span after which time the rate will then gradually increase one percent per year and be capped at the current Freddie Mac Weekly Primary Mortgage Market Survey (PMMS) for 30 year fixed rate conforming loans, rounded to the nearest 0.125%, as of the

date such modification agreement is prepared. For the week of August 4, 2011, this rate was 4.39%. As such, there is reasonable belief that modifying the Plaintiff's mortgage would result in a violation of the section of the aforementioned PSA regarding restrictions on modifications due to the fact that the Servicer Defendant may predict that the interest rate may be permanently lowered as result of said proposed modification and thus could not be modified.

131.   Some Prospectus' and PSAs are less restrictive but still limit a servicer's ability to modify a certain number of loans in a Trust. The reasons for this are that after a certain number of modifications are performed in a given pool of mortgages there becomes less and less money to pay the bond holders. When this begins to happen it becomes materially adverse to modify any other mortgages in the pool. As a modification of mortgages as allowed by the HAMP program would result in a violation of the PSAs already in existence any mortgage governed by a standard private label PSA is highly unlikely to be modified if prohibited by the existing PSA and/or after the aforementioned tipping point of adverse effect on cash flow is reached in a PSA restricting modification.

132.   To compound the problems presented by this situation, PSAs require 100% of the bond holders consent in order to change the terms of a Prospectus or PSA. As mortgage securitizations result in thousands of bonds being sold globally, it is practically impossible to obtain 100% consent regarding any issue once the securitization is complete. As consent of 100% of the Bondholders is needed to alter the PSA in a manner that would affect the Trust's cash-flow, as would certainly be the case as a result of widespread modifications to the underlying mortgages, the required consent to change the terms of a Trust is an event with a near zero probability of occurring.

133.   Lastly, the previous problem becomes even more complex when synthetic collateralized mortgage obligations are taken into consideration. Bonds issued by a CMO are often divided into what are called Tranches. Each of these Tranches represents a different payment/risk priority tier, each of which has a different rate of revenue, dividend and/or credit

rating. The riskiest Tranches are not investment grade and as such cannot be sold to entities like pension and mutual funds, which make up the profile of a large percentage of purchasers of RMBS Bonds. Therefore, these non-investment grade Bonds are often re-securitized into what are called synthetic collateralized mortgage obligations (SCMO). These SCMOs are a securitization in which the assets of the SCMO are the RMBS Bonds issued by a CMO, rather than the underlying mortgages of said CMO. Despite the fact that a SCMO is nothing more than the repackaging of the riskiest Tranches of other CMOs, bonds issued by a SCMO are also divided into Tranches with similar payment/risk priority tiers. (While Moody's, as well as Standard & Poor's, rated most of these SCMOs as investment grade they were in fact made up almost entirely of BBB- or lower grade bonds from other CMOs.) The process is again repeated and the worst of the worst is repackaged as SCMO2. This process can be repeated (and often is) an endless number of times thereby making it practically impossible to obtain consent of 100% of Bondholders necessary to change the terms of a Trust, Prospectus or PSA.

134.     As such, for those Plaintiffs and other homeowner HAMP applicants whose mortgages were owned by Trusts governed by PSAs with merely restrictive clauses regarding modification, the first initial applicants for the HAMP Program received modifications and those applying at a point in time when further modifications of loans in that pool would affect cash flows to bond holders, were simply purposefully left in limbo by the Servicer Defendants, so as to maximize servicing fees and recoverable servicing expenses as part of the aforementioned scheme.

135.     For those Plaintiffs and other homeowner HAMP applicants whose mortgages were owned by Trusts governed by PSAs with clauses prohibiting modification, the Servicer Defendants of their mortgages never had any intention of modifying their mortgages due to the contractual prohibitions against modification contained in the PSAs governing the servicing of their loans. Instead the Servicer Defendants, exploited and ignored HAMP Guidelines and Directives and purposefully hindered, delayed and deceptively misled homeowners, regarding the likelihood of success of their legitimate modification attempts, in

32

a scheme to instead enrich themselves in violation of Massachusetts Consumer Protection Laws. Instead, the Servicer Defendants chose to "season" those mortgages so as to maximize servicing fees and recoverable servicing expenses as previously described herein.

136.    The Servicer Defendants knew that mortgages of the Plaintiffs' and others could not be modified and instead of notifying them of the impossibility of fulfilling their request in a timely manner as required under HAMP Guidelines, the Servicer Defendants did willfully, knowingly, deceptively mislead Plaintiffs and other Massachusetts HAMP applicants, week after week, month in, month out, for, in some cases, years, by repeatedly requesting duplicate documentation, falsely claiming that documents were lost and/or were never received, and falsely claiming that requests were stalled in underwriting, negotiation and/or quality control, all while ignoring HAMP Guidelines regarding the timely processing  of  HAMP requests, which allow only 30 calendar days in which to render a decision. Some of the Plaintiff HAMP applicants and others suffered the additional indignity of being granted modifications and/or Trail Period Plans, only to later discover that those binding contracts would not be honored by the Servicer Defendants.

137.    The overwhelming majority of the mortgages made by the Originator Defendants were securitized and this information was deceptively and purposefully withheld (and continues to be withheld) from the Plaintiffs and other homeowners in Massachusetts and nationwide.

138.    The Servicer Defendants were aware of these restrictions/prohibitions regarding modifications when each of them executed its agreement with the federal government to participate in the Treasury Department's Home Affordable Modification Program (HAMP) and abide by its guidelines and directives yet decided they would use their position as servicer to manipulate the situation in a scheme to enrich themselves.  The Servicer Defendants actions were, and continue to be, deceptive and misleading business practices solely designed to exploit a United States Federal Government program designed to assist homeowners in saving their homes and property, and the pooling and servicing agreements governing their actions regarding the mortgages they serviced for Trusts. The Servicer Defendants instead, did

willfully misrepresent to Plaintiffs and other homeowners their ability to pursue modification of their mortgages under the HAMP program, in an effort to instead enrich themselves, from the illicit servicing activities of residential mortgage loans while knowingly causing significant harm to the named Plaintiffs herein and tens, if not hundreds, of thousands of other Massachusetts homeowners, the bond-holders of the Trusts for which they service mortgages for, and the public's economic well being at large.

### H. FNMA, The Trustee Defendants and Illegal Foreclosures

139.    FNMA and the Trustee Defendants also foreclosed (or attempted foreclosure) on Plaintiffs and others statewide knowing that under Massachusetts Law no default to the Holder of Plaintiffs' and others Notes actually existed.

140.    As aforementioned, in typical mortgage securitizations, mortgages are added together with other mortgages and a pool of mortgages is created. The resultant pool of mortgages is then sold to a Trust and/or REMIC which becomes the actual owner/holder of the Note and/or Mortgage.

141.    As such, the Note-holder cannot enforce the default provisions of said Note unless a default to said Note-holder exists. Under the governing Prospectus' and the PSAs entered into by The Servicer Defendants with the Trusts that purchased mortgage pools, the Servicer Defendants and any other subsequent servicing entity of the loans in said Trusts are contractually required to forward, from their own funds, monthly payments of principal and interest not received by the Servicer Defendants, to said Trusts.

142.    This is a standard contractual obligation and practice in residential mortgage securitizations. This is evidenced in the Prospectus Supplements governing mortgages serviced by the OneWest Servicer Defendants identified as the Lehman XS Trust Mortgage Pass-Through Certificates Series 2007-12N (Exhibit 8 *Id. at pp. S-134 & S-141 "Servicers Responsibilities" & "Advances"*), the IndyMac INDX Mortgage Loan Trust 2006 (Exhibit 9 *Id. at pp. S-48 "Advances"* ) and the Home Equity Mortgage Loan Asset-Backed Trust Series INABS 2007-B, Home Equity Mortgage Loan Asset-Backed Certificates Series INABS 2007-

B (Exhibit 10 *Id. at section titled "Servicing of Mortgage Loans" paragraphs headed "Advances"* ). This fact is further evidenced in the PSA governing Plaintiff Truong's mortgage (Exhibit 5 at *Article 1, section 1.01 defined terms, periodic advance and again at sections 3.08, 3.20 and 3.14*).

143.    As evidenced and stipulated in the aforementioned Prospectus Supplements, the various Servicer Defendants are contractually obligated to forward payments of principal and interest, from their own funds, on all defaulted loans to the respective Trusts that own the mortgages they service. This is a standard contractual obligation of all mortgage securitizations. By fulfilling this contractual obligation, the Servicer Defendants act as a third party making payment on behalf of defaulted borrowers to the claimed Holders of those Mortgages and/or Notes (Trusts). As only the true Holders of those Mortgages and Notes is able to enforce the default provisions of those documents, defaults to the true Holders of said Notes must exist.

144.    As the Servicer Defendants are contractually required (as aforementioned and evidenced in Exhibits 5,8,9 & 10), as a party with no security interest in the Plaintiffs' and others properties, Mortgages and/or Notes,  to pay the principal and interest payments on behalf of those Plaintiffs' and others who have yet to remit payment, no default to the claimed Holders of said Notes existed (or exists) in any situation whereby foreclosure action commenced and/or was completed regarding any foreclosure whereby Plaintiffs' and others Mortgages and Notes are governed by Prospectus', Prospectus Supplements, and Pooling and Servicing Agreements of any Securitized Mortgage Backed Trust.

145.    As such the Plaintiff's and others mortgage payments were in fact received by the claimed Note-holders and no enforceable defaults existed at time of foreclosures. As the records regarding the advances made to Trusts regarding Plaintiff's and others Mortgages are held by the Servicer Defendants and the Trustee Defendants, the information regarding the these Defendants' custodial accounts as they relate to said Trusts can only be obtained through discovery. However, it is clear that if the terms of said governing Prospectus',

Prospectus Supplements and/or PSAs, made part of this complaint and referenced herein, were adhered to, no actual default to the claimed Note-holder has or had occurred of Plaintiffs and others Notes in related foreclosure actions on a massive scale.

146.    In cases whereby Defendant FNMA claims to be the purported owner of a Plaintiff's mortgage (as is the case with the named Plaintiff Ouch's subject property located at 43 Inland Street, Lowell, MA 01851) it is important to be familiar with said Defendant's business mechanism.

147.    FNMA buys loans from approved mortgage sellers, FNMA securitizes mortgages (creates and establishes Trusts that become the true owner of the Mortgages and Notes in the same fashion as the aforementioned private label mortgage backed Trusts), appoints itself as Trustee of the Trusts it creates which then sells the resultant mortgage-backed securities to investors, with FNMA's unconditional  guarantee that all of the stated principal and interest payments of the mortgage loans held by said Trust will be timely passed through to the Trust and ultimately the investors. Stated on page one of the Amended and Restated 2007 FNMA Single Family Trust Agreement dated January 1, 2009 (Exhibit 11) is as follows;

C.    Fannie Mae has purchased and intends to purchase residential mortgage loans.

D.    Fannie Mae intends to set aside and transfer residential loans acquired by it to various Trusts established pursuant to this Trust Agreement and the related Issue Supplements and to issue guaranteed mortgage pass through certificates representing undivided beneficial ownership interest in the assets of the related Trusts.

E.    Fannie Mae intends to guarantee to each Trust sufficient funds to permit timely distribution s to Holders of principal and interest on Certificates, a required by this Trust Agreement.

F.    Fannie Mae intends to be the Master Servicer of the Mortgage Loans held in each Trust and to arrange for and supervise the contractual servicing of the Mortgage Loans by Direct Servicers.

G.    Fannie Mae intends to be the Trustee for each Trust.

36

148.    FNMA creates Trusts, exactly like a private label securitization of mortgages, and remains as Trustee (and Master Servicer) of each Trust. The Trusts now becomes the claimed true Holders of Notes and Mortgages of each securitization, not FNMA. As stated in the FNMA Amended and Restated 2007 Single-Family Master Trust Agreement (Exhibit 11) the Direct Servicer (i.e. the Servicer Defendants) may be responsible for *"Delinquency Advances"*(Exhibit 11 *Id. at pp. 4,5)* as specified in their individual Direct Servicer Contracts with FNMA. This clause requires the Direct Servicer (or Sub-Servicer, if applicable) to advance payment on any non-performing loans, just as in Prospectus', Prospectus Supplements, and PSAs governing private label securitizations. However, FNMA created Trusts are given the additional assurance that if for any reason the Direct Servicer does not or is not required to forward said Delinquency Advances, FNMA unconditionally guarantees that it will forward said Delinquency Advances to the Trusts it created as stated in said Master Trust Agreement (Exhibit 11 *Id. at pp. 54 Article VII through pp. 59).*

149.    As Defendant FNMA is a major purchaser of mortgages and seller of mortgage backed securities but is not required to register it's Trusts and/or governing Direct Servicer Agreement's with the U.S. Securities and Exchange Commission, the records regarding the identities of said FNMA Trusts and the monthly payment advances regarding the Plaintiffs' and others mortgages purportedly owned, guaranteed or held by FNMA Trusts (or "Pools" as they are often referred to) are in the sole possession of Defendant FNMA and can only be obtained through discovery.

150.    However, it is upon information and belief that FNMA, acting in its capacity as Trustee of the Trusts it created, was not the owner of Plaintiffs and others mortgages prior to foreclosure auctions and/or recording of foreclosure deeds. FNMA merely claims ownership after purchasing said properties at auction, acting in its capacity as Trustee, on behalf of said Trusts. FNMA does offer a limited purchase of mortgage loans or REO property from Trusts as stated in their Master Trust Agreement (Exhibit 10 *Id. at Sec 2.5, 2.5(1) sub paragraphs (d) (iii) being most relevant to Plaintiff's and others claims*). However, as FNMA is in sole

37

possession of the records as to whether or not said "limited purchase of mortgage loans or REO property" clause was exercised in the case of Plaintiffs' and others loans, and these facts can only be obtained through discovery, it is upon information and belief, the Plaintiffs' so named herein, and tens, if not hundreds of thousands of other Massachusetts homeowners have been foreclosed on by FNMA (or by Servicer Defendants acting on FNMA's behalf and/or on its instruction) in violation of Massachusetts Law, on a scale so enormous it is almost unfathomable.

151.    Furthermore, it is upon information and belief that FNMA established Trusts were the actual Holders of Plaintiffs' and tens, if not hundreds of thousands of others Mortgages and Notes at the time foreclosure action was initiated and concluded against them in the name of FNMA (or by Servicer Defendants acting on FNMA's behalf and/or on its instruction) as the claimed holder, in the State of Massachusetts.

152.    Moreover, Defendant FNMA, acting in its capacity as Master Servicer, forwarded to the Trusts that claimed to hold Plaintiffs' and others Mortgages and Notes, the monthly scheduled payments of principal and interest due, as is required by FNMA's unconditional guarantee, as a third party, on behalf of Plaintiffs' and others, regardless of whether they were received by the Direct Servicer (the Servicer Defendants) or FNMA as Master Servicer. As such, the Notes of Plaintiffs' and others were not in default to the claimed Holders of same (FNMA Trusts) at the time of foreclosure action.

153.    Trustee Defendant FNMA knew that they, as a third party, had in fact paid the obligations of the Plaintiffs' and others so situated, to the claimed Holders of Plaintiffs' and others Mortgages and/or Notes and, as such, was aware that no default of said Notes existed to the claimed Holders of Plaintiffs and others Mortgages and/or Notes at the time foreclosure action was commenced and/or completed.

154.    Trustee Defendants Harmon Law, P.C., Orlans Moran and Ablitt Law acted (and continues to act) as legal counsel for Servicer Defendants OneWest, Bank of America, JPMorgan Chase, and Wells Fargo Bank, as well as Trustee Defendants FNMA, Deutsche

Bank, Wells Fargo, US Bank and JPMorgan Chase and has represented them in hundreds if not thousands of foreclosures in the State of Massachusetts.

155.    As such they are culpable for their actions and involvement regarding said aforementioned illegal foreclosures and/or evictions of Plaintiffs' and others, whose Notes were not in default, by virtue of payment of monthly Mortgage payments of principal and interest, on behalf Plaintiffs' and others, by the Servicer Defendants and/or FNMA, acting as third parties remitting payment on behalf of Plaintiffs and others to the claimed Holders of their Notes and Mortgages.

156.    Trustee Defendants Harmon Law, Orlans Moran and Ablitt Scofield have a duty as legal counsel to enforce only those foreclosure actions that complied with Massachusetts Law and either informed their clients of said violations of the Law and participated in systematic illegal foreclosure/eviction actions anyway and/or or failed to inform their clients at all.

157.    The Servicer Defendants' improper acts still continue, including, *inter alia*;

> a.   misrepresenting their intentions to arrange loan modifications for Plaintiffs and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiffs and others of the opportunity to seek assistance under a federal government program Defendants publicly represented they would abide by but knew they could not;

> b.   deceptively misleading plaintiffs and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet instead are purposefully ignoring guidelines and directives of said federal program, seeking to enrich themselves by keeping plaintiffs' and others modification requests in limbo while ever increasing the billing of servicing advances and eventually foreclosing (and/or facilitating short sales) on borrowers properties, while borrowers seek, in good faith, to modify their mortgages under said federal program;

    c.   willfully, purposefully and systematically stalling Plaintiffs' and others legitimate requests to cancel foreclosures while actively seeking to be considered for a said modification program, in direct violation of guidelines and directives of aforementioned program;

158.    Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, the Servicer Defendants have;

    a.   serially strung out, delayed, and otherwise purposefully hindered the modification process in an effort to deceive homeowners from the fact that they cannot modify a given mortgage due to the restrictions placed upon it as servicer by the governing pooling and servicing agreements it entered into previously;

    b.   in the case of the OneWest Servicer Defendants,  said Defendants expedited foreclosure action, and concealed the alleged fact that a given loan may be covered against loss by an existing loss sharing agreement with the FDIC, further incentivizing the Defendants to profit via foreclosure or short sale action by exploiting said loss sharing agreement;

159.    Because the Servicer Defendants have or are ignoring guidelines and directives of a government program they agreed to abide by, while fraudulently, deceptively, misleadingly, and publicly proclaiming to follow said guidelines,  hundreds or thousands of homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes.

160.    By employing the aforementioned deceptive and misleading business practices, the Defendants have left, i.e. hundreds or thousands of borrowers seeking modifications, in a state of limbo – often worse off than they were before they sought a modification from the Servicer

Defendants. The Servicer Defendants' actions are fraudulent, misleading and purposefully deceptive, and are unfair under state laws.

161.    The Trustee Defendants' improper acts still continue, including, *inter alia*;

      a.   Deceptively, misleadingly, fraudulently, and otherwise illegally seeking to foreclose and/or completing foreclosures and/or evictions on Plaintiffs' and other's homes while having full knowledge that no actual default to the Holder of Plaintiffs' and others Notes exists and/or existed.

      b.   deceptively concealing from Plaintiffs and others the fact that Notes purported to be in default were actually in good standing as the Note-holder was in fact receiving Plaintiffs' and others monthly payments of principal and interest from the Servicer Defendants and/or FNMA.

162.    These acts continue to this day with hardball tactics and deception that continues to threaten Plaintiffs' and others Constitutional rights and financial security, as well as the economic future of the State of Massachusetts, the nation, and the worldwide economic system.


## CLAIMS OF THE NAMED PLAINTIFFS
### As To The Originator Defendants

### IndyMac Fraudulently Represented the Financial Soundness of its Mortgage Products to Borrowers

**Plaintiff Heang Ouch v IndyMac Bank**

163.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

164.    Plaintiff, Heang Ouch is a citizen of the State of Massachusetts residing at 43 Inland Street, Lowell, MA 01851, which is the one of the subject properties incorporated and referred to herein.

165.    Plaintiff had no assets for a down payment for the purchase transaction of the subject property and no assets for reserve.

166.    Defendant IndyMac knew borrower had insufficient assets to pay for a down payment so as to be financially vested in the purchase transaction, yet had developed a high risk lending instrument specifically tailored to the Plaintiff's situation (and for others so similarly situated) so as to make said loan to enrich themselves by fraudulently misrepresenting the financial soundness of this lending instrument to Plaintiff, knowing said loan would cause injury to the Plaintiff.

167.    At best the Plaintiff is an unsophisticated consumer who could be easily taken advantage of by the issuance of a highly complex, hi-risk mortgage lending instrument to him. Knowing these facts, IndyMac reduced its underwriting standards and developed a high-risk lending instrument specifically tailored to the Plaintiff's situation (and others so similarly situated) so as to make said loan to enrich themselves by fraudulently misrepresenting the financial soundness of this lending instrument to Plaintiff, thereby placing Plaintiff in a financial position with extreme likelihood of failure, knowing repayment was unlikely, and that said loan would cause injury to the Plaintiff.

## Countrywide/Bank of America Fraudulently Represented the Financial Soundness of its Mortgage Products to Borrowers

**Plaintiffs Savi San and Savonn San v Countywide/Bank of America, N.A.**

168.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

169.    Plaintiffs, Savai San and Savonn San are citizens of the State of Massachusetts residing at 476 Jefferson Street, Fall River, MA 02721, which is one of the subject properties incorporated and referred to herein.

170.    On or about March 30, 2007, Plaintiffs San purchased the property located at 476 Jefferson Street, Fall River, MA 02721.

171.    Plaintiffs San gave a mortgage and note to Bank of America, N.A. in regards to the aforementioned purchase which was recorded in the Fall River, Bristol County Registry of Deeds, on March 30, 2007 in book 06610 at page 41.

172.    Plaintiffs San had no assets for a down payment for the purchase transaction of the subject property and no assets for reserve in addition, no assets were verified by Bank of America relating to the mortgage application for said purchase of subject property.

173.    Plaintiffs San also did not make enough income to qualify for a conventionally underwritten mortgage at the time of their application for mortgage for said purchase of subject property, so Bank of America offered them a mortgage which would allow them to qualify by only requiring that they pay interest only as a monthly payment.

174.    Defendant Bank of America knew borrowers did not earn enough income to qualify for a conventionally underwritten mortgage, and had insufficient assets to pay for a down payment and/or held in reserve for future payments so as to be financially vested in the purchase transaction, yet developed a high risk lending instrument specifically tailored to the Plaintiff's situation (and for others so similarly situated) so as to make said loan to enrich themselves by fraudulently misrepresenting the financial soundness of this lending instrument to Plaintiffs, knowing said loan would cause injury to the Plaintiffs due to the high likelyhood of future default by Plaintiffs.

**Defendant's Actions Caused Injury to Plaintiffs**

175.    Plaintiffs have suffered injury caused by the Originator Defendant's actions, including but not limited to the creation of a situation whereby Plaintiffs would be unable to repay their mortgage loan obligations, improper negative reporting to credit bureaus, monetary damages from higher principle balances, inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, increased accrued interest, legal fees for defense of foreclosure and/or eviction, rental payments, and the eventual loss of their home and property.

**The Servicer Defendants Violate Massachusetts Consumer Protection Act and**

**Applicable Regulations**

**Deceptive And Misleading Representations and Business Practices**

**Regarding their Modification Activities**

**Heang Ouch v The One West Servicer Defendants**

176.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

177.   Plaintiff, Heang Ouch is a citizen of the State of Massachusetts residing at 43 Inland Street, Lowell, MA 01851, which is one of the subject properties referred to herein.

178.   Plaintiff made an application to the OneWest Servicer Defendants for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to his hardship on or about November 2009 with the assistance of Dragon Law Firm, PLLC of 101 North State Street, Suite 301, Concord, NH 03301.

179.   Plaintiff was determined by the OneWest Servicer Defendants to have met the threshold requirements for HAMP, as described above.

180.   On or about May of 2010 the OneWest Servicer Defendants denied Plaintiff for HAMP without providing Plaintiff with any reasonable explanation.

181.   On July 14, 2010, Harmon Law, P.C. sent Plaintiff a Notice of Intention to Foreclose on behalf of Defendant OneWest.

182.   A foreclosure auction was held on Plaintiff's subject property on August 10, 2010 and said property was sold to Trustee Defendant FNMA.

183.   During the entire eight months since he first applied for the HAMP program, Plaintiff was stalled by the OneWest Servicer Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in his modification attempts.

44

It is upon information and belief that the OneWest Servicer Defendants purposefully misled Plaintiff and hindered his modification requests in an effort to enrich themselves by ignoring his legitimate request for modification under HAMP so as to maximize servicing income, servicing expenses, and/or to take advantage of the loss sharing agreement with the FDIC.

184.     The OneWest Servicer Defendants' conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

    a.   misrepresenting their intentions to arrange loan modifications for Plaintiff, while in fact purposefully creating abusive roadblocks to deprive Plaintiff of the opportunity to seek assistance under a federal government program Defendants publicly represented they would abide by;

    b.   deceptively misleading plaintiffs by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully ignoring guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances and/or take advantage of the loss sharing agreement with the FDIC in order to maximize profits, while Plaintiff sought, in good faith, to modify his mortgage under said federal program;

    c.   engaging in intrinsic fraud by willfully, purposefully and systematically stalling Plaintiff's legitimate requests to cancel foreclosures while actively seeking to be considered for a modification, in direct violation of guidelines and directives of aforementioned federal program;

    d.   deceptively and fraudulently seeking to and/or completing foreclosures on plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

185.    Defendants' conduct as described in this complaint was willful or knowing within the meaning of Massachusetts Consumer Protection Act, G.L. c. 93A, §9.

**Dieu Troung v Bank of America, N.A. and BAC Home Loans Servicing, LP**

186.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

187.    Plaintiff, Dieu Truong is a citizen of the State of Massachusetts residing at 162-164 Glendale Road, Quincy, MA 02169, which is one of the subject property referred to herein.

188.    On or about June of 2010, Plaintiff Truong made an application to Servicer Defendant BAC Home Loans Servicing, LP for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to his hardship.

189.    On July 2, 2010, Claudia, a representative of BAC Home Loans Servicing, LP, informed Plaintiff Truong that his documents had not been received and he was instructed to forward them again.

190.    On July 2, 2010 Plaintiff Truong faxed another complete submission for HAMP consideration to Defendant BAC Home Loans Servicing, LP.

191.    On August 4, 2010 Plaintiff Truong spoke to Pat, a representative of BAC Home Loans Servicing, LP (BAC), and gave financial information over the telephone. Pat informed Plaintiff Truong that she would send out another HAMP package to fill out and return.

192.    After waiting several weeks for said package to arrive and receiving nothing from BAC, Plaintiff Truong called BAC again and spoke to a representative named David who assured Plaintiff Truong that a package would be sent.

193.    Plaintiff Truong received package from BAC and filled it out and sent back the package, with the requested documentation on or about September 1, 2010.

194.    On September 14, 2010, Plaintiff Truong spoke to a BAC representative named Julie, who told Plaintiff Truong that his request was "in review" and he was instructed to call back next week.

195.    On October 6, 2010, Plaintiff Truong spoke to a BAC representative named Kevin who informed Plaintiff that his request was still being reviewed and was waiting for the file to be assigned to a negotiator.

196.    Between October 15, 2010 and continuing through January 15, 2011, Plaintiff Truong received seven identical HAMP modification packages to fill out and return to BAC. Plaintiff Truong complied with all requests for paperwork and documentation from BAC.

197.    On January 27, 2011, Plaintiff Truong was told by BAC representative Diana that his "investor" was not doing HAMP and that his modification request had been denied.

198.    To date, Plaintiff Truong has not received anything in writing from BAC, stating that he has been denied a HAMP modification, a required under HAMP Guidelines and Directives.

199.    On May 17, 2011, Harmon Law Offices, P.C. sent a notice to Plaintiff Truong stating that it had been retained by BAC to foreclose on Plaintiff's mortgage. This notice further states that Harmon Law P.C. has been instructed to bring foreclosure in the name of Wells Fargo Bank, N.A. as Trustee for the Certificate Holders of Banc of America Alternative Loan Trust 2005-2 Mortgage Pass-Through Certificates Series 2005-2 (the purported "investor" that Plaintiff Truong was told was "*not doing HAMP*" as mentioned above).

47

**Vith Chrorm v Bank of America, N.A. and BAC Home Loans Servicing, LP**

200.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

201.     Plaintiff, Vith Chrorm is a citizen of the State of Massachusetts residing at 12 Zarek Drive, Attleboro MA 02703, which is one of the subject properties referred to herein.

202.     On or about March of 2010, Plaintiff Truong made an application to Defendant BAC Home Loans Servicing, LP for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to his hardship and a statement attesting to his foreseeable imminent default.

203.     On April 14, 2010, Suneaka, a representative of BAC, spoke with Plaintiff Chrorm and confirmed receipt of his submission.

204.     On June 10, 2010, an unnamed representative of BAC asked Plaintiff Chrorm *"why do you need a modification when you are current on your payments at this time?",* even though he had already stated foreseeable imminent default in his original submission.

205.     On July 21, 2010 an unnamed representative of BAC informed Plaintiff Chrorm that his request for HAMP had been forwarded to the underwriting department.

206.     On July 27, 2010 an unnamed representative of BAC informed Plaintiff Chrorm that his request was waiting to be assigned to an underwriter and his request was being *"escalated"*.

207.     On August 18, 2010 and unnamed representative of BAC requested all new HAMP documents and supporting income and assets verification documents from Plaintiff Chrorm. Plaintiff complied with this request and faxed them to BAC that same day.

208.     On August 25, 2010 an unnamed representative of BAC informed Plaintiff Chrorm that his HAMP request had been denied on August 19, 2010 and that he should try to re-submit his file from scratch. The aforementioned BAC representative went on to state that a

letter had been sent to Plaintiff from BAC regarding said denial and Plaintiff was told to ignore it.

209.    As short time after the aforementioned conversation Plaintiff Chrorm faxed another complete HAMP request to BAC.

210.    On September 30, 2010 an unnamed representative of BAC informed Plaintiff Chrorm that his recent HAMP request was again under review for HAMP consideration.

211.    On October 26, 2010- an unnamed representative of BAC informed Plaintiff Chrorm that his file was going to underwriting but that it was *"going to be awhile"*.

212.    On October 12, 2010 an unnamed representative of BAC informed Plaintiff Chrorm that his file was still under review and to keep making status checks.

213.    On October 18, 2010 an unnamed representative of BAC informed Plaintiff Chrorm that a new HAMP request package had been sent to him and he was instructed to fill it out and return it to BAC as soon as possible.

214.    Sometime between October 19, 2010 and November 10, 2010, the aforementioned package was received by Plaintiff Chrorm and sent back to BAC with the requested documentation.

215.    On November 12, 2010 an unnamed representative of BAC confirmed receipt of the aforementioned package request and supporting documentation.

216.    On November 23, 2010 an unnamed representative of BAC told Plaintiff Chrorm that another package had been sent to him and he was instructed to fill it out and return it to BAC via Federal Express and was further told not to fax it to BAC.

217.    On November 29, 2010 Plaintiff Chrorm sent the aforementioned package to BAC via Federal Express.

218.    On December 13, 2010 an unnamed representative of BAC requested that Plaintiff Chrorm fax a copy of his signed 2009 tax returns to BAC. Those returns were faxed that day and confirmed as received by BAC on December 15, 2010.

219.    On December 22, 2010 an unnamed representative of BAC informed Plaintiff Chrorm that his request was being reviewed by an underwriter.

220.    On January 4, 2011 an unnamed representative of BAC informed Plaintiff Chrorm that he should watch his mail as his request had been approved on December 30, 2010.

221.    On January 13, 2011 Plaintiff Chrorm contacted BAC to inquire about his approval and the mail he was supposed to *"watch for"*, as he had yet to receive anything from BAC. An unnamed representative of BAC informed him that his HAMP modification request had been sent to his *"investor"* for additional approval and should be done by March 1, 2011.

222.    On January 24, 2011 an unnamed representative of BAC informed Plaintiff Chrorm that his request was now in the quality control department (final stage) and a decision would be forthcoming regarding his request for HAMP.

223.    On February 2, 2011 an unnamed representative of BAC informed Plaintiff Chrorm that his request for HAMP modification had been declined because Plaintiff property was unoccupied but that if he sent in a utility bill he would be given further consideration.

224.    On February 7, 2011 an unnamed representative of BAC informed Plaintiff Chrorm that his request was still in review.

225.    On February 25, 2011 an unnamed representative of BAC informed Plaintiff Chrorm that his file was in underwriting and that all documents had been received.

226.    On March 11, 2011 an unnamed representative of BAC informed Plaintiff Chrorm that his file was still in underwriting and that no documents were needed.

227.    On March 14, 2011 an unnamed representative of BAC informed Plaintiff Chrorm that his request for modification under HAMP guidelines had been declined. Also, that he did not qualify for any type of modification. Plaintiff was not given a reason why, nor has he received anything in writing from BAC regarding said denial.

**Davis  v Americas Servicing Company (ASC) and Wells Fargo Bank, N.A.**

228.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

50