## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS, BOSTON

| | | |
|---|---|---|
| HEANG OUCH, DIEU TRUONG,<br>VITH CHRORM & NIENG YERN,<br>SAVAI SAN, SAVONN SAN,<br>SUSAN SORSBY RANDY FOLLETT<br>& SUZANNE FOLLETT,<br>SONG KIM ROS & NHIEP<br>HOUT ROS, MARLENA DAVIS,<br>NEANG LIM, SAROEUN ROM, KOLAP<br>IM, VANDY & DAOVANNEY DUCH,<br>MOISE FILS, CHHEANG & IN THY,<br>CHANTHA OUM, NOVELETTE<br>NAPIER, NATASHA NAPIER,<br>SARUN KIM, KENG HOUTH,<br>KIMLON HOUTH, MICHAEL FRANCIS,<br>SOKUM HENG & SOTHY KUM,<br>NAROM NOP & KAB SEUN, CHHUOM<br>MOM, SAVAN CHHEM, SOK CHAN<br>CHHEM, CHANNY LOM,<br>JEANINE CHHOEUM, STEPHEN &<br>NANCY STRAUSS, SOPHAL KOL,<br>DARICK THIN & CHANTHOL LY,<br>PROS CHHOT, AND J. CHARLES<br>LAUTURE & MELINDA MATTHEWS,<br>on behalf of themselves and<br>all others similarly situated<br><br>                Plaintiffs,<br><br>vs.<br><br>FEDERAL NATIONAL<br>MORTGAGE ASSOCIATION<br>*also known as* FNMA *and/or* Fannie Mae,<br>INDEPENDENT NATIONAL<br>MORTGAGE CORPORATION<br>*also known as* INDYMAC BANK,<br>ONEWEST BANK, IMB HOLDCO,<br>LLC, IMB MANAGEMENT<br>HOLDINGS, LP, DUNE CAPITAL,<br> LLC, J.C. FLOWERS & CO., MSD<br>CAPITAL, LP, STONE POINT<br>CAPITAL, SOROS FUND | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **C.A. NO. 1:11-CV-12090**<br><br>**CLASS ACTION**<br><br>**2ND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1

**MANAGEMENT, LLC, SSP** )
**OFFSHORE, LLC, PAULSON & CO.,** )
**SILAR ADVISORS, LP, SILAR MCF-1,** )
**LLC, WELLS FARGO BANK, N.A.,** )
**AMERICAS SERVICING COMPANY** )
*also known as* **ASC, WACHOVIA** )
**MORTGAGE, BARCLAYS CAPITAL** )
**REAL ESTATE, INC. doing business as** )
**HOMEQ SERVICING, BEAR STERNS** )
**RESIDENTIAL MORTGAGE** )
**CORPORATION,** )
**JPMORGAN CHASE BANK, N.A.,** )
**CHASE HOME FINANCE, LLC,** )
**EMC MORTGAGE CORPORATION,** )
**WASHINGTON MUTUAL, INC.,** )
**VIRTUALBANK A Division of LYDIA** )
**PRIVATE BANK,** )
**OCWEN LOAN SERVICING, LLC,** )
**AMERICAN HOME MORTGAGE** )
**SERVICING, INC.** *also known as* )
**A.H.M.S.I., CAPITAL ONE** )
**TAYLOR BEAN & WHITAKER,** )
**COUNTRYWIDE FINANCIAL** )
**CORPORATION, COUNTRYWIDE** )
**HOME LOANS, INC.,** )
**BAC HOME LOANS SERVICING, LP,** )
**BANK OF AMERICA, N.A., MIDFIRST** )
**BANK, SOVEREIGN BANK,** )
**WELLS FARGO BANK, N.A.** )
**as trustee for THE VARIOUS TRUSTS** )
**NOTED HEREIN, DEUTSCHE BANK** )
**NATIONAL TRUST COMPANY** )
**as trustee for THE VARIOUS TRUSTS** )
**NOTED HEREIN, U.S. BANK NATIONAL** )
**ASSOCIATION as Trustee for** )
**THE VARIOUS TRUSTS** )
**NOTED HEREIN, DOONAN, GRAVES** )
**& LONGORIA, LLC, ORLAN MORAN,** )
**PLLC, ABLITT SCOFIELD, and** )
**HARMON LAW OFFICES, P.C.** )

**Defendants.**
_____

2

## INTRODUCTION

1.      Plaintiffs Heang Ouch, Dieu Truong, Vith Chrorm & Nieng Yern, Savai San, Savonn San, Susan Sorsby, Randy Follett & Suzanne Follett, and Song Kim Ros & Nhiep Hout Ros, Marlena Davis, Neang Lim, Saroeun Rom, Kolap Im, Daovanney & Vandy Duch, Moise Fils, Chheang  & In Thy, Chantha Oum, Novelette Napier, Natasha Napier, Sarun Kim, Keng Houth, Kimlon Houth, Michael Francis, Sakum Heng & Sothy Kum, Narom Nop & Kab Seun, Chhuom Mom, Savan Chhem, Sok Chan Chhem, Channy Lom, Jeanine Chhoeum, Stephen & Nancy Strauss, Sophal Kol, Darick Thin & Chanthol Ly, Pros Chhot, and J. Charles Lauture & Melinda Matthews, on behalf of themselves and all other similarly-situated individuals ("Plaintiffs") bring this class action as described in the paragraphs set forth herein.

2.      This complaint arises from the acts and/or intentional omissions of multiple Defendants, acting independently and through their subsidiaries, owners and/or predecessors in interest  as follows;

   a.   Defendants Independent National Mortgage Corporation also known as IndyMac Bank, Countrywide, Bank of America, N.A., EMC Mortgage Corporation, Washington Mutual, Inc., Bear Stearns Residential Mortgage Corporation, VirtualBank a Division of Lidia Private Bank (collectively referred to as "Originator Defendants");

   b.   Defendants OneWest Bank and its consortium of Investors; IMB HoldCo, LLC, IMB Management Holdings, LP, Dune Capital, LLC, J.C. Flowers & Co., MSD Capital, L.P., Stone Point Capital, Soros Fund Management, LLC, SSP Offshore, LLC, Paulson & Co., Silar Advisors, LP,  SILAR MCF-1, LLC (collectively referred as the "OneWest Servicer Defendants" where not otherwise described in their individual capacities), Bank of America, N.A. & BAC Home Loans Servicing, LP (collectively referred to as the "BOA Servicer Defendants"), JPMorgan Chase Bank, Chase Home Finance, LLC & EMC Mortgage Corporation, (collectively referred to as the "Chase Servicer Defendants"),Wells Fargo Bank, Wachovia & Americas Servicing Company (collectively referred to as the "Wells Fargo Servicer Defendants"), Ocwen

Loan Servicing, LLC, American Home Loan Servicing, Inc., Barclays Capital Real

Estate, Inc., d.b.a., HomEq Servicing, Taylor Bean & Whitaker, MidFirst Bank,

Sovereign Bank, and Capital One, (all collectively referred to as "Servicer

Defendants");

c.    Federal National Mortgage Association, a.k.a. FNMA and/or Fannie Mae, in its

capacity as Trustee for various, as yet identified FNMA Trusts, Deutsche Bank

National Trust Co., Wells Fargo Bank, N.A., U.S. Bank, N.A., MidFirst Bank,

Doonan, Graves & Longoria , LLC, Orlans Moran, PLLC., Ablitt Scofield, and

Harmon Law, P.C. (collectively referred to as "Trustee Defendants")

as a result of:

a.    the Originator Defendants; by deceptively lowering mortgage underwriting

standards and misrepresenting the financial soundness of their mortgages products

with full knowledge that Plaintiffs and others obtaining said mortgages as a result

would likely be unable to perform;

b.    the Servicer Defendants; by deceptively misleading Plaintiffs and others by

exploiting homeowners attempts to modify their mortgages as part of an overall

scheme to maximize mortgage servicing profitability;

c.    the Trustee Defendants; by attempting foreclosure and/or foreclosing on

Plaintiffs' on others property when no actual default existed to the Holder of Plaintiffs'

and others Notes.

3.    Plaintiff's claims are threefold:

a.    Defendants Independent National Mortgage Corporation also known as IndyMac

Bank, Countrywide, Bank of America, N.A., EMC Mortgage Corporation,

Washington Mutual, Inc., Bear Sterns Residential Mortgage Corporation, VirtualBank

a Division of Lidia Private Bank, (collectively referred to as "Originator Defendants")

were/are leading financial institutions and mortgage originators on which Plaintiffs'

and others thought they could and did rely. The Originator Defendants did willfully

4

perpetrate a fraudulent scheme to enrich themselves by significantly lowering their underwriting standards, creating high risk lending instruments, and the employment of predatory lending practices in order to make mortgage loans to borrowers they knew had an extremely high probability of non-performance.

b.    The OneWest Servicer Defendants, the BOA Servicer Defendants, the Chase Servicer Defendants, the Wells Fargo Servicer Defendants, Ocwen Loan Servicing, LLC, American Home Loan Servicing, Inc., Barclays Capital Real Estate, Inc., d.b.a., HomEq Servicing, Taylor Bean & Whitaker, MidFirst Bank, Sovereign Bank, and Capital One, (collectively referred to as "Servicer Defendants")  committed a fraud and employed deceptive and misleading business practices by encouraging homeowner borrowers to apply for modification of their mortgages under the Federal Government's Home Affordable Modification Program (HAMP), knowing that Plaintiffs and others would not be able to modify their mortgages due to contractual obligations the Servicer Defendants were bound to adhere to, as specified in the Prospectus' and/or Pooling and Servicing Agreements governing the Servicer Defendants and the Trusts for which they serviced Plaintiffs' and others mortgages for. These deceptive and misleading business practices allowed the Servicer Defendants to use Plaintiffs and other borrowers as unwitting pawns in a fraudulent scheme to exploit and manipulate the complexities of said Prospectus' and/or Pooling and Servicing Agreements and the HAMP program's Guidelines and Supplemental Directives to significantly enrich themselves. The Servicer Defendants did so willfully, deceptively and purposefully, resulting in Plaintiffs and tens of thousands of other Massachusetts homeowners having their modification attempts hindered, strung along and otherwise stalled for months and/or years only to later discover that the Servicer Defendants could not modify their mortgages. The fact that the Servicer Defendants were contractually restricted and/or prohibited from modifying Plaintiffs'

5

and other borrowers mortgages to begin with was deceptively withheld from Plaintiffs and other Massachusetts homeowners and borrowers on an unprecedented scale;

c. The Trustee Defendants violated Massachusetts Uniform Commercial Code by attempting to foreclose on and/or foreclosing on Plaintiffs property when no actual default existed to the Holder of Plaintiffs' and others Notes. The Trustee Defendants knew that no default existed and purposefully, willfully and fraudulently foreclosed on Plaintiffs anyway.

## JURISDICTION AND VENUE

4.    This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) in that this complaint is a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are 100 or more members in the proposed class and the Named Plaintiffs are citizens of a State different from the majority of Defendants.

5.    The parties are joined in a single lawsuit due to the significant number of common issues of fact and law raised by the claims of the Plaintiffs as detailed below.

6.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because Plaintiffs are residents of Massachusetts and Defendants transact substantial business in this district.

## PARTIES

7.    Individual and Representative Plaintiff Susan Sorsby is a citizen of Massachusetts residing at 2 Fremont Road, Marshfield, MA 02050 which is one of the subject properties referenced herein.

8.    Individual and Representative Plaintiff Heang Ouch is a citizen of Massachusetts residing at 43 Inland Street, Lowell, MA 01851 which is one of the subject properties referenced herein.

9.    Individual and Representative Plaintiff Dieu Truong is a citizen of Massachusetts residing at and owner of that property located at 162-164 Glendale Road, Quincy, MA 02169 which is one of the subject properties referred to herein.

10.     Married Couple and Representative Plaintiffs Vith Chrorm and Nieng Yern are citizens of Massachusetts residing at and owner of that property located at 12 Zarek Drive, Attleboro, MA 02703 which is one of the subject properties referred to herein.

11.     Individual and Representative Plaintiff Savai San is a citizen of Massachusetts residing at and owner of that property located at 476 Jefferson Street, Fall River, MA 02721 which is one of the subject properties referred to herein.

12.     Individual and Representative Plaintiff Savonn San is a citizen of Massachusetts residing at and owner of that property located at 476 Jefferson Street, Fall River, MA 02721 which is one of the subject properties referred to herein.

13.     Married Couple and Representative Plaintiffs Randy Follett & Suzanne Follett are citizens of Massachusetts residing at and owners of that property located at 57 Mayflower Lane, Wareham, MA 02538 which is one of the subject properties referred to herein.

14.     Married Couple and Representative Plaintiffs Song Kim Ros and Nhiep Hout Ros are citizens of Massachusetts residing at and owner of that property located at 65 Parker Street, Brockton, MA 02302 which is one of the subject properties referred to herein.

15.     Individual and Representative Plaintiff Chhuom Mom is a citizen of Massachusetts residing at and owner of that property located at 39 Pickering Street, Fall River, MA 02720 which is one of the subject properties referred to herein.

16.     Individual and Representative Plaintiff Savan Chhem is a citizen of Massachusetts residing at and owner of that property located at 34 Daisy Lane, Fall River, MA 02721 which is one of the subject properties referred to herein.

17.     Individual and Representative Plaintiff Sok Chan Chhem is a citizen of Massachusetts residing at and owner of that property located at 34 Daisy Lane, Fall River, MA 02721 which is one of the subject properties referred to herein.

18.     Plaintiff, Channy Lom is a citizen of the State of Massachusetts residing at and owner of 74 Daisy Lane, Fall River, MA 02721, which is the one of the subject properties incorporated and referred to herein.

19.     Plaintiff, Jeanine Chhoeum is a citizen of the State of Massachusetts residing at and owner of 78 Fort Hill Avenue, Lowell, MA 01852, which is the one of the subject properties incorporated and referred to herein.

20.     Married Couple and Representative Plaintiffs Stephen & Nancy Strauss are citizens of Massachusetts residing at and owner of that property located at 90 Pinedale Avenue, Billerica, MA 01821 which is one of the subject properties referred to herein

21.     Individual and Representative Plaintiff Marlena Davis is a citizen of Massachusetts residing at and owner of that property located at 66 Osceola Street, Mattapan, MA 02126 which is one of the subject properties referred to herein.

22.     Individual and Representative Plaintiff Sophal Kol is a citizen of Massachusetts residing at and part owner of that property located at 57 Harris Street, Revere, MA 02151 which is one of the subject properties referred to herein

23.     Individual and Representative Plaintiff Neang Lim is a citizen of Massachusetts residing at and owner of that property located at 200 Trotting Park Road, Lowell, MA 02154 which is one of the subject properties referred to herein.

24.     Individual and Representative Plaintiff Saroeun Rom is a citizen of Massachusetts residing at and owner of that property located at 819 Chelmsford Street, Lowell, MA 02151 which is one of the subject properties referred to herein.

25.     Individual and Representative Plaintiff Kolap Im is a citizen of Massachusetts residing at and owner of that property located at 21 Hillside Street, Lowell, MA 02151 which is one of the subject properties referred to herein.

26.     Married Couple and Representative Plaintiffs Daovanney & Vandy Duch are citizens of Massachusetts residing at and owner of that property located at 335 Walker Street, Lowell, MA 01851 which is one of the subject properties referred to herein.

27.     Individual and Representative Plaintiff Moise Fils is a citizen of the state of Georgia and owner of that property located at 18A Business Terrace, Unit 18A, Hyde Park, MA 02368 which is one of the subject properties referred to herein.

28.     Married Couple and Representative Plaintiffs Randy & Suzanne Follett are citizens of Massachusetts residing at and owner of that property located at 57 Mayflower Lane, Wareham, MA which is one of the subject properties referred to herein.

29.     Married Couple and Representative Plaintiffs Chheang & In Thy are citizens of Massachusetts residing at and owner of that property located at 55 Geneva Street, Revere, MA 02151 which is one of the subject properties referred to herein

30.     Individual and Representative Plaintiff Chantha Oum is a citizen of Massachusetts residing at and owner of that property located 18 Bourne Street, Lowell, MA 02152 which is one of the subject properties referred to herein.

31.     Individual and Representative Plaintiff Novelette Napier is a citizen of Massachusetts residing at and owner of that property located 30 Sanford Street, Boston, MA 02126 which is one of the subject properties referred to herein.

32.     Individual and Representative Plaintiff Natasha Napier is a citizen of Massachusetts residing at and owner of that property located 30 Sanford Street, Boston, MA 02126 which is one of the subject properties referred to herein.

33.     Individual and Representative Plaintiff Sarun Kim is a citizen of Massachusetts residing at and owner of that property located 1-3 Glidden Avenue, Lowell, MA 01851 which is one of the subject properties referred to herein.

34.     Individual and Representative Plaintiff Keng Houth is a citizen of Massachusetts residing at and part owner of that property located 55 Huntington Street, Lowell, MA 01852 which is one of the subject properties referred to herein.

35.     Individual and Representative Plaintiff Kimlon Houth is a citizen of Massachusetts residing at and part owner of that property located 55 Huntington Street, Lowell, MA 01852 which is one of the subject properties referred to herein.

36.     Individual and Representative Plaintiff Michael Francis is a citizen of Massachusetts residing at and part owner of that property located 172-172A Eliot Street, Milton, MA 02186 which is one of the subject properties referred to herein.

37.     Married Couple and Representative Plaintiffs Sakum Heng & Sothy Kum are citizens of Massachusetts residing at and owner of that property located at 15-17 Farley Street, Lawrence, MA 01843 which is one of the subject properties referred to herein.

38.     Married Couple and Representative Plaintiffs Vith Chrorm and Nieng Yern are citizens of Massachusetts residing at and owner of that property located at 12 Zarek Drive, Attleboro, MA 02703 which is one of the subject properties referred to herein.

39.     Married Couple and Representative Plaintiffs Darick Thin & Chanthol Ly are citizens of Massachusetts residing at and owner of that property located at 82 Light Street, Lynn, MA 01905 which is one of the subject properties referred to herein.

40.     Individual and Representative Plaintiff Pros Chhot is a citizen of Massachusetts residing at claims to be the rightful owner of that property located 87 Tremont Street, Fall River, MA 02720 which is one of the subject properties referred to herein

41.     Married Couple and Representative Plaintiffs J. Charles Lauture & Melinda Matthews are citizens of Massachusetts residing at 16 Whitby Terrace, Dorchester, MA 02125 and owner of that property located at 127 Shirley Street, Boston, MA 02119 which is one of the subject properties referred to herein.

42.     Defendant Bank of America, N.A. is a mortgage lender with headquarters at 101 Tryon Street, Charlotte, North Carolina 28255.

43.     Defendant BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A., located at 4500 Park Granada, Calabasas, California 91302.

44.     Defendant Countrywide Home Loans, Inc. was a mortgage servicing subsidiary of Countrywide Financial Corporation and was located at 4500 Park Granada, Calabasas, California 91302.

45.     Defendant Countrywide Financial Corporation was a financial services holding company that was purchased by Bank of America in 2008 and was located at 4500 Park Granada, Calabasas, California 91302.

46.     Defendant Wells Fargo Bank, N.A. is a company which is the trustee for the certificate holders of various Trusts as noted herein. Upon information and belief Defendant Wells Fargo Bank, N.A. is located at 420 Montgomery Street, San Francisco, CA 94163.

47.     Defendant, Deutsche Bank National Trust Company ("Deutsche Bank") is located at 7575 Irvine Center Drive, Irvine, CA 92618.  Deutsche Bank is the Trustee for the certificate holders of various Trusts as noted herein.

48.     Defendant U.S. Bank, N.A. is a company which is the trustee for the certificate holders of various Trusts as noted herein. Upon information and belief Defendant U.S. Bank, N.A. is located at 209 S. LaSalle Street, Suite 300, Chicago, IL 60604.

49.      Defendant Harmon Law, PC is a law firm which represents various Defendants in the foreclosure matters regarding various Plaintiffs' subject property referenced herein. Said foreclosure matters numbering in the hundreds if not thousands in the State of Massachusetts. Upon information and belief Defendant Harmon Law is located at 150 California Street, Newton, MA 02458.

50.     Defendant Ablitt Scofield is a law firm which represents various Defendants in the foreclosure matters regarding various Plaintiffs' subject property referenced herein. Upon information and belief Defendant Ablitt Scofield is located at 304 Cambridge Road, Woburn, MA 01801.

51.     Defendant Doonan Graves & Longoria, LLC is a law firm which represents various Defendants in the foreclosure matters regarding various Plaintiffs' subject property referenced herein. Upon information and belief Defendant Doonan Graves & Longoria, LLC is located at 100 Cummings Center, Suite 225D, Beverly, MA 01915.

52.     Defendant Orlans Moran, PLLC is a law firm which represents various Defendants in the foreclosure matters regarding various Plaintiffs' subject property referenced herein. Upon information and belief Defendant Orlans Moran, PLLC is located at 45 School Street, #2F, Boston, MA 02108.

53.     Defendant Independent National Mortgage Corporation (also known as IndyMac Bank was a banking and mortgage lending/servicing entity which was taken over by the FDIC in July of 2008 and was purchased from the FDIC by IMB HoldCo, Inc., at which time its headquarters were located in the state of California.

54.     Defendant OneWest Bank is a banking and mortgage lending/servicing entity which is a wholly owned subsidiary of IMB HoldCo, LLC, located at 888 East Walnut Street, Pasadena, California 91101.

55.     Defendant IMB HoldCo, LLC is a financial services holding company which is owned by IMB Management Holdings, LP, which upon information and belief is located at 888 East Walnut Street, Pasadena, California 91101.

56.     Defendant IMB Management Holdings, LP is a limited partnership is owned by a consortium of private equity investors, which controls and/or owns IMB HoldCo, LLC, which upon information and belief is located at 888 East Walnut Street, Pasadena, California 91101.

57.     Defendant Dune Capital, LLC is a limited liability company, which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 623 Fifth Avenue, 30th Floor, New York, NY 10022.

58.     Defendant J.C. Flowers & Co. is a company, which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 717 Fifth Avenue, 26th Floor, New York, NY 10022.

59.     Defendant MSD Capital, L.P. is a limited partnership which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 645 Fifth Avenue, 21st Floor, New York, NY 10022.

60.     Defendant Stone Point Capital is a company which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 919 Third Avenue, Suite 39314, New York, NY 39314.

61.     Defendant SSP Offshore, LLC is a limited liability company which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 888 Seventh Avenue, 33rd Floor, New York, NY 10106.

62.     Defendant Soros Fund Management, LLC is a limited liability company that controls and/or owns SSP Offshore, LLC, which upon information and belief is located at 888 Seventh Avenue, 33rd Floor, New York, NY 10106.

63.     Defendant SILAR MCF-1, LLC is a limited liability company which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 333 Seventh Avenue, FL3, New York, NY 10001.

64.     Defendant Silar Advisors, LP is a limited partnership that controls and/or owns SILAR MCF-1, LLC, which upon information and belief is located at 333 Seventh Avenue, FL3, New York, NY 10001.

65.     Defendant Paulson & Co is a company which is part of the consortium that controls and/or owns IMB Management Holdings, LP, which upon information and belief is located at 1251 Avenue of the Americas, 50th Floor, New York, NY 10020.

66.     Defendant Federal National Mortgage Association is a mortgage servicing company which upon information and belief is located at 3900 Wisconsin Avenue, NW, Washington, DC 20016.

67.     Defendant Barclays Capital Real Estate, Inc, d.b.a., HomEq Servicing is a mortgage servicing company which upon information and belief is located at 4837 Watt Avenue, North Highlands, CA 95660.

68.     Defendant JP Morgan Chase Bank, N.A., d.b.a., Chase Home Finance, LLC, and EMC Mortgage Corporation, are banking and mortgage servicing companies which upon information and belief has headquarters located at 270 Park Avenue, New York, NY 10017.

69.     Defendant Wells Fargo Bank, N.A., d.b.a., Wachovia, and Americas Servicing Company, are banking and mortgage servicing companies which upon information and belief has headquarters located at 420 Montgomery Street, San Francisco, CA 94104.

70.    Defendant Ocwen Loan Servicing, LLC, is a mortgage servicing company which upon information and belief has headquarters located at 1661 Worthington Road, West Palm Beach, FL 33409.

71.    Defendant American Home Mortgage Servicing, Inc., is a mortgage servicing company which upon information and belief has headquarters located at 1525 South Beltline Road, Coppell, TX 75019.

72.    Defendant Capital One, is a mortgage servicing and personal banking services company which upon information and belief has headquarters located at 1680 Capital One Drive, McLean, VA 22102.

73.    Defendant Sovereign Bank, is a mortgage servicing and personal banking services company which upon information and belief has headquarters located at 601 Penn Street, Reading, PA 19601.

74.    Defendant MidFirst Bank, is a mortgage servicing and personal banking services company which upon information and belief has headquarters located at 501 Northwest Grand Blvd., Oklahoma City, OK 73118.

75.    Defendant Taylor Bean & Whitaker, was a mortgage servicing company which upon information and belief had headquarters located at 315 NE 14th Street, Ocala, FL 34470.

76.    Defendant Washington Mutual Bank, Inc., was a mortgage lending and servicing company. It's banking subsidiary, Washington Mutual Bank, FA (also known as WaMu), was seized by the Office of Thrift Supervision on or about September 25, 2008 and placed into receivership of the FDIC. On or about September 26, 2008 Washington Mutual Inc. and its remaining subsidiary, WMI Investment Corp., filed for bankruptcy protection, under Chapter 11 of the US Bankruptcy Code. Upon information and belief Washington Mutual, Inc. has headquarters located at 1301 Second Avenue, Seattle, WA 98101.

77.    Defendant VirtualBank a Division of Lydia Private Bank, was a mortgage lending and servicing company. Lydia Private Bank, was closed by the Office of Comptroller of the Currency on or about August 19, 2011 and placed into receivership of the FDIC. On or about

August 19, 2011 substantially all of the assets of Lydia Private Bank were purchased by Sabadell United Bank, N.A.  Upon information and belief Lydia Private Bank was headquartered at 180 Royal Palm Way, Palm Beach, FL 33480.

78.    Defendant Bear Sterns Residential Mortgage Corporation, is a mortgage lending and servicing company which upon information and belief had headquarters located at 640 Freedom Business Center Drive, Suite 600, King of Prussia, PA 19406.

79.     In March 2009 the FDIC held an auction for IndyMac Bank, which it had seized in 2008, and sold it as New IndyMac Bank to Defendant IMB HoldCo, LLC.  On March 19, 2009 IMB HoldCo, LLC formed One West Bank and  began operations as a newly formed Pasadena, California based federal savings bank.  From and after its acquisition of IndyMac in March 2009 and continuing to the present, both as a successor in interest to IndyMac and as principals, IMB HoldCo, LLC, IMB Management Holdings, LP, Dune Capital, LLC, J.C. Flowers & Co., MSD Capital, L.P., Stone Point Capital, Soros Fund Management, LLC, SSP Offshore, LLC, Paulson & Co., Silar Advisors, LP,  SILAR MCF-1, LLC (often referred to jointly as the "OneWest Servicer Defendants" where not otherwise described in their individual capacities) have engaged in and continued the wrongful conduct complained of herein. Each of these Servicer Defendants had actual and/or constructive knowledge of the acts of the other OneWest Defendants as described herein, and ratified, approved, joined in, acquiesced in, and/or authorized the acts of the other, and/or retained the benefits of said acts.

80.    In 2007, Defendant Bank of America commenced negotiations to acquire Countrywide Home Loans, Inc. and Countrywide Financial Corporation (hereinafter referred to as "Countrywide").  By late 2007, Bank of America began merging its operations with Countrywide and adopting some of Countrywide's practices.  From and after its acquisition of Countrywide in July 2008 and continuing to the present, both as a successor in interest to Countrywide and as a principal, Bank of America has engaged in and continued the wrongful conduct complained of herein.

81.     Many of the Defendants had actual and/or constructive knowledge of the acts of other Defendants as described herein, and ratified, approved, joined in, acquiesced in, and/or authorized the acts of the other, and/or retained the benefits of said acts.

## FACTUAL BACKGROUND

### A.     Fraudulent Scheme Designed and Executed by the Originator Defendants

82.     The Originator Defendants were/are among the leading providers of residential real estate mortgages in Massachusetts and in the United States during all times relevant to this complaint.

83.     The fraud perpetrated by the Originator Defendants from 2000 through 2009, was willful and pervasive.  It began with simple greed and then accelerated when said Defendants discovered they could not sustain their businesses, unless they systematically and significantly reduced their underwriting standards and created increasingly complex, esoteric, and high risk loan products to induce Plaintiffs and other borrowers into ever larger loans on increasingly risky terms.  As the Originator Defendants knew from no later than 2004, these loans were unsustainable for the borrowers and to a certainty would result in a crash that would destroy the equity invested by Plaintiffs and other Massachusetts borrowers.  Further, those actions would cause the high risk pools of mortgages the Originator Defendants had sold to Real Estate Mortgage Investment Conduits (REMICs) and/or Trusts to default on a nationwide scale.

84.     With their fraudulently obtained mortgages, the Originator Defendants executed their plan to continue the practice of "pooling" the foregoing mortgages and sell the pools for inflated value to REMIC/Trusts that would pay for the mortgages by issuing Bonds (mortgage backed securities/MBS) to investors on a global scale (securitizing).  This was part of a massive fraudulent scheme to absolve the Originator Defendants of any ownership interest in the mortgage loans they originated, and any impending financial consequences, from the massive nationwide mortgage loan defaults that the Originator defendants knew would be the

direct result of their fraudulent underwriting tactics. The Originator Defendants knew that these mortgages had been made by significantly reducing credible underwriting standards to the point whereby, regardless of their representations to the contrary, the likelihood of borrower non-performance on these mortgages was extremely high.

85.     Rapidly, the Originator Defendants scheme grew into a brazen plan to disregard underwriting standards and create high risk lending instruments – county-by-county, city-by-city, person-by-person – in order to take business from legitimate mortgage providers, and moved on to massive securities fraud hand-in-hand with concealment from, and deception of, Plaintiffs and other mortgagors on an unprecedented scale.

86.     The Originator Defendants senior management teams knew the scheme would cause a liquidity crisis that would devastate Plaintiffs' and others home values and net worth.

87.     At the very least, at the time of entering into the Notes referenced herein with respect to Plaintiffs and others, the Originator Defendants, and each Defendant in the chain of title of the foregoing mortgages and the successors to each of the foregoing, were bound and obligated to fully and accurately disclose to each borrower, including each Plaintiff herein, that the mortgages being offered to the Plaintiffs were, in fact, part of a massive fraud that the Originator Defendants knew would result in the loss of the Plaintiffs' and others home equity, would cause severe impairment to the Plaintiffs' and others credit ratings, and eventually the potential loss of Plaintiffs' and others homes through foreclosure.

88.     It is now all too clear that this was one of the ultimate high-stakes fraudulent investment schemes of the last decade.  Couched in banking and securities jargon, the Originator Defendants deceptive gamble with consumers' primary assets –their homes- was (and still is) nothing more than a financial fraud perpetrated by the Originator Defendants and others on a scale never before seen.

89.     This scheme was a significant contributing factor which led directly to a mortgage meltdown in Massachusetts (and nationwide) causing home values to decrease significantly. The Originator Defendants' business premise was to leave the borrowers, including Plaintiffs,

and the Trusts they sold their mortgages to, responsible once the Originator Defendants and their executives had received huge salaries, bonuses, and sold their respective companies stock options or shares, while investors were still buying the Mortgage Backed Securities in increasingly overpriced and high risk mortgage pools before the inevitable market collapse, setting up a second scheme to earn billions of dollars in residential mortgage servicing fees from exploiting the servicing practices of defaulted mortgages.

90.     As a result, Plaintiffs' and others have lost equity in their homes, lost rightful property interests, their credit ratings and histories were damaged or destroyed, and Plaintiffs' incurred material costs and expenses.  At the same time, Defendants took from Plaintiffs' and other borrowers billions of dollars in principal and interest payments and fees, thereby generating billions of dollars in servicing profits.

### B.     The Foreclosure Crisis

91.     Over the last four years, the United States has been in a foreclosure crisis.  In late 2009, a congressional oversight panel noted that one in eight U.S. mortgages was in foreclosure or default.[1]

92.     For the third quarter of 2010, national foreclosure filings -- default notices, scheduled auctions and bank repossessions -- were reported on 930,437 properties in the 3rd quarter. One in every 139 U.S. housing units received a foreclosure filing in that quarter.[2]

93.     Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

94.     The foreclosure crisis is not over.  Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011or 2012.  *See* Eric Tymoigne, *Securitization, Deregulation, Economic Stability, and Financial Crisis*,

---

[1] Congressional Oversight Panel, Oct. 9, 2009 report at 3.  *Available at* http://cop.senate.gov/reports/library/report100909-cop.cfin.
[2] Reality Trac Staff, *Foreclosure Activity Increases 4% in Third Quarter* (October 14, 2010). *Available at* http://www.realtytrac.com/content/press-releases/q3-2010-and-september-2010-foreclosure-reports-6108.

Working Paper No. 573.2 at 9, Figure 30,[3] (citing a Credit Suisse study showing monthly mortgage rate resets).

### C.   Creation of the Home Affordable Modification Program

95.     Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act").  12 U.S.C. § 5201 *et seq.* (2009).

96.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."

97.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP.  12 U.S.C. § 5211.  Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions.

98.     Congress allocated up to $700 billion to the United States Department of the Treasury for TARP.  12 U.S.C. § 5225.

99.     In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities."  12 U.S.C. § 5213(3).

100.    The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures."

101.    The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures.  12 U.S.C. § 5220.

---

[3] *Available at* http://papers.ssrn.com/so13/papers.cfm?abstract_id=1458413

102.    On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

103.    The Making Home Affordable program consists of two subprograms. The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

104.    The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP. It is the exploitation of this subprogram that is one of the issues in this case.

105.    HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

### D.  Duties of a Participating Servicer Under HAMP

106.    On various dates, the Servicer Defendants each became a participating servicer of the United States Treasury Department's Making Home Affordable Program (of which HAMP is a subsidiary program) and executed Servicer Participation Agreements (SPA) agreeing to follow the guidelines and supplemental directives of the aforementioned programs (an example of a HAMP Program Servicer Participation Agreement is attached as Exhibit 1).

107.    When each Servicer Defendant signed a SPA with the U.S. Treasury it agreed in its capacity as loan servicer[4] to participate in HAMP, to abide by HAMP's requirements, and to perform loan modification and other foreclosure prevention services described in the program guidelines and supplemental directives and amounts to a public proclamation of its intention to do so.

---

[4] "Servicer" is the industry term for a financial institution that acts as agent for the owner of a loan to perform many of the functions that deal directly with the homeowner, including processing of payment, loss mitigation and overseeing foreclosure.

20

108.     As a Congressional Oversight Panel evaluating HAMP noted, "participation in the program by servicers is voluntary, but once a servicer elects to participate, adherence to the program standards is mandatory for all the servicer's loans."  Congressional Oversight Panel, December 14, 2010 report –*Id. at pp. at 4*.[5]

109.     The SPAs executed by each Servicer Defendant incorporate all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications," referred to as "Supplemental Directives" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers.  These documents together are known as the "Program Documentation," *see* SPA § 1.A, and are incorporated by reference herein.  The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."  SPA §§ 1.A., 2.A.[6]

110.     The first Supplemental Directive ("SD") was issued on April 6, 2009, and states that the national mortgage modification program was "aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels."  SD 09-01 (Exhibit 2 *Id. at pp.1*).  This directive and the directives to follow were issued to provide guidance for adoption and implementation of HAMP "to provide a borrower with sustainable monthly payments."

111.     The Program Documentation requires Participating Servicers to evaluate all loans that are 60 or more days delinquent or appear to be in imminent default (as defined by the Program Documentation), to determine which loans meet the HAMP eligibility criteria.  SD 09-01 (Exhibit 2 *Id. at pp. 4*).  In addition, if a borrower contacts a Participating Servicer regarding a

---

[5] *Available at* http://cop.senate.gov/reports/library/report-121410-cop.cfm.
[6] The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 3), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications and Supplemental Documentation-Frequently Asked, Supplemental Directive 09-08.  The Program Documentation has been consolidated by the U.S. Treasury Department into a single document known as the Making Home Affordable Handbook.  These documents together describe the basic activities required under HAMP and are incorporated by reference and are available at http://www.hmpadmin.com.

HAMP modification, the Participating Servicer must collect income and hardship information to determine if the borrower is eligible for a HAMP modification (Exhibit 2 *Id. at pp. 3-4*).

112.    A HAMP Modification consists of two stages.  First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP") agreement.  Second, upon successful completion of the TPP, the Servicer must offer the homeowner a permanent modification.  Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income.

113.    A mortgage is eligible for HAMP if threshold criteria enumerated in the Program Documentation are met.  Aside from criteria that require the loan to be a first lien mortgage originated before 2009, that the property be occupied, and that it be the borrower's principal residence, the most salient conditions are that the loan is delinquent or default is reasonably foreseeable; that the borrower documents a financial hardship (as defined in the Program Documentation); and that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income.

114.    HAMP Guidelines and Supplemental Directives thoroughly cover everything required of each Servicer participating in HAMP. These guidelines were designed to give homeowners a fair shot at maintaining their homeownership even in the face of a nationwide economic set back precipitated by the Originator Defendants' actions and the resultant crash of the real estate market that destroyed the equity of Plaintiffs and others.

115.    Many of HAMP's guidelines and directives spell out specific timelines that participating servicers must adhere to in order to make the process proceed in a timely fashion. As stated in Supplemental Directive 10-01(Exhibit 3 –*id. at pp. 2-3*) participating servicers have only 10 business days following receipt of an initial request to notify the applicant in writing that the package was received. Further, within 30 calendar days from the date initial request is received, the servicer must review the submitted documentation, and if complete, send a Trial Period Plan Notice (acceptance into the program) or make a

determination that the applicant is not eligible for the program . These timelines are further reinforced in Supplemental Directive 10-02 (Exhibit 4 –*id. at pp. 4*).

116.     There are also guidelines designed to protect applicants from foreclosure during the application process.  Supplemental Directive 09-01, (Exhibit 2 *Id. at pp.14*), states that participating servicers should not proceed with a foreclosure sale until a borrower has been evaluated for HAMP and that servicers must use reasonable efforts to contact borrowers to determine their eligibility. Supplemental Directive 10-02 (Exhibit 4), was issued to improve program effectiveness by amending policies and procedures related to initiation and continuation of foreclosure actions. Page 5 (Exhibit 4) of this Directive states that a servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale unless and until at least one of five circumstances exist.  Page 6 (Exhibit 4) of this Directive also sets a minimum time frame threshold in which a homeowner must request HAMP consideration in order to be entitled to such protection from foreclosure of 7 business days prior to a scheduled foreclosure date. Page 7 (Exhibit 4) of this Directive further states that servicers must implement written procedures applicable to all loans that are potentially eligible for HAMP and requires that the servicer provide a written certification to the foreclosure attorney/trustee that at least one of the five circumstances under the Directive (Exhibit 4), and that all other available loss mitigation alternatives were exhausted and that a non-foreclosure outcome could not be reached. Furthermore said certification must be provided no sooner than 7 business days prior to the scheduled foreclosure sale date.  Servicer participants in the HAMP Program do not have discretion in applying these directives when it suits them.

117.     When the HAMP Program was introduced, the Servicer Defendants recognized right away that it could become an integral part of an overall scheme to unfairly earn billions of dollars in illicit profits from servicing income by exploiting the HAMP Program and using it as an excuse to keep millions of mortgages in a perpetual default status that should have been rightfully modified or foreclosed upon if good servicing practices were applied. In this scheme the applicant Plaintiffs and other homeowners are mentally and emotionally tortured

during their attempts at modification and used as unwitting pawns, and in the end the Plaintiffs, other homeowners, and the Trusts (and ultimately the bond holders of those Trusts) that own the Mortgages and Notes are left holding the proverbial "bag".

118.     While each of the Servicer Defendants executed a HAMP SPA agreeing to follow the rules of the program, their actions demonstrate that they systematically ignore HAMP Guidelines and Supplemental Directives on a routine basis. Guidelines regarding timely review of applications are disregarded. Guidelines regarding deadlines for the request and return of documentation are ignored. Guidelines prohibiting foreclosure against applicants are summarily overlooked. Guidelines regarding written notifications during the process are sporadically applied, at best.

119.     The Plaintiffs and other applicants are met with a daunting challenge of misinformation, lost document claims, repetitive requests for documents already supplied and all manner of tactics designed to stall or otherwise hinder the application process by the Servicer Defendants.

120.     The aforementioned actions by the Servicer Defendants are all by intention, with the primary goal of keeping as many applications for modification (HAMP or otherwise) in a perpetual state of limbo, for as long as possible a period of time, in an effort to maximize servicing income for the Servicer Defendants. This is accomplished by the combined exploitation of the HAMP Program, and the Pooling and Servicing Agreements governing the conduct of the Servicer Defendants regarding the pools of mortgages they service for the Trusts that own said pools.

     **E.**    **The Servicer Defendants' Financial Incentives Against Modification**

121.     The residential mortgage servicing industry was created decades ago when mortgage lenders designed a standardized system by which they could securitize mortgages and thereby recapitalize their lending capability, after having lent out the majority of their capital, much faster than waiting years for borrowers to pay off their mortgages. The premise was simple enough; a mortgage originator makes a large number of loans. That originator pools the loans

into one large grouping known as a "pool of mortgages". That pool of mortgages is then sold to a Real Estate Mortgage Investment Conduit (REMIC). These REMICs are often named and referred to as Trusts. They are legal entities registered with the Securities and Exchange Commission. However, they are merely shells created for the sole purpose of acquiring the pools of mortgages, which become assets of the respective Trusts.

122.     The creation of this "mortgaged backed Trust" concept allows mortgage originators to get the loans it recently made off their books. They no longer have ownership of the mortgages and notes they pooled together and consequently become recapitalized, giving originators the ability to lend again, in months as opposed to years. Originators also receive the added benefit that should mortgages default and eventually fail, they suffer no financial consequences as they no longer retain any ownership interest in those mortgages and notes that have been pooled and sold to Trusts.

123.     Trusts are inherently faced with two problems from the moment of their creations. First, because they are just shells (they have no physical address, no communications capability, and no personnel), they have no capital to pay for the pools of mortgages, and secondly, for the same reason as aforementioned, they have no personnel to service the mortgage accounts. The first problem is solved by the securitization of the Trust's assets. This is done by selling bonds (sometimes referred to as certificates) commonly called Residential Mortgage Backed Securities (RMBS) or simply Mortgage Backed Securities (MBS) to big investors such as pension funds, retirement funds, etc. The second problem is solved by paying companies (i.e. the Servicer Defendants) to deal with the day to day handling of mortgage servicing related matters such as collecting monthly principal and interest payments, paying taxes and insurance, etc.  Thus the necessity of keeping the Trusts as separate entities, in order for the recapitalization of mortgage originators to be accomplished through securitization, gave rise to the mortgage servicing industry.

124.     When a securitization of mortgages takes place many documents are created to outline the duties of the various participants of each securitization. These documents include required

forms that must be filed with the SEC and those that are not. Those documents relevant to this complaint are the Prospectus and/or Prospectus Supplement, and the Pooling and Servicing Agreement.

125.     The Prospectus and/or Prospectus Supplement are documents, registered with the SEC, outlining the entire structure of a mortgage backed Trust's securitization. It's topics range from descriptions of the mortgages in the pool, who originated those mortgages and under what circumstances, who the Trustee of said Trust shall be and their duties, the delivery of the mortgages and notes to the Trust, The Certificates (bonds) offered for sale, monthly payments to the Certificate holders (bond holders), and who the servicer will be at the inception of the Trust as well as the servicer's duties. The Prospectus and/or Prospectus Supplement is the document given to potential purchasers of the MBSs being offered for sale by the Trust in much the same manner that a company going public issues a prospectus prior to the issuance of its stock on a public exchange.

126.     In a Prospectus and/or Prospectus Supplement another document is referenced called a Pooling and Servicing Agreement (PSA). The majority of the clauses contained in the PSA are contained in the Prospectus and/or Prospectus Supplement as the PSA is a contract between the Trust and the servicer and is not necessarily required to be registered with the SEC, so long as its relative content, as it relates to the financial impact it has on said Trust, is disclosed in full within the Prospectus and/or Prospectus Supplement.

127.     As stated in all Prospectus and/or Prospectus Supplements, mortgage servicers are paid by Trusts to service the Trust's mortgages and part of payment for the performance of those services is based as a percentage of the total amount of principal balance of all the loans in a given pool of mortgages the servicer services (i.e. $1,000,000,000 in pool principal balance @ .5% = $5,000,000 servicing fee).

128.     Under HAMP, the federal government incentivizes participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable.  Servicers receive $1,000.00 for each HAMP modification.  However, this

incentive is countered by a number of financial factors that make it far more profitable for the Servicer Defendants to avoid modification, continue to keep a mortgage in a state of default or distress and to eventually push loans toward foreclosure or short sale.

129.    By purposefully hindering the modification process and delaying foreclosure, the Servicer Defendants are able to exploit a given pool of mortgages for maximal profitability, by keeping the total amount of principal balance of the pool artificially inflated so that they are able to maximize the amount of the servicing fee of said pool.

130.    Were the Servicer Defendants to simply foreclose on all borrowers as soon as good servicing practices would dictate, the servicing fees they collect would drop as suddenly and dramatically as the principal balance of the mortgages in said pools. Instead they purposefully and willfully delay foreclosure, by manipulating and hindering homeowner's attempts at modification, even when the Servicer Defendants know it is impossible for the majority homeowners to be modified, so as to lower servicing income in a controlled manner and maximize profits from servicing income for as long a time as is possible.

131.    This is of course, done at the expense of the borrowers applying for modifications who are given false hope and suffer the indignities of significant emotional and mental distress. The borrowers and the bond-holders of the various Trusts are left holding the bag in the end, when foreclosure finally takes place and the property is liquidated for a fraction of the mortgage's value, while the Servicer Defendants reap billions of dollars in profits derived from illicit servicing fees based on values of pools of mortgages that have been artificially inflated by the Servicer Defendants' willful and purposeful false representations to be attempting to assist borrower requests for modifications they cannot possibly comply with or agree to (see section F  - The Servicer Defendants Contractual Restrictions against Modification).

132.    Also stipulated in all Prospectus and/or Prospectus Supplements is a requirement that servicers must forward, from their own funds, monthly payments of principal and interest, less the servicing fees, to the Trusts on all mortgages in a given pool of mortgages, including those

payments of non-performing loans and REO properties. These payments are called periodic/monthly/delinquency advances or simply "advances". This is evidenced in the Prospectus and/or Prospectus Supplement governing Plaintiff Truong's mortgage (Exhibit 5) at *Article 1, section 1.01 defined terms, periodic advance and again at sections 3.08, 3.20 and 3.14*. There are also other types of servicing advances required to be made by servicers stated in Prospectus' and/or Prospectus Supplements including, but not limited to, property inspections, broker price opinions, appraisals, property management and maintenance, legal fees, service processing, etc.

133.    Further stated in all Prospectus' and/or Prospectus Supplements, advances made by a servicer are recoverable by the servicer through either standard collection practices (from the borrower) or once a property, as security for a mortgage in the pool, is foreclosed on and the property (now considered Real Estate Owned or REO property of the Trust) is eventually liquidated. In the case of a liquidation of a property, the servicer is paid as first order of priority from the proceeds of said liquidation. Furthermore, recovery of advances often includes interest on the funds advanced enabling the Servicer Defendants to actually earn interest income from their advances made.

134.    Entering into a permanent modification will often significantly delay a servicer's ability to recover advances it is required to make to a Trust as compared to the aforementioned foreclosure/liquidation scenario.  This is due to the practice of adding those advances to the principal balance of the loan when a modification is made, thereby spreading out the recovery of those advances by the servicer, over the life of the loan. Also, a servicer's right to recover expenses from a Trust in a loan modification, rather than a foreclosure, is less clear and less generous. Considering that the Servicing Defendants are only interested in their own respective profitability (having no ownership interest in the Trust's assets; i.e. Mortgages & Notes), they are greatly incentivized against modification even further by these Pooling and Servicing Agreement requirements.

135.    Moreover, by exploiting loopholes in Pooling and Servicing Agreements, the Servicer Defendants profit handsomely by routinely using the "borrower has applied for a HAMP modification excuse" to justify delaying the foreclosure of defaulted mortgages to Trusts, for a time lengthily enough to incur a significant amount of aforementioned servicing advances, and foreclosing when defaults have effectively "ripened", making full recovery of said advances, often with interest. This is done by stringing along borrowers' attempts at modification, as aforementioned in preceding paragraphs, so as to justify the time delay to the Trusts, used primarily to allow the bill for servicing advances to pile up. Furthermore, this reimbursement structure limits the Servicer Defendants' incentive to rein in foreclosure costs and actually incentives them to increase and pad the costs of foreclosure.

136.    Servicers will charge for unnecessary work and/or work that was never done (referred to in the mortgage securitization industry as "Junk Fees"; see *Written Testimony of Adam J. Levitin Associate Professor of Law Georgetown University Law Center Before the House Financial Services Committee Subcommittee on Housing and Community Opportunity "Robo-Singing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing" November 18, 2010-* attached as Exhibit 6) in an effort to increase the costs of foreclosure and subsequently the amount of servicing advance fees recovered when a foreclosure and liquidation of property eventually takes place.

137.    This is all a clever, fraudulent, misleading and deceptive balancing act employed by the Servicer Defendants to maximize profits using Plaintiff borrowers and others as unwitting pawns. While the Defendant Servicer is making servicing advances, it appears to be losing money on the foreclosure process, yet this is offset later when recovery is made (after foreclosure and final liquidation of property) and profit is realized from the recovery of all the necessary, unnecessary, and fraudulent servicing advances claimed to be paid out by the Defendant Servicer, plus interest. These advances are recovered by the Defendant Servicer as the first order of payment priority from sale proceeds upon liquidation (sale by the Trust) of a foreclosed property. To the Servicer Defendants, advances they are required to make with

respect to defaulted mortgages, as stated in the Pooling and Servicing Agreements with the Trusts for which they service mortgages for, are quite literally like "money in the bank".

138.    It is by employing these types of fraudulent, deceptive and misleading business practices, exploiting loopholes in the Pooling and Servicing Agreements they are contractually bound to adhere to, and while using the HAMP Program in tandem to cover their tracks, the Servicer Defendants have made obscene profits from the servicing of residential mortgage loans while knowingly causing significant harm to the named Plaintiffs and tens, if not hundreds, of thousands of other Massachusetts homeowners, the bond-holders of the Trusts for which they service mortgages for, and the public's economic well being at large.

139.    Additionally, the case of the OneWest Servicer Defendants, their conduct is particularly egregious. Servicer Defendant IMB HoldCo, LLC negotiated a loss sharing arrangement (Exhibit 7) as part of its agreement with the FDIC to purchase the assets of IndyMac Bank guaranteeing that they would be partially compensated for losses from qualifying loans as follows;

      a.    New IndyMac *(i.e. OneWest Bank)* assuming the first 20% of losses after which the FDIC will share losses 80/20 for the next 10% of losses and 95/5 thereafter.

140.    This aforementioned loss sharing agreement with the FDIC additionally insulates the OneWest Servicer Defendants from the losses normally associated with defaulted mortgages and/or mortgage pools, not yet or just recently sold to Trusts in the securitization process at the time the FDIC halted IndyMac's business. This enabled the OneWest Servicer Defendants to foreclose (or facilitate short sales) on borrower's property and ultimately realize a profit on foreclosed properties and/or short sales of "qualified" loans as defined in said loss sharing agreement (and if necessary, enabling them to repurchase other mortgages and/or pools of mortgages, with minimal financial consequence). The OneWest Servicer Defendants knew

they would be able to make significant profits by, ignoring their obligations and public proclamations to assist homeowners nationwide under a Federal Government program they agreed to abide by, and instead foreclose and/or facilitate short sales on as many FDIC "qualified" non-performing mortgages as possible.

141.   As the records pertaining to "qualified loans" under said loss sharing agreement are in the control of the OneWest Servicer Defendants, information regarding the scope of their actions regarding foreclosures of "qualified loans" as defined by the loss sharing agreement with the FDIC can only be obtained through discovery. However, it is upon information and belief that the OneWest Servicer Defendants exploited and manipulated said agreement and willfully denied homeowners the ability to pursue modification of their mortgages under the HAMP program in an effort to instead enrich themselves.

142.   As the records regarding servicing advances and periodic advances and/or advances made and recovered by the Servicer Defendants as a whole are in the control of each Servicer Defendant, specific information regarding the scope of their actions regarding the manipulation of HAMP program in conjunction with their exploitation of Pooling and Servicing Agreements can only be obtained through discovery. However, it is upon information and belief, based on the facts presented herein, the Servicer Defendants routinely utilized these aforementioned fraudulent, deceptive and misleading tactics to willfully deny homeowners the ability to pursue modification of their mortgages under the HAMP program, fraudulently and deceptively mislead homeowners of their ability to obtain a modification at all,  in an effort to instead enrich themselves, from the illicit servicing activities of residential mortgage loans while knowingly causing significant harm to the named Plaintiffs herein and tens, if not hundreds, of thousands of other Massachusetts homeowners, the bond-holders of the Trusts for which they service mortgages for, and the public's economic well being at large.

**F.**    **The Servicer Defendant's Contractual Restrictions Against Modification**

143.    The Servicer Defendants violations of Massachusetts Law are compounded by their deceptive and misleading representations, statements and actions in dragging out the processing of Plaintiffs' and other homeowners HAMP applications over months and even years, while full well knowing that they could not possibly modify those homeowners mortgages due to mortgage modification restrictions and/or prohibitions against modifications as specified in the Prospectus' and Prospectus Supplements, and Pooling and Servicing Agreements governing the mortgages in the Trusts they serviced mortgages for.

144.    The aforementioned restrictions are typically part of every securitization of residential real estate mortgages as a method of protecting the integrity of the revenue stream paid to investors which purchased the Residential Mortgage Backed Securities (RMBSs) of given securitization. If a large enough percentage of mortgages in a given pool are modified then there will not be enough revenue to cover the payments due RMBS holders.

145.    Such a restriction, given by way of example and made part of this complaint herein, is the Prospectus Supplement governing the securitization of the Lehman XS Trust Mortgage Pass-Through Certificates Series 2007-12N (Exhibit 8 *Id. at pp. S-140 "Waiver on Modification of Mortgage Loan Terms."*) This section (clause) restricts the ability of the servicer to modify a given mortgage in the pool if the modification is "*materially adverse to the Trust Fund.*"

146.    After a certain number of modifications are performed in said pool of mortgages (as governed by the terms of its PSA) there becomes less and less money to pay the bond holders. When this begins to happen it becomes materially adverse to said Trust to modify any other mortgages in the pool. As a modification of borrower's mortgages as allowed by the aforementioned federal modification program would result in a violation of the section of the aforementioned PSA regarding modifications, any mortgage governed by the aforementioned PSA is highly unlikely to be modified after the materially adverse mathematical tipping point is reached.

147.     Moreover, the securitization of the Lehman XS Trust Mortgage Pass-Through Certificates Series 2007-12N is extremely complex. The mortgage pools and Servicers are of the multi-party variety. This Trust was created and purchased several mortgage sub-pools consisting of loans originated by IndyMac Bank, Residential Funding, Bank of America, Countrywide, Paul Financial, GreenPoint Mortgage Funding, and Aurora Loan Services (at the time a subsidiary of Lehman Brothers Bank).

148.     The loans were placed into three different pools all governed by the same Prospectus and owned by the same Trust. The companies originating these loans were given the servicing rights to the loans they originated with the exception of GreenPoint loans which transferred all of its servicing rights to Aurora in August 2007.

149.     This Trust was made up of approximately $1,304,325,000.00 worth of mortgage loans of the sub-prime variety, all of which had an expected high non-performance rate as noted in said Prospectus Supplement. The Mortgaged Backed Securities issued by this Trust to pay for said pools of mortgages were purchased by Lehman Brothers which, upon information and belief, repackaged said Mortgage Backed Securities in a second securities offering through another Trust backed, not by the original pools of mortgages, but by the Mortgaged Backed Securities of the original Trust themselves. This would mean that modifications of mortgages in any of the three pools of mortgages combined in this Trust would not only be materially adverse to the original Trust and its Bond-holders but also to the second Trust backed by the Bonds of the First Trust as well.

150.     This "synthetic" type of Mortgage Backed Securities offering not only makes it more complex but creates a situation whereby most, if not all mortgages in a Trust of this type are impossible to modify due to the small and/or non-existent margin of loss allowed to cash flows of each Trust in order to ensure payments can be made to the inextricably linked bond-holders of each Trust. As such, modifying any given mortgage would create the "*materially adverse*" condition to the Trust, as stated in the foregoing Prospectus Supplement, making modification of mortgages in the pools a practical impossibility.

151.     Moreover, given as examples and made part of this complaint herein, are the

Prospectus Supplements of Trusts serviced by the OneWest Defendants identified as the

IndyMac INDX Mortgage Loan Trust 2006-AR15, Mortgage Pass-Through Certificates series

2006-AR15 (Exhibit 9 *Id. at pp. S-49 "Certain Modifications and Refinancings"* )*,* and the

Home Equity Mortgage Loan Asset-Backed Trust Series INABS 2007-B, Home Equity

Mortgage Loan Asset-Backed Certificates Series INABS 2007-B (Exhibit 10 *Id. at section*

*titled "Servicing of Mortgage Loans" paragraphs headed "Certain Modifications"* ).

152.     These aforementioned sections (clauses) restrict the ability of the servicer to modify a

given mortgage in those pools unless the servicer repurchases the loan from the Trust which

owns it. This event is highly unlikely to take place, given the Servicer Defendants' proclivity

for selling mortgages to recover capital to begin with.  Furthermore, the Servicer Defendants

would almost certainly not willingly repurchase a loan that would be in default (or one

whereby a reasonably foreseeable default is predicted) and as a result the OneWest

Defendants, as servicer of the loans in those aforementioned Trusts, would not modify any of

the loans held in those Trusts, as the repurchase of those loans would not be profitable.

153.     As additional example and made part of this complaint herein, is the Prospectus

Supplement of governing the servicing of Plaintiff Dieu Truong's mortgage (Exhibit 5 *Id. at*

*section 3.21(b)(i)* under the heading *Modifications, Waivers, Amendments and Consents at*

*45)*.

154.     This aforementioned section (clause) restricts the ability of the servicer to modify a

given mortgage in the pool if the interest rate of the mortgage is permanently lowered. As

example, the mortgage of Plaintiff Truong as referenced herein has an interest rate of 6.25%,

fixed rate for 30 years. A modification of said Plaintiff's mortgage as allowed by the

aforementioned federal modification program would initially reduce the rate of his mortgage

over a five year time span after which time the rate will then gradually increase one percent

per year and be capped at the current Freddie Mac Weekly Primary Mortgage Market Survey

(PMMS) for 30 year fixed rate conforming loans, rounded to the nearest 0.125%, as of the

date such modification agreement is prepared. For the week of August 4, 2011, this rate was 4.39%. As such, there is reasonable belief that modifying the Plaintiff's mortgage would result in a violation of the section of the aforementioned PSA regarding restrictions on modifications due to the fact that the Servicer Defendant may predict that the interest rate may be permanently lowered as result of said proposed modification and thus could not be modified.

155.    Some Prospectus' and PSAs are less restrictive but still limit a servicer's ability to modify a certain number of loans in a Trust. The reasons for this are that after a certain number of modifications are performed in a given pool of mortgages there becomes less and less money to pay the bond holders. When this begins to happen it becomes materially adverse to modify any other mortgages in the pool. As a modification of mortgages as allowed by the HAMP program would result in a violation of the PSAs already in existence any mortgage governed by a standard private label PSA is highly unlikely to be modified if prohibited by the existing PSA and/or after the aforementioned tipping point of adverse effect on cash flow is reached in a PSA restricting modification.

156.    To compound the problems presented by this situation, PSAs require 100% of the bond holders consent in order to change the terms of a Prospectus or PSA. As a typical mortgage securitization results in thousands of bonds being sold globally, it is practically impossible to obtain 100% consent regarding any issue once the securitization is complete. As consent of 100% of the Bondholders is needed to alter the PSA in a manner that would affect the Trust's cash-flow, as would certainly be the case as a result of widespread modifications to the underlying mortgages, the required consent to change the terms of a Trust is an event with a near zero probability of occurring.

157.    Lastly, the previous problem becomes even more complex when synthetic collateralized mortgage obligations are taken into consideration. Bonds issued by a CMO are often divided into what are called Tranches. Each of these Tranches represents a different payment/risk priority tier, each of which has a different rate of revenue, dividend and/or credit

rating. The riskiest Tranches are not investment grade and as such cannot be sold to entities like pension and mutual funds, which make up the profile of a large percentage of purchasers of RMBS Bonds. Therefore, these non-investment grade Bonds are often re-securitized into what are called synthetic collateralized mortgage obligations (SCMO). These SCMOs are a securitization in which the assets of the SCMO are the RMBS Bonds issued by a CMO, rather than the underlying mortgages of said CMO. Despite the fact that a SCMO is nothing more than the repackaging of the riskiest Tranches of other CMOs, bonds issued by a SCMO are also divided into Tranches with similar payment/risk priority tiers. (While Moody's, as well as Standard & Poor's, rated most of these SCMOs as investment grade they were in fact made up almost entirely of BBB- or lower grade bonds from other CMOs). The process is again repeated and the worst of the worst is repackaged as SCMO2. This process can be repeated (and often is) an endless number of times thereby making it practically impossible to obtain consent of 100% of Bondholders necessary to change the terms of a Trust, Prospectus or PSA.

158.    As such, for those Plaintiffs and other homeowner HAMP applicants whose mortgages were owned by Trusts governed by PSAs with merely restrictive clauses regarding modification, the first initial applicants for the HAMP Program received modifications and those applying at a point in time when further modifications of loans in that pool would affect cash flows to bond holders, were simply purposefully left in limbo by the Servicer Defendants, so as to maximize servicing fees and recoverable servicing expenses as part of the aforementioned scheme.

159.    For those Plaintiffs and other homeowners HAMP applicants whose mortgages were owned by Trusts governed by PSAs with clauses prohibiting modification, the Servicer Defendants of their mortgages never had any intention of modifying their mortgages due to the contractual prohibitions against modification contained in the PSAs governing the servicing of those mortgage loans. Instead the Servicer Defendants, exploited and ignored HAMP Guidelines and Directives and purposefully hindered, delayed and deceptively misled homeowners, regarding the likelihood of success of their legitimate modification attempts, in

a scheme to instead enrich themselves in violation of Massachusetts Laws. Instead, the Servicer Defendants chose to "season" those mortgages so as to maximize servicing fees and recoverable servicing expenses as previously described herein.

160.    The Servicer Defendants knew that mortgages of the Plaintiffs' and others could not be modified and instead of notifying them of the impossibility of fulfilling their request in a timely manner as required under HAMP Guidelines, the Servicer Defendants did willfully, knowingly, deceptively mislead Plaintiffs and other Massachusetts HAMP applicants, week after week, month in, month out, for, in some cases, years, by repeatedly requesting duplicate documentation, falsely claiming that documents were lost and/or were never received, and falsely claiming that requests were stalled in underwriting, negotiation and/or quality control, all while ignoring HAMP Guidelines regarding the timely processing  of  HAMP requests, which allow only 30 calendar days in which to render a decision. Some of the Plaintiff HAMP applicants and others suffered the additional indignity of being granted modifications and/or Trail Period Plans, only to later discover that those binding contracts would not be honored by the Servicer Defendants.

161.    The overwhelming majority of the mortgages made by the Originator Defendants were securitized and this information was deceptively and purposefully withheld (and continues to be withheld) from the Plaintiffs and other homeowners in Massachusetts and nationwide.

162.    The Servicer Defendants were aware of these restrictions/prohibitions regarding modifications when each of them executed its agreement with the federal government to participate in the Treasury Department's Home Affordable Modification Program (HAMP) and abide by its guidelines and directives yet decided they would use their position as servicer to manipulate the situation in a scheme to enrich themselves.  The Servicer Defendants actions were, and continue to be, fraudulent and amount to deceptive and misleading business practices solely designed to exploit a United States Federal Government program designed to assist homeowners in saving their homes and property, and the Pooling and Servicing Agreements governing their actions regarding the mortgages they serviced for Trusts. The

Servicer Defendants instead, did willfully fraudulently misrepresent to Plaintiffs and other homeowners their ability to pursue modification of their mortgages under the HAMP program (or otherwise), in an effort to instead enrich themselves, from the illicit servicing activities of residential mortgage loans while knowingly causing significant harm to the named Plaintiffs herein and tens, if not hundreds, of thousands of other Massachusetts homeowners, the bond-holders of the Trusts for which they service mortgages for, and the public's economic well being at large.

### H.   FNMA, The Trustee Defendants and Illegal Foreclosures

163.    FNMA and the Trustee Defendants also foreclosed (or attempted foreclosure) on Plaintiffs and others statewide knowing that under Massachusetts Law no default to the Holder of Plaintiffs' and others Notes actually existed.

164.    As aforementioned, in typical mortgage securitizations, mortgages are added together with other mortgages and a pool of mortgages is created. The resultant pool of mortgages is then sold to a Trust and/or REMIC which becomes the actual owner/holder of the Note and/or Mortgage.

165.    As such, the Note-holder cannot enforce the default provisions of said Note unless a default to said Note-holder exists. Under the governing Prospectus' and the PSAs entered into by The Servicer Defendants with the Trusts that purchased mortgage pools, the Servicer Defendants and any other subsequent servicing entity of the loans in said Trusts are contractually required to forward, from their own funds, monthly payments of principal and interest not received by the Servicer Defendants, to said Trusts.

166.    This is a standard contractual obligation and practice in residential mortgage securitizations. This is evidenced in the Prospectus Supplements governing mortgages serviced by the OneWest Servicer Defendants identified as the Lehman XS Trust Mortgage

Pass-Through Certificates Series 2007-12N (Exhibit 8 *Id. at pp. S-134 & S-141 "Servicers Responsibilities" & "Advances"* ), the IndyMac INDX Mortgage Loan Trust 2006 (Exhibit 9 *Id. at pp. S-48 "Advances"* ) and the Home Equity Mortgage Loan Asset-Backed Trust Series INABS 2007-B, Home Equity Mortgage Loan Asset-Backed Certificates Series INABS 2007-B (Exhibit 10 *Id. at section titled "Servicing of Mortgage Loans" paragraphs headed "Advances"* ). This fact is further evidenced in the PSA governing Plaintiff Truong's mortgage (Exhibit 5 at *Article 1, section 1.01 defined terms, periodic advance and again at sections 3.08, 3.20 and 3.14*).

167.    As evidenced and stipulated in the aforementioned Prospectus Supplements (and other Prospectus Supplements specific to the various Plaintiffs as noted subsequently herein), the various Servicer Defendants are contractually obligated to forward payments of principal and interest, from their own funds, on all defaulted loans, to the respective Trusts that own the mortgages they service. This is a standard contractual obligation of all mortgage securitizations. By fulfilling this contractual obligation, the Servicer Defendants act as a third party making payment on behalf of defaulted borrowers to the Holders of those Mortgages and/or Notes (Trusts). As only the true Holders of those Mortgages and Notes is able to enforce the default provisions of those documents, defaults to the true Holders of said Notes must exist.

168.    As the Servicer Defendants are contractually required (as aforementioned and evidenced in Exhibits 5, 8, 9,10, 12, 13, 14, 15, 16, 17, 18 & 19), as a party with no security interest in the Plaintiffs' and others properties, Mortgages and/or Notes,  to pay the principal and interest payments on behalf of those Plaintiffs' and others who have yet to remit payment, no default to the claimed Holders of said Notes existed (or exists) in any situation whereby foreclosure action commenced and/or was completed regarding any foreclosure whereby Plaintiffs' and others Mortgages and Notes are governed by Prospectus', Prospectus Supplements, and Pooling and Servicing Agreements of any Securitized Mortgage Backed Trust.

169.    As such the Plaintiff's and others mortgage payments were in fact received by the actual Note-holders and no enforceable defaults existed at time of foreclosures. As the records regarding the advances made to Trusts regarding Plaintiff's and others Mortgages are held by the Servicer Defendants and the Trustee Defendants, the information regarding these Defendants' custodial accounts as they relate to said Trusts can only be obtained through discovery. However, it is clear that if the terms of said governing Prospectus', Prospectus Supplements and/or PSAs, made part of this complaint and referenced herein, were adhered to, no actual default to the claimed Note-holder has or had occurred of Plaintiffs and others Notes in related foreclosure actions on a massive scale.

170.    In cases whereby Defendant FNMA claims to be the purported owner of a Plaintiff's mortgage it is important to be familiar with said Defendant's business mechanism.

171.    FNMA buys loans from approved mortgage sellers, FNMA securitizes mortgages (creates and establishes Trusts that become the true owner of the Mortgages and Notes in the same fashion as the aforementioned private label mortgage backed Trusts), appoints itself as Trustee of the Trusts it creates which then sells the resultant mortgage-backed securities to investors, with FNMA's unconditional  guarantee that all of the stated principal and interest payments of the mortgage loans held by said Trust will be timely passed through to the Trust and ultimately the investors. Stated on page one of the Amended and Restated 2007 FNMA Single Family Trust Agreement dated January 1, 2009 (Exhibit 11) is as follows;

C.     Fannie Mae has purchased and intends to purchase residential mortgage loans.

D.     Fannie Mae intends to set aside and transfer residential loans acquired by it to various Trusts established pursuant to this Trust Agreement and the related Issue Supplements and to issue guaranteed mortgage pass through certificates representing undivided beneficial ownership interest in the assets of the related Trusts.

E.     Fannie Mae intends to guarantee to each Trust sufficient funds to permit timely distribution s to Holders of principal and interest on Certificates, a required by this Trust Agreement.

F.     Fannie Mae intends to be the Master Servicer of the Mortgage Loans held in each Trust and to arrange for and supervise the contractual servicing of the Mortgage Loans by Direct Servicers.

G.     Fannie Mae intends to be the Trustee for each Trust.

172.    FNMA creates Trusts, exactly like a private label securitization of mortgages, and remains as Trustee (and Master Servicer) of each Trust. The Trusts now becomes the claimed true Holders of Notes and Mortgages of each securitization, not FNMA. As stated in the FNMA Amended and Restated 2007 Single-Family Master Trust Agreement (Exhibit 11) the Direct Servicer (i.e. the Servicer Defendants) may be responsible for *"Delinquency Advances"*(Exhibit 11 *Id. at pp. 4,5)* as specified in their individual Direct Servicer Contracts with FNMA. This clause requires the Direct Servicer (or Sub-Servicer, if applicable) to advance payment on any non-performing loans, just as in Prospectus', Prospectus Supplements, and PSAs governing private label securitizations. However, FNMA created Trusts are given the additional assurance that if for any reason the Direct Servicer does not or is not required to forward said Delinquency Advances, FNMA unconditionally guarantees that it will forward said Delinquency Advances to the Trusts it created as stated in said Master Trust Agreement (Exhibit 11 *Id. at pp. 54 Article VII through pp. 59).*

173.    As Defendant FNMA is a major purchaser of mortgages and seller of mortgage backed securities but is not required to register it's Trusts and/or governing Direct Servicer

Agreement's with the U.S. Securities and Exchange Commission, the records regarding the identities of said FNMA Trusts and the monthly payment advances regarding the Plaintiffs' and others mortgages purportedly owned, guaranteed or held by FNMA Trusts (or "Pools" as they are often referred to) are in the sole possession of Defendant FNMA and can only be obtained through discovery.

174.    However, it is upon information and belief that FNMA, acting in its capacity as Trustee of the Trusts it created, was not the owner of Plaintiffs and others mortgages prior to foreclosure auctions and/or recording of foreclosure deeds. FNMA merely claims ownership after purchasing said properties at auction, acting in its capacity as Trustee, on behalf of said Trusts.

175.    FNMA does offer a limited purchase of mortgage loans or REO property from Trusts as stated in their Master Trust Agreement (Exhibit 10 *Id. at Sec 2.5, 2.5(1) sub paragraphs (d) (iii) being most relevant to Plaintiff's and others claims*). However, as FNMA is in sole possession of the records as to whether or not said "limited purchase of mortgage loans or REO property" clause was exercised in the case of Plaintiffs' and others loans, and these facts can only be obtained through discovery, it is upon information and belief, the Plaintiffs' so named herein, and tens, if not hundreds of thousands of other Massachusetts homeowners have been foreclosed on by FNMA (or by Servicer Defendants acting on FNMA's behalf and/or on its instruction) in violation of Massachusetts Law, on a scale so enormous it is almost unfathomable.

176.    Furthermore, it is upon information and belief that FNMA established Trusts were the actual Holders of Plaintiffs' and tens, if not hundreds of thousands of others Mortgages and Notes at the time foreclosure action was initiated and concluded against them in the name of FNMA (or by Servicer Defendants acting on FNMA's behalf and/or on its instruction, which is more often the case) as the claimed holder, in the State of Massachusetts.

177.    Moreover, Defendant FNMA, acting in its capacity as Master Servicer, forwarded to the Trusts that claimed to hold Plaintiffs' and others Mortgages and Notes, the monthly

scheduled payments of principal and interest due, as is required by FNMA's unconditional guarantee, as a third party, on behalf of Plaintiffs' and others, regardless of whether they were received by the Direct Servicer (the Servicer Defendants) or FNMA as Master Servicer. As such, the Notes of Plaintiffs' and others were not in default to the claimed Holders of same (FNMA Trusts) at the time of foreclosure action.

178.    Trustee Defendant FNMA knew that they, as a third party, had in fact paid the obligations of the Plaintiffs' and others so situated, to the Holders of Plaintiffs' and others Mortgages and/or Notes and, as such, was aware that no default of said Notes existed to the Holders of Plaintiffs and others Mortgages and/or Notes at the time foreclosure action was commenced and/or completed.

179.    Trustee Defendants Harmon Law, P.C., Orlans Moran, PLLC, Doonan, Graves & Longoria, LLC, and Ablitt Scofield acted (and continue to act) as legal counsel for Servicer Defendants OneWest, Bank of America, JPMorgan Chase, and Wells Fargo Bank, as well as Trustee Defendants FNMA, Deutsche Bank, Wells Fargo, US Bank and JPMorgan Chase and has represented them in hundreds if not thousands of foreclosures in the State of Massachusetts.

180.    As such they are culpable for their actions and involvement regarding said aforementioned illegal foreclosure attempts, and illegal foreclosures and/or evictions of Plaintiffs' and others, whose Notes were not in default, by virtue of payment of monthly Mortgage payments of principal and interest, on behalf Plaintiffs' and others, by the Servicer Defendants and/or FNMA, acting as third parties remitting payment on behalf of Plaintiffs and others to the claimed Holders of their Notes and Mortgages.

181.    Trustee Defendants Harmon Law, P.C., Orlans Moran, PLLC, Doonan, Graves & Longoria, LLC, and Ablitt Scofield have a duty as legal counsel to enforce only those foreclosure actions that complied with Massachusetts Law and either informed their clients of said violations of the Law and participated in systematic illegal foreclosure/eviction actions anyway and/or or failed to inform their clients at all.

43

182.    Much has been made of late by various official law enforcement offices regarding the proclivity of mortgage originators and servicers alike for concealing the true chain of title and ownership interest in originally executed mortgages and notes, in the State of Massachusetts and nationwide. It took recent Court Decisions in Massachusetts (i.e. *U.S. Bank National Association v. Ibanez*, 458 Mass. 637, 647-*2011*) to get servicers and Trustee Defendants to identify the Trusts as the true holders of said obligations, in foreclosure filings and documents today.

183.    However, it is not effectual, from the standpoint of justice for those Plaintiffs and others so damaged, to merely know that these deceptive tactics are being employed. It must also be demonstrated why these tactics are being employed, in order to obtain a true understanding of the magnitude of the fraud that has been perpetrated upon the people of the State of Massachusetts and others nationwide, in order for appropriate damages to be merited.

184.    The Servicer, Trustee, and FNMA Defendants have, collectively, attempted and succeeded in many cases, to conceal the true identity of the present holders of mortgages and notes in foreclosure proceedings and official documents, and as the foregoing paragraphs have elucidated, these practices still continue in regards to all foreclosures involving mortgages and notes owned by FNMA sponsored Trusts, in spite of the aforementioned recent Court Decisions.

185.    The Servicer, Trustee, and FNMA Defendants, attempt to conceal the beneficial ownership of said obligations because by revealing said facts, they lead to the documents governing their complex interactions and relationships among each other, and within these documents is the evidence and true scope of their wrongdoing.

186.    During this entire foreclosure crisis, the Servicer ,Trustee, and FNMA Defendants have tried to keep the knowledge of their contractual obligations to each other, and their complex interactions and relationships out of public knowledge, for fear of being found that many of their practices are willfully, knowingly and purposefully designed to flaunt and violate State and Federal Laws as if they were of no consequence, all in an precise, well

44

organized effort to reap billions of dollars in illicit profits for their respective firms while financially damaging, and mentally and emotionally torturing the Plaintiffs and others, and severely damaging the economic wellbeing of the State of Massachusetts and this Nation as a whole.

187.    The Servicer Defendants' improper acts still continue, including, *inter alia*;

      a.    fraudulently misrepresenting their intentions to arrange loan modifications for Plaintiffs and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiffs and others of the opportunity to seek assistance under a federal government program Defendants publicly represented they would abide by but knew they could not;

      b.    deceptively misleading Plaintiffs and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet instead are purposefully ignoring guidelines and directives of said federal program, seeking to enrich themselves by keeping Plaintiffs' and others modification requests in limbo while ever increasing the billing of servicing advances and eventually foreclosing (and/or facilitating short sales) on borrowers properties, while borrowers seek, in good faith, to modify their mortgages under said federal program;

      c.    willfully, purposefully and systematically stalling Plaintiffs' and others legitimate requests to cancel foreclosures while actively seeking to be considered for a said modification program, in direct violation of guidelines and directives of aforementioned program and in violation of Massachusetts Law;

188.    Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, the Servicer Defendants have;

a.   fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the Servicer Defendants publicly represented they would administer;

b.   deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances and/or (in the case of the OneWest Servicer Defendants) take advantage of the OneWest Servicer Defendants loss sharing agreement with the FDIC in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

c.   fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

d.   deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

189.   Because the Servicer Defendants have or are ignoring guidelines and directives of a government program they agreed to abide by, while fraudulently, deceptively, misleadingly, and publicly representing to follow said guidelines,  hundreds or thousands of homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes.

190.   By employing the aforementioned fraudulent, and deceptive and misleading business practices, the Defendants have left, i.e. hundreds or thousands of borrowers seeking modifications, in a state of limbo – often worse off than they were before they sought a modification from the Servicer Defendants and knowingly inflicted severe emotional and mental distress on Plaintiffs and others. The Servicer Defendants' actions are fraudulent, misleading and purposefully deceptive, and are unfair under state laws.

191.   The Trustee Defendants' improper acts still continue, including, *inter alia*;

> a.   Deceptively, misleadingly, fraudulently, and otherwise illegally seeking to foreclose and/or completing foreclosures and/or evictions on Plaintiffs' and other's homes while having full knowledge that no actual default to the Holder of Plaintiffs' and others Notes exists and/or existed.
>
> b.   deceptively concealing from Plaintiffs and others the fact that Notes purported to be in default were actually in good standing as the Note-holder was in fact receiving Plaintiffs' and others monthly payments of principal and interest from the Servicer Defendants and/or FNMA.

192.   These acts continue to this day with hardball tactics and deception that continues to threaten Plaintiffs' and others Constitutional rights and financial security, as well as the economic future of the State of Massachusetts, the nation, and the worldwide economic system.

## CLAIMS OF THE NAMED PLAINTIFFS
### As To The Originator Defendants

**<u>Fraudulent Representation the Financial Soundness of their Mortgage Products to Borrowers</u>**

**Heang Ouch v IndyMac Bank**

193.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

194.     Plaintiff, Heang Ouch is a citizen of the State of Massachusetts residing at 43 Inland Street, Lowell, MA 01851, which is the one of the subject properties incorporated and referred to herein.

195.     On or about January 19, 2007, Plaintiff purchased said subject property located at 43 Inland Street, Lowell, MA 01851 for $240,000.00, and executed two mortgages to IndyMac Bank; a first mortgage for $192,000.00, recorded in the Middlesex North County Registry of Deeds in Book 20908 at page 268, and a second mortgage for $48,000.00, recorded in the Middlesex North County Registry of Deeds in Book 20908 at page 282, to fund said purchase.

196.   As evidenced by the County records, Plaintiff had no assets for a down payment for the purchase transaction of the subject property and claims to have had no assets for reserve.

197.   Originator Defendant IndyMac knew borrower had insufficient assets to pay for a down payment so as to be financially vested in the purchase transaction, yet had developed a high risk lending instrument specifically tailored to the Plaintiff's situation (and for others so similarly situated) so as to make said loan to enrich themselves by fraudulently misrepresenting the financial soundness of this lending instrument to Plaintiff, knowing said loan would cause injury to the Plaintiff.

198.     At best the Plaintiff is an unsophisticated consumer who could be easily taken advantage of by the issuance of a highly complex, hi-risk mortgage lending instrument to him. Knowing these facts, Originator Defendant IndyMac reduced its underwriting standards and developed a high-risk lending instrument specifically tailored to the Plaintiff's situation (and others so similarly situated) so as to make said loan to enrich themselves by fraudulently misrepresenting the financial soundness of this lending instrument to Plaintiff and others, thereby placing Plaintiff and others in a financial position with extreme likelihood of failure, knowing repayment was unlikely, and that said loan would cause injury to the Plaintiff.

**Savi San and Savonn San v Countywide/Bank of America, N.A.**

199.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

200.    Plaintiffs, Savai San and Savonn San are citizens of the State of Massachusetts residing at 476 Jefferson Street, Fall River, MA 02721, which is one of the subject properties incorporated and referred to herein.

201.    On or about March 30, 2007, Plaintiffs San purchased the property located at 476 Jefferson Street, Fall River, MA 02721.

202.    Plaintiffs San gave a mortgage and note to Bank of America, N.A. in regards to the aforementioned purchase which was recorded in the Fall River, Bristol County Registry of Deeds, on March 30, 2007 in book 06610 at page 41.

203.    Plaintiffs San had no assets for a down payment for the purchase transaction of the subject property and no assets for reserve. Furthermore, no assets were verified by Bank of America relating to the mortgage application for said purchase of subject property.

204.    Plaintiffs San also did not make enough income to qualify for a conventionally underwritten mortgage at the time of their application for mortgage for said purchase of subject property, so Bank of America offered them a mortgage which would allow them to qualify by only requiring that they pay interest only as a monthly payment.

205.    Originator Defendant Bank of America knew borrowers did not earn enough income to qualify for a conventionally underwritten mortgage, and had insufficient assets to pay for a down payment and/or held in reserve for future payments so as to be financially vested in the purchase transaction. At best the Plaintiffs are unsophisticated consumers who could be easily taken advantage of by the issuance of a highly complex, hi-risk mortgage lending instrument to him. Knowing these facts, Originator Defendant Bank of America, N.A. developed a high risk lending instrument specifically tailored to the Plaintiffs' situation (and for others so similarly situated) so as to make said loan to enrich themselves by fraudulently misrepresenting the financial soundness of this lending instrument to Plaintiffs and others,

knowing said loan would cause injury to the Plaintiffs due to the high likely-hood of future default by Plaintiffs.

**Channy Lom v Bank of America, N.A.**

206.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

207.    Plaintiff, Channy Lom is a citizen of the State of Massachusetts residing at 74 Daisy Lane, Fall River, MA 02721, which is the one of the subject properties incorporated and referred to herein.

208.    On or about December 21, 2006, Plaintiff purchased the property located at 74 Daisy Lane, Fall River, MA 02721.

209.    Plaintiff gave a Mortgage to Bank of America, N.A. in regards to the aforementioned purchase which was recorded in the Fall River, Bristol County Registry of Deeds, on March 30, 2007 in book 00036 at page 137.

210.    Plaintiff had no assets for a down payment for the purchase transaction of the subject property and no assets for reserve. Furthermore, no assets were verified by Bank of America relating to the mortgage application for said purchase of subject property.

211.    Defendant Bank of America knew Plaintiff had insufficient assets to pay for a down payment and/or held in reserve for future payments so as to be financially vested in the purchase transaction. At best the Plaintiff is an unsophisticated consumer who could be easily taken advantage of by the issuance of a highly complex, hi-risk mortgage lending instrument to him. Knowing these facts, Originator Defendant Bank of America, N.A. lowered their underwriting standards and developed a high risk lending instrument specifically tailored to the Plaintiff's situation (and for others so similarly situated) so as to make said loan to enrich themselves by fraudulently misrepresenting the financial soundness of this lending instrument to Plaintiff and others, knowing said loan would cause injury to the Plaintiff due to the high likely-hood of future default by Plaintiff.

**Susan Sorsby v Washington Mutual Bank, FA and Washington Mutual, Inc.**

212.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

213.    Plaintiff Susan Sorsby is a citizen of the State of Massachusetts residing at 2 Fremont Road, Marshfield, MA 02050, which is one of the subject properties incorporated and referred to herein.

214.    On or about May 19, 2006, Plaintiff refinanced her property located at 2 Fremont Road, Marshfield, MA 02050, with a loan of $206,000.00, given by Washington Mutual Bank.

215.    Plaintiff gave a mortgage and note to Washington Mutual Bank, F.A. in regards to the aforementioned purchase which was recorded in the Plymouth County Registry of Deeds, on May 19, 2006 in book 32711 at page 30.

216.    Plaintiff did not make enough income to qualify the mortgage at the time of her application for said refinance mortgage of the subject property, so Originator Defendant Washington Mutual offered her a mortgage which would allow her to qualify by merely stating Plaintiff's income on her application, at an amount high enough whereby she would be able to qualify for said refinance loan.

217.    Originator Defendant Washington Mutual knew Plaintiff did not earn enough income to qualify said refinance mortgage. In fact, Originator Defendant Washington Mutual encouraged Plaintiff (through its representatives) to state an income figure of $67,200.00 per year (as stated on the final mortgage application presented at closing as prepared by Washington Mutual) working as a waitress at the "99" Pub Restaurant, in order to qualify for said refinance mortgage.

218.    Instead of denying the Plaintiff's refinance application for insufficient income to qualify for said mortgage loan, Originator Defendant Washington Mutual developed a high risk lending instrument specifically tailored to the Plaintiff's situation (and for others so similarly situated) so as to make said loan to enrich themselves by fraudulently misrepresenting the financial soundness of this lending instrument to Plaintiff and others,

51

knowing said loan would cause injury to the Plaintiff  due to the high likely-hood of future default by Plaintiff due to insufficient income of Plaintiff to qualify for said loan.

**Novelette Napier & Natasha Napier v Bear Sterns Residential Mortgage Corporation**

219.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

220.     Plaintiffs, Novelette Napier & Natasha Napier are citizens of the State of Massachusetts residing at 30 Sanford Street, Boston, MA 02126, which is the one of the subject properties incorporated and referred to herein.

221.     On or about June 12, 2006, Plaintiffs purchased the subject property at 30 Sanford Street, Boston, MA 02126, and executed a Mortgage and Note to Bear Sterns Residential Mortgage Corporation (Bear Sterns) for $376,800.00 which was recorded in the Suffolk County Registry of Deeds in Book 39790 at Page 96.

222.     At the time the mortgage was originated, Natasha Napier was excluded from the application process by Originator Defendant Bear Sterns due to their claim that her credit score was too low. As such, Originator Defendant Bear Sterns solely used Novelette Napier's income and credit information for qualification for said mortgage.

223.     At the time of the mortgage was originated, Novelette Napier was a Nurse's Aide earning approximately $30,000.00 per year.

224.     Under acceptable underwriting practices, Novelette Napier's income would not have been enough to qualify for a mortgage loan of $376,800.00. Recognizing this fact Originator Defendant Bear Sterns created a complex and high risk financial instrument which would allow Novelette Napier to obtain said mortgage loan.

225.     Said mortgage loan had features which would lower the monthly payment to the point that would allow Novelette Napier to qualify for a mortgage loan that had a high probability of eventual default, due to insufficient income to repay said mortgage loan. Those features included adjustable rate terms with a low start rate, and negative amortization and interest only payment options.

226.    Originator Defendant Bear Sterns knew Plaintiff Novelette Napier did not make enough income to reasonably repay said mortgage loan, yet had developed a high risk lending instrument specifically tailored to the Plaintiff's situation (and for others so similarly situated) so as to make said loan to enrich themselves by fraudulently misrepresenting the financial soundness of this lending instrument to Plaintiffs, knowing said loan would cause injury to the Plaintiffs.

227.    At best the Plaintiffs are unsophisticated consumers who could be easily taken advantage of by the issuance of a highly complex, hi-risk mortgage lending instrument to them. Knowing these facts, Originator Defendant Bear Sterns reduced its underwriting standards and developed a high-risk lending instrument specifically tailored to the Plaintiffs' situation (and others so similarly situated) so as to make said loan to enrich themselves by fraudulently misrepresenting the financial soundness of this lending instrument to Plaintiffs and others, thereby placing Plaintiffs and others in a financial position with extreme likelihood of failure, knowing repayment was unlikely, and that said loan would cause injury to the Plaintiffs.

**Keng Houth & Kimlon Houth v VirtualBank and Lydian Private Bank**

228.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

229.    Plaintiffs, Keng Houth & Kimlon Houth are citizens of the State of Massachusetts residing at 55 Huntington Street, Lowell, MA 01852, which is the one of the subject properties incorporated and referred to herein.

230.    On or about September 25, 2006, Plaintiffs refinanced the subject property at 30 Sanford Street, Boston, MA 02126, and executed a Mortgage and Note to VirtualBank, a Division of Lydian Private Bank, for $266,250.00 which was recorded in the Middlesex North County Registry of Deeds in Book 20557 at Page 229.

231.    Under acceptable underwriting practices, Plaintiff's income would not have been enough to qualify for a mortgage loan of $266,250.00. Recognizing this fact Originator

Defendants VirtualBank and Lydian Private Bank created a complex and high risk financial instrument which would allow Plaintiffs to obtain said mortgage loan.

232.   Said mortgage loan had features which would lower the monthly payment to the point that would allow Plaintiffs to qualify for a mortgage loan that had a high probability of eventual default, due to insufficient income to repay said mortgage loan. Those features included adjustable rate terms with a low start rate, and negative amortization and interest only payment options.

233.   Originator Defendants VirtualBank and Lydian Private Bank knew Plaintiffs did not make enough income to reasonably repay said mortgage loan, yet had developed a high risk lending instrument specifically tailored to the Plaintiff's situation (and for others so similarly situated) so as to make said loan to enrich themselves by fraudulently misrepresenting the financial soundness of this lending instrument to Plaintiffs, knowing said loan would cause injury to the Plaintiffs.

234.   At best the Plaintiffs are unsophisticated consumers who could be easily taken advantage of by the issuance of a highly complex, hi-risk mortgage lending instrument to them. Knowing these facts, Originator Defendants VirtualBank and Lydian Private Bank reduced its underwriting standards and developed a high-risk lending instrument specifically tailored to the Plaintiffs' situation (and others so similarly situated) so as to make said loan to enrich themselves by fraudulently misrepresenting the financial soundness of this lending instrument to Plaintiffs and others, thereby placing Plaintiffs and others in a financial position with extreme likelihood of failure, knowing repayment was unlikely, and that said loan would cause injury to the Plaintiffs.

**J. Charles Lauture & Melinda Matthews v EMC Mortgage Corporation, Wells Fargo Bank, National Association, and Harmon Law, P.C.**

235.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

236.   On or about January 14, 2005, Plaintiff, J. Charles Lauture, purchased the Subject Property, as noted herein, located at 127 Shirley Street, Boston, MA 02119 for the sum of

$322,000. Said purchase is evidenced by a Deed transferring interest in said property to Plaintiff recorded in the Suffolk County Registry of Deeds on January 14, 2005 in Book 36311, at Page 237.

237.    On or about November 4, 2005, Plaintiff Lauture executed a Quit-Claim Deed, transferring his interest in said Subject Property to Himself and his wife, Melinda Matthews. Said Quit-Claim Deed was recorded in the Suffolk County Registry of Deeds on November 9, 2005 in Book 38448, at Page 75.

238.    On or about December 21, 2005, Plaintiffs executed a Mortgage and Note, secured by the Subject Property, which they gave to GreenPoint Mortgage (as Lender) and Mortgage Electronic Registration Systems, Inc./MERS (as Mortgagee) in return for a refinance loan in the amount of $372,800.00. Said Mortgage was recorded in the Suffolk County Registry of Deeds on January 21, 2006 in Book 38751, at Page 295.

239.    On or about March –April 2006, Plaintiffs' Mortgage and Note were sold to EMC Mortgage Corporation and subsequently pooled and sold to a Trust named, the GreenPoint Mortgage Funding Trust 2006-AR3. Wells Fargo Bank, N.A. was appointed as Trustee of said Trust.  On or about March - April 2006 the servicing of Plaintiffs' Mortgage was transferred to EMC Mortgage Corporation, a wholly owned subsidiary of JPMorgan Chase Bank, N.A.

240.    Although GreenPoint Mortgage was the actual originator of these Plaintiffs' Mortgage and Note, GreenPoint was acting jointly with EMC Mortgage Corporation to accomplish said mortgage's origination.

241.    In this joint venture, an entire group worked together to create, establish and operate the GreenPoint Mortgage Funding Trust 2006-AR3. Members of this group business venture included EMC Mortgage Corporation (as Sponsor – purchases loans from originators & forms pool & as Servicer), GreenPoint Mortgage (as Originator), Structured Asset Mortgage Investments II, Inc. (as Depositor – creates issuing entity; the Trust), Bear Stearns & Co., Inc. (as the Underwriter of the Securities/Bonds), and Wells Fargo Bank, N.A. (as Trustee of said Trust).

242.   GreenPoint Mortgage was responsible for the actual face to face origination of the mortgages. However, EMC Mortgage Corporation was responsible for setting the underwriting guidelines and mortgage product creation to determine what loans would be deemed acceptable for purchase by EMC and used to construct the pool of mortgages that would eventually be purchased by the entity created and named the GreenPoint Mortgage Funding Trust 2006-AR3.

243.    In this venture, EMC Mortgage had predetermined what underwriting guidelines and standards would be acceptable for all mortgage loans that would be originated by and subsequently purchased from GreenPoint (by EMC) immediately upon origination, as was the case with Plaintiffs' mortgage loan. As such, the Plaintiffs' mortgage loan would not have been originated by GreenPoint, if GreenPoint did not have a purchaser (i.e. EMC) for said mortgage loan. GreenPoint originated the Plaintiffs' mortgage loan using a mortgage loan product and underwriting guidelines established and set by EMC Mortgage in a predetermined arrangement between GreenPoint and EMC to fulfill EMC's need to acquire a group of mortgages large enough to create the GreenPoint Mortgage Funding Trust 2006-AR3.

244.   Understanding these complex interactions between said entities is important in order to establish EMC Mortgage Corporation's culpability in the origination of these Plaintiffs' mortgage loan, as GreenPoint no longer exists.

245.   At the time of the origination of the Plaintiffs' mortgage loan, GreenPoint was owned by North Fork Bank. North Fork Bank was subsequently purchased by Capital One Financial Corp in December 2006. GreenPoint was subsequently closed by Capital One and all of its loans and servicing rights sold to Countrywide, which in turn, was purchased by Bank of America, N.A.

246.   Considering these facts, it is upon information and belief of these Plaintiffs that EMC Mortgage Corporation is the only entity in existence today that can be held responsible for a claim that said mortgage loan product was created simply to assist EMC's plan to create a pool of mortgages so as to create the GreenPoint Mortgage Funding Trust 2006-AR3, while

giving absolutely no consideration to whether said mortgage loan product would be sustainable by and/or in the best interest these Plaintiffs and others.

247.    EMC would go on to sell the resultant pool of mortgages created by lowering origination underwriting guidelines, knowing full well that they would suffer no financial consequences when mortgage loans so originated would default, but rather would in fact profit by servicing said mortgage loans as described in the preceding paragraphs.

248.    In the case of the mortgage loan origination of these Plaintiffs, they did not make enough income to qualify for a conventionally underwritten mortgage at the time of their application for said mortgage, so GreenPoint Mortgage offered them a mortgage loan product, created and approved by EMC Mortgage Corporation, which would allow them to qualify by not verifying the Plaintiffs' income and additionally only requiring that they pay a minimum monthly payment amount that would result in the Plaintiffs paying less than half of the fully amortized payment. This type of mortgage loan product is called a negative amortization mortgage. Every month the borrower pays the minimum payment, the balance of what a fully amortized payment would have been, is added to the principal balance of the loan and as a result, the amount of principal balance continues to rise.

249.    Originator Defendant EMC Mortgage Corporation knew that many of the target borrowers would not earn enough income to qualify for a conventionally underwritten mortgage. At best the Plaintiffs and others are unsophisticated consumers who could be easily taken advantage of by the issuance of a highly complex, hi-risk mortgage lending instrument to them. Knowing these facts, Originator Defendant EMC Mortgage Corporation developed a high risk lending instrument specifically tailored to the Plaintiffs' and others situations so as to make said loan (and other loans) to enrich themselves by fraudulently misrepresenting the financial soundness of this lending instrument (through GreenPoint) to Plaintiffs and others, knowing said loan would cause injury to the Plaintiffs due to the high likely-hood of future default by Plaintiffs.

250.    This type of conduct is representative of the EMC Mortgage Corporation Originator Defendant's behavior in many cases where mortgages have been directly or indirectly originated by EMC and/or JPMorgan Chase Bank, N.A. and any of its subsidiaries in the State of Massachusetts and nationwide.

### Defendant's Actions Caused Injury to Plaintiffs

251.    Plaintiffs have suffered injury caused by the Originator Defendant's actions, including but not limited to the creation of a situation whereby Plaintiffs would be unable to repay their mortgage loan obligations, improper negative reporting to credit bureaus, monetary damages from higher principle balances, inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, increased accrued interest, legal fees for defense of foreclosure and/or eviction, rental payments, and the eventual loss of their home and property.


### As to The Servicer Defendants

### Violation of Massachusetts Consumer Protection Act and Applicable Regulations

### Deceptive And Misleading Representations and Business Practices

### Regarding their Modification Activities
### and/or Fraud


### Heang Ouch v The One West Servicer Defendants for 93A Violations and Fraud

252.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

253.    Plaintiff, Heang Ouch is a citizen of the State of Massachusetts residing at 43 Inland Street, Lowell, MA 01851, which is one of the subject properties referred to herein.

254.    Plaintiff made an application to the OneWest Servicer Defendants for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S.

Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to his hardship on or about November 2009 with the assistance of Dragon Law Firm, PLLC of 101 North State Street, Suite 301, Concord, NH 03301.

255.    Plaintiff was determined by the OneWest Servicer Defendants to have met the threshold requirements for HAMP, as described above.

256.    On or about May of 2010 the OneWest Servicer Defendants denied Plaintiff for HAMP without providing Plaintiff with any reasonable explanation.

257.    On July 14, 2010, Harmon Law, P.C. sent Plaintiff a Notice of Intention to Foreclose on behalf of Defendant OneWest.

258.    A foreclosure auction was held on Plaintiff's subject property on August 10, 2010 and said property was sold to Trustee Defendant FNMA.

259.    During the entire eight months since he first applied for the HAMP program, Plaintiff was stalled by the OneWest Servicer Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in his modification attempts.

It is upon information and belief that the OneWest Servicer Defendants purposefully misled Plaintiff and hindered his modification requests in an effort to enrich themselves by ignoring his legitimate request for modification under HAMP so as to maximize servicing income, servicing expenses, and/or to take advantage of the loss sharing agreement with the FDIC.

258.    The OneWest Servicer Defendants' conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

> a.    fraudulently misrepresenting their intentions to properly review requests
> for loan modifications for Plaintiff and others, while in fact purposefully
> creating abusive roadblocks to deprive Plaintiff and others of the opportunity

to seek assistance under a federal government program the Servicer Defendants publicly represented they would administer;

b.   deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances and/or (in the case of the OneWest Servicer Defendants) take advantage of the OneWest Servicer Defendants loss sharing agreement with the FDIC in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

c.   fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

d.   deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

259.   Defendants' conduct as described in this complaint was willful or knowing within the meaning of Massachusetts Consumer Protection Act, G.L. c. 93A, §9.

**Dieu Troung v Bank of America, N.A. and BAC Home Loans Servicing, LP**

**For 93A Violations and Fraud**

260.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

261.    Plaintiff, Dieu Truong is a citizen of the State of Massachusetts residing at 162-164 Glendale Road, Quincy, MA 02169, which is one of the subject property referred to herein.

262.    On or about June of 2010, Plaintiff Truong made an application to Servicer Defendant BAC Home Loans Servicing, LP for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to his hardship.

263.    On July 2, 2010, Claudia, a representative of BAC Home Loans Servicing, LP, informed Plaintiff Truong that his documents had not been received and he was instructed to forward them again.

264.    On July 2, 2010 Plaintiff Truong faxed another complete submission for HAMP consideration to Defendant BAC Home Loans Servicing, LP.

265.    On August 4, 2010 Plaintiff Truong spoke to Pat, a representative of BAC Home Loans Servicing, LP (BAC), and gave financial information over the telephone. Pat informed Plaintiff Truong that she would send out another HAMP package to fill out and return.

266.    After waiting several weeks for said package to arrive and receiving nothing from BAC, Plaintiff Truong called BAC again and spoke to a representative named David who assured Plaintiff Truong that a package would be sent.

267.    Plaintiff Truong received package from BAC and filled it out and sent back the package, with the requested documentation on or about September 1, 2010.

268.    On September 14, 2010, Plaintiff Truong spoke to a BAC representative named Julie, who told Plaintiff Truong that his request was "in review" and he was instructed to call back next week.

269.    On October 6, 2010, Plaintiff Truong spoke to a BAC representative named Kevin who informed Plaintiff that his request was still being reviewed and was waiting for the file to be assigned to a negotiator.

270.    Between October 15, 2010 and continuing through January 15, 2011, Plaintiff Truong

received seven identical HAMP modification packages to fill out and return to BAC. Plaintiff

Truong complied with all requests for paperwork and documentation from BAC.

271.    On January 27, 2011, Plaintiff Truong was told by BAC representative Diana that his

"investor" was not doing HAMP and that his modification request had been denied.

272.    To date, Plaintiff Truong has not received anything in writing from BAC, stating that

he has been denied a HAMP modification, a required under HAMP Guidelines and Directives.

273.    On May 17, 2011, Harmon Law Offices, P.C. sent a notice to Plaintiff Truong stating

that it had been retained by BAC to foreclose on Plaintiff's mortgage. This notice further

states that Harmon Law P.C. has been instructed to bring foreclosure in the name of Wells

Fargo Bank, N.A. as Trustee for the Certificate Holders of Banc of America Alternative Loan

Trust 2005-2 Mortgage Pass-Through Certificates Series 2005-2 (the purported "investor" that

Plaintiff Truong was told was "*not doing HAMP*" as mentioned above).

The BAC Home Loans Servicing, LP and Bank of America , N.A. Servicer Defendants'

conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and

generally recognized standards applicable to the consumer lending business by;

      a.    fraudulently misrepresenting their intentions to properly review requests

      for loan modifications for Plaintiff and others, while in fact purposefully

      creating abusive roadblocks to deprive Plaintiff and others of the opportunity

      to seek assistance under a federal government program the Servicer

      Defendants publicly represented they would administer;

      b.    deceptively misleading Plaintiff and others by publicly claiming to be a

      participating servicer in a federal government mortgage modification program

      yet purposefully, willfully and intentionally ignored guidelines and directives

      of said federal program, seeking instead to enrich themselves by first

      hindering the modification process in order to maximize the collection of

      servicing fees and billing of servicing advances and then foreclosing (and/or

facilitating short sales) on borrowers properties to make recovery of said advances in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

c.  fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

d.  deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

274.    The BAC Home Loans Servicing and Bank of America, N.A. Servicer Defendants' conduct as described in this complaint was willful or knowing within the meaning of Massachusetts Consumer Protection Act, G.L. c. 93A, §9.

**Vith Chrorm v Bank of America, N.A. and BAC Home Loans Servicing, LP**

**For 93A Violations and Fraud**

275.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

276.    Plaintiff, Vith Chrorm is a citizen of the State of Massachusetts residing at 12 Zarek Drive, Attleboro MA 02703, which is one of the subject properties referred to herein.

277.    On or about March of 2010, Plaintiff Truong made an application to Defendant BAC Home Loans Servicing, LP for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to his hardship and a statement attesting to his foreseeable imminent default.

278.    On April 14, 2010, Suneaka, a representative of BAC, spoke with Plaintiff Chrorm and confirmed receipt of his submission.

279.    On June 10, 2010, an unnamed representative of BAC asked Plaintiff Chrorm *"why do you need a modification when you are current on your payments at this time?"*, even though he had already stated foreseeable imminent default in his original submission.

280.    On July 21, 2010 an unnamed representative of BAC informed Plaintiff Chrorm that his request for HAMP had been forwarded to the underwriting department.

281.    On July 27, 2010 an unnamed representative of BAC informed Plaintiff Chrorm that his request was waiting to be assigned to an underwriter and his request was being *"escalated"*.

282.    On August 18, 2010 and unnamed representative of BAC requested all new HAMP documents and supporting income and assets verification documents from Plaintiff Chrorm. Plaintiff complied with this request and faxed them to BAC that same day.

283.    On August 25, 2010 an unnamed representative of BAC informed Plaintiff Chrorm that his HAMP request had been denied on August 19, 2010 and that he should try to re-submit his file from scratch. The aforementioned BAC representative went on to state that a letter had been sent to Plaintiff from BAC regarding said denial and Plaintiff was told to ignore it.

284.    As short time after the aforementioned conversation Plaintiff Chrorm faxed another complete HAMP request to BAC.

285.    On September 30, 2010 an unnamed representative of BAC informed Plaintiff Chrorm that his recent HAMP request was again under review for HAMP consideration.

286.    On October 26, 2010- an unnamed representative of BAC informed Plaintiff Chrorm that his file was going to underwriting but that it was *"going to be awhile"*.

287.    On October 12, 2010 an unnamed representative of BAC informed Plaintiff Chrorm that his file was still under review and to keep making status checks.

288.    On October 18, 2010 an unnamed representative of BAC informed Plaintiff Chrorm that a new HAMP request package had been sent to him and he was instructed to fill it out and return it to BAC as soon as possible.

289.    Sometime between October 19, 2010 and November 10, 2010, the aforementioned package was received by Plaintiff Chrorm and sent back to BAC with the requested documentation.

290.    On November 12, 2010 an unnamed representative of BAC confirmed receipt of the aforementioned package request and supporting documentation.

291.    On November 23, 2010 an unnamed representative of BAC told Plaintiff Chrorm that another package had been sent to him and he was instructed to fill it out and return it to BAC via Federal Express and was further told not to fax it to BAC.

292.    On November 29, 2010 Plaintiff Chrorm sent the aforementioned package to BAC via Federal Express.

293.    On December 13, 2010 an unnamed representative of BAC requested that Plaintiff Chrorm fax a copy of his signed 2009 tax returns to BAC. Those returns were faxed that day and confirmed as received by BAC on December 15, 2010.

294.    On December 22, 2010 an unnamed representative of BAC informed Plaintiff Chrorm that his request was being reviewed by an underwriter.

295.    On January 4, 2011 an unnamed representative of BAC informed Plaintiff Chrorm that he should watch his mail as his request had been approved on December 30, 2010.

296.    On January 13, 2011 Plaintiff Chrorm contacted BAC to inquire about his approval and the mail he was supposed to *"watch for"*, as he had yet to receive anything from BAC. An unnamed representative of BAC informed him that his HAMP modification request had been sent to his *"investor"* for additional approval and should be done by March 1, 2011.

297.    On January 24, 2011 an unnamed representative of BAC informed Plaintiff Chrorm that his request was now in the quality control department (final stage) and a decision would be forthcoming regarding his request for HAMP.

65

298.    On February 2, 2011 an unnamed representative of BAC informed Plaintiff Chrorm that his request for HAMP modification had been declined because Plaintiff property was unoccupied but that if he sent in a utility bill he would be given further consideration.

299.    On February 7, 2011 an unnamed representative of BAC informed Plaintiff Chrorm that his request was still in review.

300.    On February 25, 2011 an unnamed representative of BAC informed Plaintiff Chrorm that his file was in underwriting and that all documents had been received.

301.    On March 11, 2011 an unnamed representative of BAC informed Plaintiff Chrorm that his file was still in underwriting and that no documents were needed.

302.    On March 14, 2011 an unnamed representative of BAC informed Plaintiff Chrorm that his request for modification under HAMP guidelines had been declined. Also, that he did not qualify for any type of modification. Plaintiff was not given a reason why, nor has he received anything in writing from BAC regarding said denial.

The BAC Home Loans Servicing, LP and Bank of America , N.A. Servicer Defendants' conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

    a.    fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the Servicer Defendants publicly represented they would administer;

    b.    deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or

66

facilitating short sales) on borrowers properties to make recovery of said

advances in order to maximize profits, while Plaintiff and others sought, in

good faith, to modify their mortgage under said federal program;

c.   fraudulently misleading Plaintiff and others by instructing them to

repeatedly submit documentation for application to have their mortgages

modified under said federal program while full well knowing that Plaintiff and

others mortgages could not be modified due to the contractual restrictions

against modification contained in the pooling and servicing agreements

governing the servicing of Plaintiff and others mortgages;

d.   deceptively and fraudulently seeking to and/or completing foreclosures on

Plaintiff and other borrower's homes while having full knowledge that no

actual default under the terms of the note/deed of trust exists.

303.    The BAC Home Loans Servicing and Bank of America, N.A. Servicer Defendants'

conduct as described in this complaint was willful or knowing within the meaning of

Massachusetts Consumer Protection Act, G.L. c. 93A, §9.

**Narom Nop & Kab Seun v BAC Home Loans Servicing, LP and Bank of America, N.A.**

**For 93A Violations and Fraud**

304.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

305.    Plaintiffs, Narom Nop & Kab Seun are citizens of the State of Massachusetts residing

at 20 South Ridge Circle, Lowell, MA 02852, which is the one of the subject properties

incorporated and referred to herein.

306.    Plaintiffs made an application to the BAC Servicer Defendant for consideration for

their mortgage to be modified under the guidelines and supplemental directives of the U.S.

Treasury Department's Making Home Affordable Home Affordable Modification Program

that included personal financial information, tax information, and a statement attesting to their

hardship on or about August 2009.

307.    During the entire two years since Plaintiffs first applied for the HAMP program they suffered extreme emotional and mental distress as the Plaintiffs were stalled by the BAC Servicer Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in their modification attempts and repeatedly threatened with foreclosure. It is upon information and belief that the BAC Servicer Defendant purposefully misled Plaintiffs and hindered their modification requests in an effort to enrich themselves by ignoring their legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

308.    On or about July 29, 2011, Trustee Defendant Harmon Law, P.C. sent Plaintiffs a Notice of Intention to Foreclose on behalf BAC Home Loans Servicing, LP stating a scheduled auction date of august 29, 2011. At the time of the filing of this complaint, that auction date has passed and the Plaintiff's subject property has been sold at auction to Defendant FNMA.

309.    The BAC Home Loans Servicing, LP and Bank of America , N.A. Servicer Defendants' conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

        a.    fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the Servicer Defendants publicly represented they would administer;

        b.    deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of

servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

c.   fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

d.   deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

310.   The BAC Home Loans Servicing and Bank of America, N.A. Servicer Defendants' conduct as described in this complaint was willful or knowing within the meaning of Massachusetts Consumer Protection Act, G.L. c. 93A, §9.

**Chhuom Mom v BAC Home Loans Servicing, LP and Bank of America, N.A.**

**For 93A Violations and Fraud**

311.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

312.   Plaintiff, Chhuom Mom is a citizen of the State of Massachusetts residing at 39 Pickering Street, Fall River, MA 02720, which is the one of the subject properties incorporated and referred to herein.

313.   Plaintiff made an application to the BAC Servicer Defendant for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to his hardship on or about August 2010.

314.    During the entire one year since Plaintiff first applied for the HAMP program he suffered extreme emotional and mental distress as the Plaintiff was stalled by the BAC Servicer Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in his modification attempts and repeatedly threatened with foreclosure. It is upon information and belief that the BAC Servicer Defendant purposefully misled Plaintiff and hindered his modification requests in an effort to enrich themselves by ignoring their legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

315.    The BAC Home Loans Servicing, LP and Bank of America , N.A. Servicer Defendants' conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

        a.    fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the Servicer Defendants publicly represented they would administer;

        b.    deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

   c.  fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

   d.  deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

316.    The BAC Home Loans Servicing and Bank of America, N.A. Servicer Defendants' conduct as described in this complaint was willful or knowing within the meaning of Massachusetts Consumer Protection Act, G.L. c. 93A, §9.

**Savan Chhem, Sok Chan Chhem v Bank of America, N.A. For Fraud**

317.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

318.    Plaintiff, Savan Chhem is a citizen of the State of Massachusetts residing at 34 Daisy Lane, Fall River, MA 02720, which is the one of the subject properties incorporated and referred to herein.

319.    Plaintiff, Sok Chan Chhem is a citizen of the State of Massachusetts residing at 34 Daisy Lane, Fall River, MA 02720, which is the one of the subject properties incorporated and referred to herein.

320.    Plaintiffs made an application to the Bank of America, N.A. Servicer Defendant for consideration for their mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to their hardship on or about November 2010.

321.    During the entire one year since Plaintiffs first applied for the HAMP program they suffered extreme emotional and mental distress as the Plaintiffs were stalled by the Bank of America, N.A. Servicer Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in their modification attempts and repeatedly threatened with foreclosure. It is upon information and belief that the BAC Servicer Defendant purposefully misled Plaintiffs and hindered their modification requests in an effort to enrich themselves by ignoring their legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

322.    The Bank of America , N.A. Servicer Defendant's conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

> a.   fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the Servicer Defendants publicly represented they would administer;

> b.   deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

c. fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

d. deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

323. The Bank of America, N.A. Servicer Defendant's conduct as described in this complaint was willful or knowing.

**Jeanine Chhoeum v BAC Home Loans Servicing, LP and Bank of America, N.A. For Fraud**

324. Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

325. Plaintiff, Jeanine Chhoeum is a citizen of the State of Massachusetts residing at 78 Fort Hill Avenue, Lowell, MA 01852, which is the one of the subject properties incorporated and referred to herein.

326. Plaintiff made an application to the BAC Servicer Defendant for consideration for her mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to her hardship on or about February 2010.

327. On or about September 2010, Plaintiff was granted a modification that was not a HAMP modification. Said modification reduced Plaintiff's Mortgage payment by an amount so insignificant that Plaintiff was still unable to afford said payment. It is upon information and belief that Plaintiff's request for a HAMP modification was denied unfairly.

328.     During the entire one year and ten months since Plaintiff first applied for the HAMP program she suffered extreme emotional and mental distress as the Plaintiff was stalled by the BAC Servicer Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in her modification attempts and repeatedly threatened with foreclosure. It is upon information and belief that the BAC Servicer Defendant purposefully misled Plaintiff and hindered her modification requests in an effort to enrich themselves by ignoring her legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

329.     The BAC Home Loans Servicing, LP and Bank of America , N.A. Servicer Defendants' conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

      a.     fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the Servicer Defendants publicly represented they would administer;

      b.     deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

c.   fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

d.   deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

The BAC Home Loans Servicing and Bank of America, N.A. Servicer Defendants' conduct as described in this complaint was willful or knowing.

**Stephen & Nancy Strauss v BAC Home Loans Servicing, LP and Bank of America, N.A. For Fraud**

330.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

331.    Plaintiffs, Stephen & Nancy Strauss are citizens of the State of Massachusetts residing at 90 Pinedale Avenue, Billerica, MA 01821, which is the one of the subject properties incorporated and referred to herein.

332.    Plaintiffs made an application to the Servicer Defendant BAC Home Loans Servicing, LP, for consideration for their mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to their hardship on or about January 28, 2010.

333.    During the entire eleven months since Plaintiffs first applied for the HAMP program they suffered extreme emotional and mental distress as the Plaintiffs were stalled by the BAC Servicer Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in their modification attempts and repeatedly threatened with foreclosure.

334.    The BAC Servicer Defendant's conduct was particularly egregious in the case of these Plaintiffs, as they were deemed to be accepted into the HAMP Program and given a Trial Period Plan on or about May 11, 2011, by the BAC Servicer Defendant. After making all three Trail Period Plan payments on time and as agreed, the BAC Servicer Defendant did not grant Plaintiffs a permanent modification and instead proceeded to initiate foreclosure action against Plaintiffs.

335.    It is upon information and belief that the BAC Servicer Defendant purposefully misled Plaintiffs and hindered their modification requests in an effort to enrich themselves by ignoring their legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

336.    The BAC Home Loans Servicing, LP and Bank of America , N.A. Servicer Defendants' conduct was, and continues to be, unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

        a.    fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the Servicer Defendants publicly represented they would administer;

        b.    deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said in

order to maximize profits, while Plaintiff and others sought, in good faith, to

modify their mortgage under said federal program;

c.   fraudulently misleading Plaintiff and others by instructing them to

repeatedly submit documentation for application to have their mortgages

modified under said federal program while full well knowing that Plaintiff and

others mortgages could not be modified due to the contractual restrictions

against modification contained in the pooling and servicing agreements

governing the servicing of Plaintiff and others mortgages;

d.   deceptively and fraudulently seeking to and/or completing foreclosures on

Plaintiff and other borrower's homes while having full knowledge that no

actual default under the terms of the note/deed of trust exists.

The BAC Home Loans Servicing and Bank of America, N.A. Servicer Defendants' conduct as

described in this complaint was willful or knowing.

**Marlena Davis  v Americas Servicing Company (ASC) and Wells Fargo Bank, N.A.**

**For 93A Violations and Fraud**

337.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

338.    Plaintiff, Marlena Davis is a citizen of the State of Massachusetts residing at 66

Osceola Street, Mattapan, MA 02126, which is the one of the subject properties incorporated

and referred to herein.

339.    Plaintiff made an application to the ASC Servicer Defendant for consideration for her

mortgage to be modified under the guidelines and supplemental directives of the U.S.

Treasury Department's Making Home Affordable Home Affordable Modification Program

that included personal financial information, tax information, and a statement attesting to her

hardship on or about July 2009.

340.    Servicer Defendant ASC's conduct was particularly egregious regarding the Davis

modification request. Plaintiff's home suffered a fire in 2008 and was damaged so badly that

she had to move in with her parents for a period of time while the property was being repaired

so as to bee habitable. Her parents reside at, and are the owners of that property located at 211 Almont Street, Mattapan, MA 02126.

341.     Servicer Defendant ASC was so determined to hinder her attempt at modification, they continuously used the excuse that they could not verify that the Plaintiff lived in the subject property, even going so far as to deny her HAMP request, in writing, claiming that her property was vacant, and verbally claiming that she lived at 211 Almont Street (her parents home) which she had left once the fire damage had been repaired. All this in spite of numerous letters, verification proving otherwise, and an offer to allow an inspector to come and visit the property to confirm her residency. These systematic stall tactics were employed by Servicer Defendant ASC from on or about July 2009 through October 2011.

342.     During the time period of Plaintiff's request for HAMP consideration she suffered extreme emotional and mental distress as Servicer Defendant referred her to foreclosure on or about February 2011, July, 2011, August 2011, September 2011, and November 2011.

343.     On or about October 17, 2011, Trustee Defendant Harmon Law, P.C. sent Plaintiff a Notice of Intention to Foreclose on behalf of Trustee Defendant Deutsche Bank stating a scheduled auction date of November 16, 2011. At the time of the filing of this complaint, that auction date has been postponed until December 16, 2011.

344.     During the entire two years and three months since Plaintiff first applied for the HAMP program, Plaintiff was stalled by the ASC Servicer Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in her modification attempts. It is upon information and belief that the ASC Servicer Defendants purposefully misled Plaintiff and hindered her modification requests in an effort to enrich themselves by ignoring her legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

345.    The ASC and Wells Fargo Bank, N.A. Servicer Defendants' conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

      a.   fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the Servicer Defendants publicly represented they would administer;

      b.   deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances and/or (in the case of the OneWest Servicer Defendants) take advantage of the OneWest Servicer Defendants loss sharing agreement with the FDIC in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

      c.   fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

    d.  deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

346.    The ASC Servicer Defendants' conduct as described in this complaint was willful or knowing within the meaning of Massachusetts Consumer Protection Act, G.L. c. 93A, §9.

**Neang Lim v Wachovia Mortgage and Wells Fargo Bank, N.A.**

**For 93A Violations and Fraud**

347.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

348.    Plaintiff, Neang Lim is a citizen of the State of Massachusetts residing at 200 Trotting Park Road, Lowell, MA 01854, which is the one of the subject properties incorporated and referred to herein.

349.    Plaintiff made an application to the Wachovia Servicer Defendant for consideration for Plaintiff's mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to Plaintiff's hardship on or about May 2009.

350.    Plaintiff was determined by the Wachovia Servicer Defendant to have met the threshold requirements for HAMP, as described above, and granted a Trail Period Plain under HAMP, on or about February 14, 2011.

351.    During the entire twenty-one months since Plaintiff first applied for the HAMP program, Plaintiff was stalled by the ASC Servicer Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in her modification attempts. It is upon information and belief that the Wachovia Servicer Defendant purposefully misled Plaintiff and hindered Plaintiff's modification requests in an effort to enrich themselves by ignoring her legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

352.    The Wachovia Servicer Defendant conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

      a.    fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the Servicer Defendants publicly represented they would administer;

      b.    deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

      c.    fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

      d.    deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

Wachovia and Wells Fargo Bank, N.A. Servicer Defendants' conduct as described in this complaint was willful or knowing within the meaning of Massachusetts Consumer Protection Act, G.L. c. 93A, §9.

**Saroeun Rom v Wachovia Mortgage and Wells Fargo, Bank, N.A.**

**For 93A Violations and Fraud**

353.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

354.    Plaintiff, Saroeun Rom is a citizen of the State of Massachusetts residing at and is owner of 819 Chelmsford Street, Lowell, MA 01851, which is the one of the subject properties incorporated and referred to herein.

355.    Plaintiff made an application to the Wachovia Servicer Defendant for consideration for Plaintiff's mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to Plaintiff's hardship on or about November 2009.

356.    Plaintiff was denied a HAMP modification and upon information and belief said denial was without due cause. Plaintiff was approved for an "in house" modification on or about October 14, 2010.

357.    During the entire eleven months since Plaintiff first applied for the HAMP program, Plaintiff was stalled by the Wachovia Servicer Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in Plaintiff's modification attempts. It is upon information and belief that the Wachovia Servicer Defendant purposefully misled Plaintiff and hindered Plaintiff's modification requests in an effort to enrich themselves by ignoring Plaintiff's legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

358.    The Wachovia Servicer Defendant conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

        a.    fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the Servicer Defendants publicly represented they would administer;

        b.    deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

        c.    fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

        d.    deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

Wachovia and Wells Fargo Bank, N.A. Servicer Defendants' conduct as described in this complaint was willful or knowing within the meaning of Massachusetts Consumer Protection Act, G.L. c. 93A, §9.

**Sophal Kol v Wells Fargo, Bank, N.A. For Fraud**

359.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

360.     Plaintiff, Sophal Kol is a citizen of the State of Massachusetts residing at and is part owner of 57 Harris Street, Revere, MA 02151, which is the one of the subject properties incorporated and referred to herein.

361.     Plaintiff made an application to the Wells Fargo Bank, N.A. Servicer Defendant for consideration for Plaintiff's mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to Plaintiff's hardship on or about April 2010.

362.     During the entire year since Plaintiff first applied for the HAMP program (Plaintiff gave up further HAMP application attempts on or about April 2011), Plaintiff was stalled by the Wells Fargo Bank, N.A. Servicer Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in his modification attempts. It is upon information and belief that the Wells Fargo Bank, N.A. Servicer Defendant purposefully misled Plaintiff and hindered Plaintiff's modification requests in an effort to enrich themselves by ignoring Plaintiff's legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

363.     The Wells Fargo Bank, N.A. Servicer Defendant conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

>     a.     fraudulently misrepresenting their intentions to properly review requests
>             for loan modifications for Plaintiff and others, while in fact purposefully

creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the Servicer Defendants publicly represented they would administer;

b.   deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances and/or (in the case of the OneWest Servicer Defendants) take advantage of the OneWest Servicer Defendants loss sharing agreement with the FDIC in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

c.   fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

d.   deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

The Wells Fargo Bank, N.A. Servicer Defendant's conduct as described in this complaint was willful or knowing.

**Kolap Im v Barclays Capital Real Estate, Inc. d/b/a/ HomEq Servicing For Fraud**

364.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

365.    Plaintiff, Kolap Im is a citizen of the State of Massachusetts residing at 21 Hillside Street, Lowell, MA 01851, which is the one of the subject properties incorporated and referred to herein.

366.    Plaintiff made an application to the HomEq Servicer Defendant for consideration for Plaintiff's mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to Plaintiff's hardship on or about April 2009.

367.    Plaintiff was determined by the HomEq Servicer Defendant to have met the threshold requirements for HAMP, as described above, and granted a Trail Period Plain under HAMP, on or about June 1, 2010.

368.    During the time period of Plaintiff's request for HAMP consideration she suffered extreme emotional and mental distress as Servicer Defendant referred her to foreclosure on or about October 20, 2009.

369.    On October 20, 2009, Defendant Doonan, Graves & Longoria, LLC. sent Plaintiff a Notice of Intention to Foreclose on behalf of Trustee Defendant U.S. Bank National Association Bank stating a scheduled auction date of November 6, 2009. Additional auction dates were also set for on or about March 25, 2010, and May 25, 2010.

370.    During the entire fourteen months since Plaintiff first applied for the HAMP program, Plaintiff was stalled by the HomEq Servicer Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in Plaintiff's modification attempts. It is upon information and belief that the HomEq Servicer Defendant purposefully misled Plaintiff and hindered Plaintiff's modification requests in an effort to enrich themselves by ignoring Plaintiff's legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

371.    The HomEq Servicer Defendant conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

        a.    fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the Servicer Defendants publicly represented they would administer;

        b.    deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances and/or (in the case of the OneWest Servicer Defendants) take advantage of the OneWest Servicer Defendants loss sharing agreement with the FDIC in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

        c.    fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

      d.   deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

The HomEq Servicer Defendant's conduct as described in this complaint was willful or knowing.

**Vandy & Daovanney Duch v Taylor Bean & Whitaker Mortgage Corp., and Ocwen Loan Servicing, LLC For Fraud**

372.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

373.    Plaintiffs, Vandy & Daovanney Duch are citizens of the State of Massachusetts residing at 335 Walker Street, Lowell, MA 01851, which is the one of the subject properties incorporated and referred to herein.

374.    Plaintiffs made an application to the Taylor Bean & Whitaker Servicer Defendant for consideration for Plaintiffs' mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to Plaintiffs' hardship on or about August 2009.

375.    Plaintiffs made another application to the Ocwen Servicer Defendant for consideration for Plaintiffs' mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to Plaintiffs' hardship on or about March 2010, after the servicing rights to Plaintiffs' mortgage had been sold to the Ocwen Servicer Defendant.

376.    During the time period of Plaintiffs' request for HAMP consideration they suffered extreme emotional and mental distress as both Servicer Defendants referred them to foreclosure on or about October 2009, February 2010, April 2010, and May 2010.

377.    On or about September 1, 2009, Defendant Orlans Moran, PLLC. sent Plaintiffs a Notice of Intention to Foreclose on behalf of Taylor Bean & Whittaker stating a scheduled auction date of October 29, 2009.

378.    Plaintiffs were granted an "in house" modification by Ocwen on or about July 2010, after Ocwen had determined that Plaintiffs did not qualify for the HAMP Program. It is upon information and belief that the Plaintiffs' request for a HAMP modification was denied without due cause.

379.    During the entire ten months since Plaintiffs first applied for the HAMP program, Plaintiffs were stalled by the Taylor Bean & Whitaker and Ocwen Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in Plaintiffs' modification attempts. It is upon information and belief that the Taylor Bean & Whitaker and Ocwen Servicer Defendants purposefully misled Plaintiffs and hindered Plaintiffs' modification requests in an effort to enrich themselves by ignoring Plaintiffs' legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

380.    The Taylor Bean & Whitaker and Ocwen Servicer Defendants conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

a.    fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the servicer defendants publicly represented they would administer;

b.    deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives

of said federal program, seeking instead to enrich themselves by first

hindering the modification process in order to maximize the collection of

servicing fees and billing of servicing advances and then foreclosing (and/or

facilitating short sales) on borrowers properties to make recovery of said

advances in order to maximize profits, while Plaintiff and others sought, in

good faith, to modify their mortgage under said federal program;

c.     fraudulently misleading Plaintiff and others by instructing them to

repeatedly submit documentation for application to have their mortgages

modified under said federal program while full well knowing that Plaintiff and

others mortgages could not be modified due to the contractual restrictions

against modification contained in the pooling and servicing agreements

governing the servicing of Plaintiff and others mortgages;

d.     deceptively and fraudulently seeking to and/or completing foreclosures

on Plaintiff and other borrower's homes while having full knowledge that no

actual default under the terms of the note/deed of trust exists;

The Taylor Bean & Whitaker and Ocwen Servicer Defendants conduct as described in this

complaint was willful and knowing.

**Chantha Oum v American Home Mortgage Servicing, Inc./AHMSI For Fraud**

381.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

382.    Plaintiff, Chantha Oum is a citizen of the State of Massachusetts residing 18 Bourne

Street, Lowell, MA 01852, which is the one of the subject properties incorporated and referred

to herein.

383.    Plaintiff made an application to the AHMSI Servicer Defendant for consideration for

her mortgage to be modified under the guidelines and supplemental directives of the U.S.

Treasury Department's Making Home Affordable Home Affordable Modification Program

that included personal financial information, tax information, and a statement attesting to Plaintiff's hardship on or about March 2010.

384.     During the time period of Plaintiff's request for HAMP consideration she suffered extreme emotional and mental distress as the AHMSI Servicer Defendant and Defendant Ablitt Scofield began foreclosure action, on behalf of Wells Fargo Bank, N.A., as Trustee for the Option One Mortgage Loan Trust 2007-2, beginning with a Service members' Relief Act Complaint and Order of Notice with the Middlesex County Land Court asking for "authority to foreclose" on the Property on behalf of Wells Fargo as Trustee for Option One Mortgage Loan Trust 2007-2, through its attorney Ablitt Scofield, on or about September 1, 2010.

385.     Plaintiff was never granted a HAMP Modification and was not informed of any denial of her application either verbally or in writing. Should her HAMP modification request have been denied, it is upon information and belief that the Plaintiff's request for a HAMP modification was denied without due cause.

386.     During the entire nine months since Plaintiff first applied for the HAMP program, Plaintiff was stalled by the AHMSI Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in Plaintiff's modification attempts. It is upon information and belief that the AHMSI Servicer Defendants purposefully misled Plaintiff and hindered Plaintiff's modification requests in an effort to enrich themselves by ignoring Plaintiff's legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

387.     The AHMSI Defendants conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

         a.     fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully

creating abusive roadblocks to deprive Plaintiff and others of the opportunity
to seek assistance under a federal government program the servicer defendants
publicly represented they would administer;

b.      deceptively misleading Plaintiff and others by publicly claiming to be a
participating servicer in a federal government mortgage modification program
yet purposefully, willfully and intentionally ignored guidelines and directives
of said federal program, seeking instead to enrich themselves by first
hindering the modification process in order to maximize the collection of
servicing fees and billing of servicing advances and then foreclosing (and/or
facilitating short sales) on borrowers properties to make recovery of said
advances in order to maximize profits, while Plaintiff and others sought, in
good faith, to modify their mortgage under said federal program;

c.      fraudulently misleading Plaintiff and others by instructing them to
repeatedly submit documentation for application to have their mortgages
modified under said federal program while full well knowing that Plaintiff and
others mortgages could not be modified due to the contractual restrictions
against modification contained in the pooling and servicing agreements
governing the servicing of Plaintiff and others mortgages;

d.      deceptively and fraudulently seeking to and/or completing foreclosures
on Plaintiff and other borrower's homes while having full knowledge that no
actual default under the terms of the note/deed of trust exists.

388.    The AHMSI Servicer Defendants conduct as described in this complaint was willful
and knowing.

**Susan Sorsby v JPMorgan Chase Bank, N.A. and Chase Home Finance, LLC**

**For 93A Violations and Fraud**

389.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

390.    Plaintiff, Susan Sorsby is a citizen of the State of Massachusetts residing at 2 Fremont Road, Marshfield, MA 02050, which is the one of the subject properties incorporated and referred to herein.

391.    Plaintiff made an application to the Chase Home Finance Servicer Defendant for consideration for her mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to Plaintiff's hardship on or about March 2010.

392.    During the time period of Plaintiff's request for HAMP consideration she suffered extreme emotional and mental distress as the Chase Servicer Defendants and Defendant Harmon Law set foreclosure auction dates on behalf of JPMorgan Chase for on or about July 30, 2010, October 29, 2010, and September 7, 2011. As of the date of this filing the Plaintiff is still under the threat of foreclosure. All of the aforementioned Defendants' conduct is particularly egregious due to the fact that Plaintiff had been granted a permanent modification, by Defendants JPMorgan Chase effective October 1, 2010.

393.    Plaintiff was granted what she was told by Chase Home Finance was a FNMA modification on or about September 2010, after Chase Home Finance had determined that Plaintiff did not qualify for the HAMP Program. It is upon information and belief that the Plaintiff's request for a HAMP modification was denied without due cause.

394.    During the entire one year and seven months since Plaintiff first applied for the HAMP program, Plaintiff was stalled by the Chase Home Finance Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in Plaintiff's modification attempts. It is upon information and belief that the Chase Home Finance Servicer Defendants purposefully misled Plaintiff and hindered Plaintiff's modification requests in an effort to enrich themselves by

ignoring Plaintiff's legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

395.    The Chase Defendants conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

a.    fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the servicer defendants publicly represented they would administer;

b.    deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

c.    fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

d.    deceptively and fraudulently seeking to and/or completing foreclosures on

Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

The Chase Servicer Defendants conduct as described in this complaint was willful and knowing within the meaning of Massachusetts Consumer Protection Act, G.L. c. 93A, §9.

**Novelette Napier & Natasha Napier v EMC Mortgage Corporation and JPMorgan Chase Bank, N.A. For Fraud**

396.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

397.    Plaintiffs, Novelette Napier & Natasha Napier are citizens of the State of Massachusetts residing 30 Sanford Street, Boston, MA 02126, which is the one of the subject properties incorporated and referred to herein.

398.    Plaintiffs made an application to the EMC Servicer Defendant (EMC is a subsidiary of JPMorgan Chase Bank, N.A.) for consideration for their mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to Plaintiffs' hardship on or about June 2009.

399.    During the time period of Plaintiffs' request for HAMP consideration they suffered extreme emotional and mental distress.

400.    Plaintiffs were granted a HAMP Modification and executed a Home Affordable Modification Agreement with EMC Mortgage Corporation, as servicer for Wells Fargo Bank, N.A., as Trustee for the Certificate-holders of Structured Asset Mortgage Investments II, Inc., Bear Stearns Mortgage Funding Trust 2006-AR1, Mortgage Pass-through Certificates, Series 2006-AR1, on or about March 23, 2010. Said modification adjusted payment terms to $1,787.49 per month.

401.    During the entire nine months since Plaintiffs first applied for the HAMP program, Plaintiffs were stalled by the EMC Servicer Defendant's customer service representatives,

inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in Plaintiffs' modification attempts.

402.    Moreover, after making 5 consecutive, on time, monthly payments, as per the agreed upon modification terms as aforementioned, on or about September 2010, Plaintiffs were denied the ability to make further payments, by refusing to acknowledge Plaintiffs' modification, and refusing to accept any payments regarding their mortgage loan, by Servicer Defendants EMC Mortgage Corporation. At the time Plaintiffs' attempted to make their 6th payment under said modification, Servicer Defendant EMC informed Plaintiffs that their mortgage was now in foreclosure.

403.    On or about September 14, 2011, Servicer Defendant JPMorgan Chase sent a letter to Plaintiffs claiming that Plaintiffs' EMC mortgage was in foreclosure, and that the servicing of said mortgage was being transferred to Chase.

404.    The EMC Mortgage Corporation Servicer Defendants conduct is unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

> a.    fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the Servicer Defendants publicly represented they would administer;

> b.    deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said

advances in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

c.   fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

d.   deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

405.    The EMC and JPMorgan Chase Servicer Defendants conduct as described in this complaint was willful and knowing.

**Sarun Kim v JPMorgan Chase Bank, N.A. and Chase Home Finance, LLC**

**For 93A Violations and Fraud**

406.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

407.    Plaintiff, Sarun Kim is a citizen of the State of Massachusetts residing at 1-3 Glidden Avenue, Lowell, MA 01851, which is the one of the subject properties incorporated and referred to herein.

408.    Plaintiff made an application to the Chase Home Finance Servicer Defendant for consideration for her mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to her hardship on or about November 2009.

409.    During the entire one year and four months since Plaintiff first applied for the HAMP program (Plaintiff gave up on modification attempts on or about March 2011), Plaintiff was stalled by the Chase Home Finance Servicer Defendant's customer service representatives,

inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in her modification attempts. It is upon information and belief that the JPMorgan Chase Servicer Defendants purposefully misled Plaintiff and hindered her modification requests in an effort to enrich themselves by ignoring her legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

410.    During the time period of Plaintiff's request for HAMP consideration she suffered extreme emotional and mental distress as JPMorgan Chase Servicer Defendants attempted foreclosure on or about August 2010.

411.    On or about July 2010, Defendant Harmon Law, P.C. sent Plaintiff a Notice of Intention to Foreclose on behalf of Chase Home Finance, LLC, as the claimed present holder of Plaintiff's Mortgage, stating a scheduled auction date of August 11, 2010.

412.    The Chase Home Finance, LLC and JPMorgan Chase Bank, N.A. Servicer Defendants' conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

      a.    fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the Servicer Defendants publicly represented they would administer;

      b.    deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or

facilitating short sales) on borrowers properties to make recovery of said

advances in order to maximize profits, while Plaintiff and others sought, in

good faith, to modify their mortgage under said federal program;

c.   fraudulently misleading Plaintiff and others by instructing them to

repeatedly submit documentation for application to have their mortgages

modified under said federal program while full well knowing that Plaintiff and

others mortgages could not be modified due to the contractual restrictions

against modification contained in the pooling and servicing agreements

governing the servicing of Plaintiff and others mortgages;

d.   deceptively and fraudulently seeking to and/or completing foreclosures on

Plaintiff and other borrower's homes while having full knowledge that no

actual default under the terms of the note/deed of trust exists.

The JPMorgan Chase Servicer Defendants' conduct as described in this complaint was willful

or knowing within the meaning of Massachusetts Consumer Protection Act, G.L. c. 93A, §9.

**Michael Francis v JPMorgan Chase Bank, N.A. and Chase Home Finance, LLC**

**For 93A Violations and Fraud**

413.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

414.   Plaintiff, Michael Francis is a citizen of the State of Massachusetts residing at 172-

172A Eliot Street, Milton, MA 02186 which is the one of the subject properties incorporated

and referred to herein.

415.   Plaintiff made an application to the Chase Home Finance Servicer Defendant for

consideration for his mortgage to be modified under the guidelines and supplemental

directives of the U.S. Treasury Department's Making Home Affordable Home Affordable

Modification Program that included personal financial information, tax information, and a

statement attesting to his hardship on or about March 2009.

416.   During the entire two years and seven months since Plaintiff first applied for the

HAMP program, Plaintiff was stalled by the Chase Home Finance Servicer Defendant's

customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in his modification attempts. It is upon information and belief that the JPMorgan Chase Servicer Defendants purposefully misled Plaintiff and hindered his modification requests in an effort to enrich themselves by ignoring his legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses. The JPMorgan Chase Servicer Defendant's behavior in this Plaintiff's case is particularly troubling as the Trust that is the Holder of Plaintiff's Mortgage and Note (Long Beach Mortgage Loan Trust 2006-9) allows for the modification of mortgages as stated in said Prospectus Supplement (Exhibit 18 *Id. at pp. 266-267 "Collection and Other Servicing Procedures Employed by the Servicer"*). However, instead of modifying Plaintiff's Mortgage, the JPMorgan Chase Servicer Defendant's kept Plaintiff's modification request in a perpetual state of limbo for almost three years, where it still remains as of the date of this filing. It is upon information and belief that the JPMorgan Chase Servicer Defendant's purposefully, willfully and knowingly deceptively mislead Plaintiff in an effort to instead enrich themselves by using Plaintiff's defaulted Mortgage as part of an overall scheme to increase servicing income and advances.

417.    During the time period of Plaintiff's request for HAMP consideration, he suffered extreme emotional and mental distress as JPMorgan Chase Servicer Defendants requested the same documentation repeatedly every thirty days, claiming after each 30 day period, the previous month's documents, as submitted by Plaintiff, had expired. Furthermore, the JPMorgan Chase Defendant's continuously sent letters to Plaintiff, demanding additional documentation be submitted within 15 days, or they would close out Plaintiff's request for HAMP consideration, in violation of HAMP Guidelines and Supplemental Directives, which allow for a far greater amount of time for applicant borrowers to respond to documentation requests.

418.    On or about July, 28, 2011, Defendant Harmon Law, P.C. sent Plaintiff a letter stating that they had been retained by Servicer Defendant JPMorgan Chase Bank, N.A. to foreclose

Plaintiff's Mortgage. Said correspondence states that Defendant Harmon Law was instructed to bring a foreclosure in the name of Deutsche Bank National Trust Company, as Trustee for Long Beach Mortgage Loan Trust 2006-9. No auction date was stated in said letter to Plaintiff.

419.    The Chase Home Finance, LLC and JPMorgan Chase Bank, N.A. Servicer Defendants' conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

    a.    fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the Servicer Defendants publicly represented they would administer;

    b.    deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

    c.    fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions

against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

d.   deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

The JPMorgan Chase Servicer Defendants' conduct as described in this complaint was willful or knowing within the meaning of Massachusetts Consumer Protection Act, G.L. c. 93A, §9.

**Sakum Heng & Sothy Kum v JPMorgan Chase Bank, N.A. and Chase Home Finance, LLC For 93A Violations and Fraud**

420.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

421.    Plaintiffs, Sakum Heng & Sothy Kum are citizens of the State of Massachusetts residing at 15-17 Farley Street, Lawrence, MA 01843, which is the one of the subject properties incorporated and referred to herein.

422.    Plaintiffs made an application to the Chase Home Finance Servicer Defendant for consideration for her mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to Plaintiffs' hardship on or about December 2010.

423.    During the time period of Plaintiffs' request for HAMP consideration they suffered extreme emotional and mental distress as the Chase Servicer Defendants and Defendant Harmon Law threatened Plaintiffs with foreclosure action in a notice sent to Plaintiffs on or about August 4, 2011. As of the date of this filing the Plaintiffs are still under the threat of foreclosure.

424.    During the entire eight months since Plaintiffs first applied for the HAMP program, Plaintiffs were stalled by the Chase Home Finance Defendant's customer service representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered Plaintiffs' modification attempts. It is upon

information and belief that the Chase Home Finance Servicer Defendants purposefully misled Plaintiffs and hindered Plaintiffs' modification requests in an effort to enrich themselves by ignoring Plaintiffs' legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

425.   The Chase Defendants conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

a.   fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the servicer defendants publicly represented they would administer;

b.   deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

c.   fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements

governing the servicing of Plaintiff and others mortgages;

    d.   deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

The Chase Servicer Defendants conduct as described in this complaint was willful and knowing within the meaning of Massachusetts Consumer Protection Act, G.L. c. 93A, §9.

**Pros Chhot v Sovereign Bank For Fraud**

426.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

427.   Plaintiff, Pros Chhot is a citizen of the State of Massachusetts residing and claims to be the rightful owner of 87 Tremont Street, Fall River, MA 02720, which is the one of the subject properties incorporated and referred to herein.

428.   Plaintiff refinanced the subject property and was given a mortgage loan by Sovereign Bank on February 15, 2008. Said Mortgage was recorded in the Fall River Registry of Deeds in Book 6873, at page 79.

429.   Sometime after receiving said mortgage loan, Plaintiff began to have difficulty making his mortgage payments and fell behind in the payments of said mortgage loan.

430.   Plaintiff made an application to the Sovereign Bank Servicer Defendant for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to Plaintiff's hardship on or about January 13, 2010.

431.   Plaintiff was determined by Sovereign Bank to have met the threshold requirements for HAMP, as noted herein.

432.   Plaintiff was informed on January 22, 2010, that his documents had expired and a completely new HAMP request package would be required.

433.    Plaintiff made another application that included personal financial information, tax information, and a statement attesting to his hardship on January 25, 2010.

434.    Plaintiff complied with all repetitive and redundant requests for the same documentation, over and over again, from January 25, 2010 through July 13, 2010.

435.    On July 14, 2010, Defendant requested another full and complete HAMP Application package be resent to them. Furthermore they requested that the only acceptable application form for said HAMP consideration would be their own special form. The Plaintiff was informed that this form would have to be mailed to him.

436.    Defendant requested another complete modification request package be sent on August 27, 2010. Plaintiff complied and sent the complete package.

437.    Plaintiff's home was scheduled for auction September 16, 2010, while he was in consideration for HAMP modification, against HAMP Guidelines and Supplemental Directives.

438.    After numerous attempts the foreclosure auction on Plaintiff's home was eventually foreclosed upon on sometime on or about December 2011.

439.    Defendant Sovereign Bank caused a foreclosure deed, dated December 29, 2011, to be recorded in the Fall River Registry of Deeds on or about December 30, 2011 in Book 7827, at Page 45.

440.    During the time period of Plaintiff's request for HAMP consideration he suffered extreme emotional and mental distress as the Sovereign Bank Servicer Defendant and Defendant Orlans Moran repeatedly threatened him with foreclosure.

441.    Plaintiff was never granted a HAMP Modification and was not informed of any denial of his application either verbally or in writing. Should his HAMP modification request have been denied, it is upon information and belief that the Plaintiff's request for a HAMP modification was denied without due cause.

442.    During the entire one year and eleven months since Plaintiff first applied for the HAMP program, Plaintiff was stalled by the Sovereign Bank Defendant's customer service

representatives, inundated with repetitive requests for the same documentation over and over again, and otherwise purposefully hindered in Plaintiff's modification attempts. It is upon information and belief that the Sovereign Bank Servicer Defendants purposefully misled Plaintiff and hindered Plaintiff's modification requests in an effort to enrich themselves by ignoring Plaintiff's legitimate request for modification under HAMP so as to maximize servicing income and servicing expenses.

443.    The Sovereign Bank Defendant's conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business by;

   a.    fraudulently misrepresenting their intentions to properly review requests for loan modifications for Plaintiff and others, while in fact purposefully creating abusive roadblocks to deprive Plaintiff and others of the opportunity to seek assistance under a federal government program the servicer defendants publicly represented they would administer;

   b.    deceptively misleading Plaintiff and others by publicly claiming to be a participating servicer in a federal government mortgage modification program yet purposefully, willfully and intentionally ignored guidelines and directives of said federal program, seeking instead to enrich themselves by first hindering the modification process in order to maximize the collection of servicing fees and billing of servicing advances and then foreclosing (and/or facilitating short sales) on borrowers properties to make recovery of said advances in order to maximize profits, while Plaintiff and others sought, in good faith, to modify their mortgage under said federal program;

   c.    fraudulently misleading Plaintiff and others by instructing them to repeatedly submit documentation for application to have their mortgages

modified under said federal program while full well knowing that Plaintiff and others mortgages could not be modified due to the contractual restrictions against modification contained in the pooling and servicing agreements governing the servicing of Plaintiff and others mortgages;

d.      deceptively and fraudulently seeking to and/or completing foreclosures on Plaintiff and other borrower's homes while having full knowledge that no actual default under the terms of the note/deed of trust exists.

The Sovereign Bank Servicer Defendant's conduct as described in this complaint was willful and knowing.

### The Servicer Defendants' Actions Caused Injury to Plaintiffs

444.    Plaintiffs have suffered injury caused by the Servicer Defendants' actions, including but not limited to, improper negative reporting to credit bureaus, monetary damages from higher principle balances, inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, and increased accrued interest.

445.    Moreover, whenever the Servicer Defendants delay the tender of a timely review of a modification request, TPP agreement and/or permanent HAMP modification the terms of such a modification are less beneficial to the homeowner than they otherwise would be had the Servicer Defendants properly performed.  If a class member has accepted a modification on terms that are less favorable than those of a HAMP-compliant modification offered at the close of their trial period, their injury is measured by the difference between the modification they accepted and the modification they were entitled to.   If an eligible homeowner has not been tendered a permanent modification, their injury is measured by the difference between their current circumstances and the terms of the modification that they were entitled to – a difference that includes the wrongful loss of a property interest for those who have suffered foreclosure.  If an eligible homeowner has been serially strung along in violation of HAMP

Guidelines, then their injury is measured by the difference between their current circumstances and the terms of a modification to which they were entitled. Further, if an eligible homeowner has been foreclosed upon during the modification process, in violation of HAMP Guidelines and Supplemental Directives, then the Plaintiffs' are entitled to the return of said property and/or any value of same and/or costs arising from said foreclosure.

446.     The Servicer Defendants' behavior has also left class members in limbo, wondering if their homes can be saved and preventing homeowners from pursuing other avenues of resolution, including using the money they are putting toward trial period-level payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

447.     Plaintiffs have been damaged because many are being, or have been, foreclosed upon, may have suffered the loss of rightful property, and have incurred the costs of legal fees associated with foreclosure and eviction defense and in some cases made rental payments to the purported new owner of their rightful property.

448.     Furthermore, the Plaintiffs owe far more money on their loans than they would have had the Servicer Defendants not fraudulently, misleadingly and deceptively represented to the public and to the borrowers of the mortgages it holds and/or services that it would follow the guidelines and supplemental directives of HAMP.

449.     Furthermore, Plaintiffs have suffered significant stress and emotional distress as a direct result of the Servicer Defendants' actions. Said damages are representative of damages sustained by other members of the class.

## FNMA and the Trustee Defendants Attempt and/or Complete Foreclosure when No Default Exists to Note-Holder/Owner of Mortgage

### Heang Ouch v OneWest Servicer Defendants, FNMA, and Harmon Law

450.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

451.     Plaintiff Heang Ouch's first mortgage loan was serviced by the Servicer Defendants IndyMac and through acquisition of IndyMac, by OneWest Bank.

452.    On or about January 16, 2007, Plaintiff, Heang Ouch and his now estranged wife Narein Kong, purchased the property located at 43 Inland Street, Lowell, Ma 01851 in consideration of $240,000.00.

453.    On or about January 23, 2007 a Quitclaim Deed was recorded in the Middlesex County North Registry of Deeds in Book 20908, Page 264 granting the Property to Plaintiff.

454.    On January 19, 2007, Plaintiff executed a Mortgage which identified IndyMac Bank, FSB as Lender on Page 1, Paragraph D. The Mortgage Deed was recorded in the Middlesex County north Registry of Deeds in Book 20908, Page 268.

455.    Upon information and belief sometime on or about February – March, 2007, Plaintiff's mortgage was purchased by a FNMA created Trust. At that point in time, that as yet identified Trust became the true owner of the Plaintiff's mortgage and note.

456.    Sometime after the origination of Plaintiff's mortgage, he began to experience a hardship which caused him to be unable to continue to make his mortgage payments.

457.    Unknown to Plaintiff at that time, upon information and belief, the OneWest Servicer Defendants and /or FNMA,  by virtue of its guarantee, did in fact make Plaintiff's mortgage payments, on Plaintiff's behalf, as a third party servicer and/or as Master Servicer with no security interest, to the true Holder of Plaintiff's Mortgage and/or Note (said Trust), without his knowledge or consent and as such the Note referenced herein is believed to have not been in default at the time foreclosure was initiated and completed due to the servicing advances paid by the OneWest Servicer Defendants and/or FNMA, on behalf of the Plaintiff to the unknown Note Holder in due course, as is required by the FNMA Amended and Restated 2007 Single-Family Master Trust Agreement (Exhibit 11).

458.    In said Master Trust Agreement the Direct Servicer (i.e. IndyMac/OneWest) is often responsible for *"Delinquency Advances"* (Exhibit 10 *Id. at pp. 4,5*) as specified in their individual Direct Servicer Contracts with FNMA. This clause requires the Direct Servicer (or Sub-Servicer, if applicable) to advance payment on any non-performing loans.

459.     Moreover, FNMA created Trusts are given the additional assurance that if for any reason the Direct Servicer does not or is not required to forward said Delinquency Advances, FNMA guarantees that it will forward said Delinquency Advances to the Trusts it created as stated in said Master Trust Agreement (Exhibit 10 *Id. at pp. 54 Article VII through pp. 59).*

460.     Regardless of whether the OneWest Servicer Defendants or FNMA paid the Plaintiff's mortgage payments on his behalf, if the terms of said Master Trust Agreement and FNMA's well publicized guarantee were adhered to, the Plaintiff's mortgage was paid to the true Holder of said instrument.

461.     On June 15, 2010, Trustee Defendant Harmon Law, P.C. filed a Service-members' Relief Act Complaint and Order of Notice with the Middlesex County Land Court to foreclose on the Property on behalf of One West which stated that the foreclosure sale would be held on August 10, 2010.

462.     On September 10, 2010 a Foreclosure Deed, dated August 20, 2010, was recorded in the Middlesex County Registry of Deeds in Book 24229, Page 105 purporting to grant ownership and title to the property to Federal National Mortgage Association (FNMA) for $214,363.50.

463.     The actions taken by the OneWest Servicer Defendants, FNMA, and Trustee Defendant Harmon are without any force or effect relative to the actual sale of the property because upon information and belief no default regarding payment of the Note to the actual Note holder exists or existed.

464.     On September 27, 2010, Trustee Defendant Harmon Law, P.C. filed a Summary Process proceeding to evict Plaintiff from the subject property referenced herein on behalf of FNMA.

465.     The Plaintiff does not dispute that his mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note is not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

466.     As no default of the Note existed to said, as yet unidentified, Trust, which was the lawful owner of said Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

467.     This type of action is representative of the OneWest Servicer Defendants, FNMA, and Trustee Defendant Harmon Law's behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized and are governed by Single-Family Master Trust Agreements of FNMA sponsored Trusts in the State of Massachusetts and nationwide.

**Susan Sorsby v JPMorgan Chase Servicer Defendant, FNMA, and Harmon Law**

468.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

469.     Plaintiff, Susan Sorsby is a citizen of the State of Massachusetts residing at 2 Fremont Road, Marshfield, MA 02050, which is the one of the subject properties incorporated and referred to herein.

470.     Plaintiff Susan Sorsby's first mortgage loan was serviced by the Servicer Defendants Washington Mutual and through acquisition of Washington Mutual, by JPMorgan Chase.

471.     On or about May 15, 2006, Plaintiff executed a Mortgage which identified Washington Mutual as Lender. Said Mortgage was recorded in the Plymouth County Registry of Deeds in Book 32711 at Page 30.

472.     Upon information and belief sometime on or about June -July, 2006, Plaintiff's mortgage was purchased by an as yet identified FNMA created Trust (or an as yet identified private label mortgage backed securitized Trust). At that point in time, that as yet identified Trust became the true owner of the Plaintiff's Mortgage and Note.

473.     Sometime after the origination of Plaintiff's mortgage, she began to experience a hardship which caused her to be unable to continue to make her mortgage payments.

474.     Unknown to Plaintiff at that time, upon information and belief, the JPMorgan Chase Servicer Defendant and /or FNMA,  by virtue of its guarantee, did in fact make Plaintiff's mortgage payments, on Plaintiff's behalf, as a third party servicer and/or as Master Servicer

with no security interest, to the true Holder of Plaintiff's Mortgage and/or Note (said Trust), without her knowledge or consent and as such the Note referenced herein is believed to have not been in default at the time foreclosure was initiated due to the servicing advances paid by the JPMorgan Chase Servicer Defendants and/or FNMA, on behalf of the Plaintiff to the unknown Note Holder in due course, as is required by the FNMA Amended and Restated 2007 Single-Family Master Trust Agreement (Exhibit 11) and/or an industry standard pooling and servicing agreement.

475.    In said Master Trust Agreement the Direct Servicer (i.e. JPMorgan Chase) is often responsible for *"Delinquency Advances"* (Exhibit 10 *Id. at pp. 4,5)* as specified in their individual Direct Servicer Contracts with FNMA. This clause requires the Direct Servicer (or Sub-Servicer, if applicable) to advance payment on any non-performing loans.

476.    Moreover, FNMA created Trusts are given the additional assurance that if for any reason the Direct Servicer does not or is not required to forward said Delinquency Advances, FNMA guarantees that it will forward said Delinquency Advances to the Trusts it created as stated in said Master Trust Agreement (Exhibit 10 *Id. at pp. 54 Article VII through pp. 59).*

477.    Regardless of whether the JPMorgan Chase Servicer Defendants or FNMA paid the Plaintiff's mortgage payments on her behalf, if the terms of said Master Trust Agreement and FNMA's well publicized guarantee ( or the "Advance" clause contained in industry standard pooling and servicing agreements) were adhered to, the Plaintiff's mortgage was paid to the true Holder of said instrument.

478.    On or about March 2, 2010, Trustee Defendant Harmon Law, P.C. filed a Service-members' Relief Act Complaint and Order of Notice with the Plymouth County Land Court to foreclose on the Property on behalf of JPMorgan Chase Bank National Association, as purchaser of the loans and other assets of Washington Mutual Bank, formerly known as Washington Mutual Bank, FA (the "Savings Bank"), from the Federal Deposit Insurance Corporation, acting as receiver for the Savings Bank and pursuant to its authority under the Federal Deposit Insurance Act, 12 U.S.C. § 1821(d).

479.    Defendant Harmon Law set foreclosure auction dates on behalf of JPMorgan Chase for on or about July 30, 2010, October 29, 2010, September 7, 2011. As of the date of this filing the Plaintiff is still under the threat of foreclosure. All of the aforementioned Defendants' conduct is particularly egregious due to the fact that Plaintiff had been granted a permanent modification, by Defendants JPMorgan Chase effective October 1, 2010. Plaintiff has made all payment regarding the aforementioned permanent modification and is current on said obligation.

480.    The actions taken by the JPMorgan Chase Defendants, FNMA, and Trustee Defendant Harmon are without any force or effect relative to the attempted sales of the property because, upon information and belief no default regarding payment of the Note to the actual Note holder exists or existed.

481.    Moreover, upon information and belief, JPMorgan Chase is not the present Holder of said Mortgage and/or Note, as stated in all foreclosure notices. Said Holder is in fact, upon information and belief an as yet identified FNMA Trust or an as yet identified private label securitized mortgaged backed Trust. As the records regarding whom the actual Holder of Plaintiff's Mortgage and Note are in the control of Defendant JPMorgan Chase, and not properly recorded in the Plymouth County Registry of Deeds, it is only through discovery that these facts can be ascertained and determined.

482.    The Plaintiff does not dispute that her mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note is not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

483.    As no default of the Note existed to said, as yet unidentified, Trust, which was the lawful Holder of said Mortgage and Note, the foreclosure proceedings are/were invalid.

484.     This type of action is representative of the JPMorgan Chase Servicer Defendants, FNMA, and Trustee Defendant Harmon Law's behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized and are governed by

private label securitized mortgage backed Trusts and/or Single-Family Master Trust Agreements of FNMA sponsored Trusts in the State of Massachusetts and nationwide.

**Dieu Troung v Wells Fargo Bank, N.A. and Harmon Law**

485.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

486.   Plaintiff Dieu Truong is a citizen of the State of Massachusetts residing at 162-164 Glendale Road, Quincy, MA 02169, which is one of the subject properties referred to herein.

487.   On or about December 22, 2004, Plaintiff Truong and his wife Elaine Dang Truong gave a mortgage to Bank of America, N.A. in the original principal amount of $350,000.00.

488.   On or about February 25, 2005, Plaintiff Truong's mortgage was pooled and sold to a Trust named Banc of America Alternative Loan Trust 2005-2 Mortgage Pass-Through Certificates Series 2005-2. Wells Fargo Bank, N.A. was appointed as Trustee of said Trust.

489.   On or about March 2010, Plaintiff Truong began to experience financial difficulty and was unable to make his mortgage payments.

490.   Upon information and belief, BAC Home Loans Servicing, LP and/or Bank of America, N.A. forwarded payment, on behalf of Plaintiff Truong, to the Note-holder of Plaintiff Truong's Note, Banc of America Alternative Loan Trust 2005-2 Mortgage Pass-Through Certificates Series 2005-2, to its Trustee, Wells Fargo Bank, N.A. as required under the pooling and servicing agreement governing Plaintiff Truong's mortgage.

491.   Upon information and belief, BAC Home Loans Servicing, LP has forwarded and continues to forward, on behalf of Plaintiff Truong, all payments not made by Plaintiff Truong to the Holder of Plaintiff Truong's Note, Banc of America Alternative Loan Trust 2005-2 Mortgage Pass-Through Certificates Series 2005-2, to its Trustee, Wells Fargo Bank, N.A. as required under the pooling and servicing agreement governing Plaintiff Truong's mortgage.

492.   On May 17, 2011, Harmon Law Offices, P.C. sent a notice to Plaintiff Truong stating that it had been retained by BAC to foreclose on Plaintiff's mortgage. This notice further states that Harmon Law P.C. has been instructed to bring foreclosure in the name of Wells

Fargo Bank, N.A. as Trustee for the Certificate Holders of Banc of America Alternative Loan Trust 2005-2 Mortgage Pass-Through Certificates Series 2005-2.

493.    The aforementioned notice states that under the terms of Plaintiff Truong's Note and Mortgage, there is outstanding $324,851.19 in principal and $21, 544.80 in interest and other charges for a total of $346,395.99.

494.    The Plaintiff does not dispute that his mortgage provides for the Statutory Power of Sale in the event of a default on the Note. However, upon information and belief, as the Note is not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

495.    Plaintiff Truong claims that said foreclosure action is illegal as no default exists to Holder of his Note, Banc of America Alternative Loan Trust 2005-2 Mortgage Pass-Through Certificates Series 2005-2, due to the third party servicer's payment of his mortgage to the Holder of his mortgage as required under the pooling and servicing agreement governing said mortgage and note.

496.    This type of action is representative of the Wells Fargo Trustee Defendant's behavior in all cases where foreclosure has be initiated and/or completed, on mortgage loans that were securitized and are governed by industry standard pooling and servicing agreements in the State of Massachusetts and nationwide.

**Sophal Kol v Wells Fargo Bank, N.A., FNMA, and Harmon Law**

497.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

498.    Plaintiff, Sophal Kol is a citizen of the State of Massachusetts residing at and is part owner of 57 Harris Street, Revere, MA 02151, which is the one of the subject properties incorporated and referred to herein.

499.    On or about October 7, 2005, Plaintiff executed a Mortgage which identified New Fed Mortgage Corp., as Lender. Said Mortgage was recorded in the Suffolk County Registry of Deeds in Book 38255 at Page 210.

500.    Upon information and belief sometime on or about October – December 2005, Plaintiff's mortgage and note was purchased by an as yet identified FNMA created Trust (or an as yet identified private label mortgage backed securitized Trust). At that point in time, that as yet identified Trust became the true owner of the Plaintiff's Mortgage and Note.

501.    Sometime after the origination of Plaintiff's mortgage, he began to experience a hardship which caused him to be unable to continue to make his mortgage payments.

502.    Unknown to Plaintiff at that time, upon information and belief, the Wells Fargo Bank, N.A. Servicer Defendant and /or FNMA,  by virtue of its guarantee, did in fact make Plaintiff's mortgage payments, on Plaintiff's behalf, as a third party servicer and/or as Master Servicer with no security interest, to the true Holder of Plaintiff's Mortgage and/or Note (said as yet identified Trust), without his knowledge or consent and as such the Note referenced herein is believed to have not been in default at the time foreclosure was initiated due to the servicing advances paid by the Wells Fargo Bank, N.A. Servicer Defendant and/or FNMA, on behalf of the Plaintiff to the unknown Note Holder in due course, as is required by the FNMA Amended and Restated 2007 Single-Family Master Trust Agreement (Exhibit 11) and/or an industry standard pooling and servicing agreement.

503.    In said Master Trust Agreement the Direct Servicer (i.e. JPMorgan Chase) is often responsible for *"Delinquency Advances"* (Exhibit 10 *Id. at pp. 4,5)* as specified in their individual Direct Servicer Contracts with FNMA. This clause requires the Direct Servicer (or Sub-Servicer, if applicable) to advance payment on any non-performing loans.

504.    Moreover, FNMA created Trusts are given the additional assurance that if for any reason the Direct Servicer does not or is not required to forward said Delinquency Advances, FNMA guarantees that it will forward said Delinquency Advances to the Trusts it created as stated in said Master Trust Agreement (Exhibit 10 *Id. at pp. 54 Article VII through pp. 59).*

505.    Regardless of whether the Wells Fargo Bank, N.A. Servicer Defendant or FNMA paid the Plaintiff's mortgage payments on his behalf, if the terms of said Master Trust Agreement and FNMA's well publicized guarantee (or the "Advance" clause contained in an industry

116

standard pooling and servicing agreement) were adhered to, the Plaintiff's mortgage was paid to the true Holder of said instrument.

506.     On or about June 23, 2011, Trustee Defendant Harmon Law, P.C. filed a Service-members' Relief Act Complaint and Order of Notice with the Boston Land Court to foreclose on the Property on behalf of Wells Fargo Bank, N.A., as present holder of Plaintiff's Mortgage.

507.     Defendant Harmon Law set foreclosure auction dates on behalf of Wells Fargo Bank, N.A. for on or about November 9, 2011 and December 28, 2011. As of the date of this filing the Plaintiff is still under the threat of foreclosure.

508.     The actions taken by the Wells Fargo Bank, N.A. Defendant, FNMA, and Trustee Defendant Harmon are without any force or effect relative to the attempted sales of the property because, upon information and belief, no default regarding payment of the Note to the actual Note holder exists or existed.

509.     Moreover, upon information and belief, Wells Fargo Bank, N.A. is not, nor have they ever been, the present Holder of said Mortgage and/or Note, as stated in all foreclosure notices. Said Holder is in fact, upon information and belief an as yet identified FNMA Trust or an as yet identified private label securitized mortgaged backed Trust. As the records regarding whom the actual Holder of Plaintiff's Mortgage and Note are in the control of Defendant Wells Fargo Bank, N.A. and/or FNMA, and not properly recorded in the Suffolk County Registry of Deeds, it is only through discovery that these facts can be ascertained and determined.

510.     The Plaintiff does not dispute that his mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note is not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

511.     As no default of the Note existed to said, as yet unidentified, Trust, which was the lawful Holder of said Mortgage and Note, the foreclosure proceedings are/were invalid.

512.     This type of action is representative of the Wells Fargo Bank, N.A. Servicer Defendant, FNMA, and Trustee Defendant Harmon Law's behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized and are governed by private label securitized mortgage backed Trusts and/or Single-Family Master Trust Agreements of FNMA sponsored Trusts in the State of Massachusetts and nationwide.

**Song Kim Ros & Nhiep Hout Ros v  Bank of America, N.A., BAC Home Loan Servicing, LP, FNMA, and Harmon Law**

513.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

514.     Plaintiffs Song Kim Ros and Nhiep Hout Ros are citizens of the State of Massachusetts residing at 65 Parker Street, Brockton, MA 02302, which is one of the subject properties referred to herein.

515.     On or about January 11, 2007, Plaintiffs Ros gave a mortgage to Countrywide in the original principal amount of $220,000.00. Said mortgage was recorded in the Plymouth County Massachusetts Registry of Deeds in book 33973 at page 94.

516.     On or about March 2007, upon information and belief, said mortgage was pooled by Trustee Defendant FNMA, with a large number of other mortgages and sold to an as yet unknown and unidentified FNMA created Trust.

517.     On or about July 2008, the servicing rights regarding Plaintiffs Ros mortgage were transferred to BAC Home Loans Servicing, LP as part of Bank of America, N.A.'s purchase of Countrywide.

518.     Upon information and belief, the servicing of the Mortgage, and the Note given by Plaintiffs Ros was, from that point on, governed by a FNMA Master Trust Agreement and their mortgage payments were unconditionally guaranteed, by FNMA, to said Trust, as specified in said Trust Agreement.

519.     On or about July 2009, Plaintiffs Ros began to experience financial difficulty and was unable to make their mortgage payments.

520.    Upon information and belief, BAC Home Loans Servicing, LP, Bank of America, N.A. and/or FNMA forwarded payment, on behalf of Plaintiffs Ros, to the Holder of Plaintiff Ros' Note, as would be required under the FNMA Master Trust Agreement governing Plaintiffs Ros' mortgage.

521.    Upon information and belief, BAC Home Loans Servicing, LP, Bank of America, N.A. and/or FNMA has forwarded, on behalf of Plaintiffs Ros, all payments not made by Plaintiffs Ros to the Holder of Plaintiff Ros' Note, as would be required under the FNMA Master Trust Agreement governing Plaintiff s Ros' mortgage.

522.    On May 18, 2011, Harmon Law Offices, P.C. sent a notice to Plaintiffs Ros stating that they had been retained by BAC to foreclose on Plaintiff's mortgage.

523.    The Plaintiffs do not dispute that their mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note is not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

524.    Plaintiffs Ros claim that said foreclosure action is illegal as no default exists to Holder of their Mortgage due to the third party servicer's (BAC) and/or Master Servicer FNMA's payment of their mortgage to the Holder of their Mortgage as required under the FNMA Master Trust Agreement governing said Mortgage.

525.    Plaintiffs Ros further claim that said foreclosure action is illegal as BAC Home Loan Servicing, LP is not the present Holder of either their Mortgage and/or Note as stated in said foreclosure notice, as those documents were transferred to a FNMA Trust on or about March 2007. Should BAC Home Loans Servicing, LP have physical possession of either document, it is only as document custodian, not as Holder, as specified in said FNMA Master Trust Agreement (Exhibit 11 *Id. at pp. 31 sec 3.4(2) Custody of Mortgage Documents - Custodial Capacity*).

526.   As no default of the Note existed to said, as yet unidentified, Trust, which was the lawful Holder of said Mortgage and Note, the foreclosure and foreclosure proceedings are/were invalid.

527.   This type of action is representative of the Bank of America Servicer Defendants, FNMA, and Trustee Defendant Harmon Law's behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized and are governed by private label securitized mortgage backed Trusts and/or Single-Family Master Trust Agreements of FNMA sponsored Trusts in the State of Massachusetts and nationwide.

**Narom Nop & Kab Seun  v  Bank of America, N.A., BAC Home Loan Servicing, LP, FNMA, and Harmon Law**

528.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

529.   Plaintiffs Narom Nop & Kab Seun are citizens of the State of Massachusetts residing at 20 South Ridge Circle, Lowell, MA 01852, which is one of the subject properties referred to herein.

530.   On or about March 15, 2006, Plaintiffs executed a mortgage to First NLC Financial Services, LLC in the original principal amount of $271,000.00. Said mortgage was recorded in the Middlesex North County Massachusetts Registry of Deeds in book 19922 at page 268.

531.   On or about March 2007, upon information and belief, said mortgage was pooled by Trustee Defendant FNMA, with a large number of other mortgages and sold to an as yet unknown and unidentified FNMA created Trust, with servicing rights to said mortgage granted to Countrywide.

532.   On or about July 2008, the servicing rights regarding Plaintiffs' mortgage were transferred to BAC Home Loans Servicing, LP as part of Bank of America, N.A.'s purchase of Countrywide.

533.   Upon information and belief, the servicing of the Mortgage, and the Note given by Plaintiffs was, from no later than April 2006, governed by a FNMA Master Trust Agreement

and their mortgage payments were unconditionally guaranteed, by FNMA, to said Trust, as specified in said Trust Agreement.

534.    On or about July 2009, Plaintiffs began to experience financial difficulty and was unable to make their mortgage payments.

535.    Upon information and belief, BAC Home Loans Servicing, LP, Bank of America, N.A. and/or FNMA forwarded payment, on behalf of Plaintiffs, to the Holder of Plaintiffs' Note, as would be required under the FNMA Master Trust Agreement governing Plaintiffs' Mortgage.

536.    Upon information and belief, BAC Home Loans Servicing, LP, Bank of America, N.A. and/or FNMA had forwarded, on behalf of Plaintiffs, all payments not made by Plaintiffs, to the Holder of Plaintiffs' Note, as would be required under the FNMA Master Trust Agreement governing Plaintiffs' Mortgage.

537.    On July 29, 2011, Harmon Law Offices, P.C. sent a notice to Plaintiffs stating that they had been retained by BAC to foreclose on Plaintiffs' Mortgage. An auction sale date was set for August 29, 2011 and the property was sold at said auction to Defendant FNMA, which upon information and belief, purchased said property at auction in its capacity as Trustee of an as yet identified FNMA Sponsored Trust. Upon information and belief, said Trust was the true Holder of Plaintiffs Mortgage and Note at the time foreclosure proceedings commenced and were completed.

538.    The Plaintiffs do not dispute that their mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note is not, nor had it ever been, in default to its Holder, the Statutory Power of Sale could not legally have been exercised.

539.    Plaintiffs claim that said foreclosure action is illegal as no default existed to Holder of their Mortgage due to the third party servicer's (BAC) and/or Master Servicer FNMA's payment of their Mortgage to the Holder of their Mortgage as required under the FNMA Master Trust Agreement governing said Mortgage.

540.    Plaintiffs' further claim that said foreclosure action was illegal as BAC Home Loan Servicing, LP was not the present Holder of either their Mortgage and/or Note, as stated in said foreclosure notice, as those documents were transferred to a FNMA Trust on or about March 2006. Should BAC Home Loans Servicing, LP have physical possession of either document, it is only as document custodian, not as Holder, as specified in said FNMA Master Trust Agreement (Exhibit 11 *Id. at pp. 31 sec 3.4(2) Custody of Mortgage Documents - Custodial Capacity*).

541.    As no default of the Note existed to said, as yet unidentified, Trust, which was the lawful Holder of said Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

542.     This type of action is representative of the Bank of America Servicer Defendants, FNMA, and Trustee Defendant Harmon Law's behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized and are governed by private label securitized mortgage backed Trusts and/or Single-Family Master Trust Agreements of FNMA sponsored Trusts in the State of Massachusetts and nationwide.

**Channy Lom  v  Bank of America, N.A. and FNMA**

543.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

544.    Plaintiff Channy Lom is a citizen of the State of Massachusetts residing at 74 Daisy Lane, Fall River, MA 02721, which is one of the subject properties referred to herein.

545.    On or about December 21, 2006, Plaintiff executed a mortgage to Bank of America, N.A. in the original principal amount of $298,500.00. Said mortgage was recorded in the Fall River County Registry of Deeds in book 00036 at page 137.

546.    On or about January - February 2007, upon information and belief, said mortgage was pooled by Trustee Defendant FNMA, with a large number of other mortgages and sold to an as yet unknown and unidentified FNMA created Trust, with servicing rights to said mortgage granted to Bank of America, N.A.

547.    Upon information and belief, the servicing of the Mortgage, and the Note given by Plaintiff was, from no later than March 2007, governed by a FNMA Master Trust Agreement and their mortgage payments were unconditionally guaranteed, by FNMA, to said Trust, as specified in said Trust Agreement.

548.    On or about March 2009, Plaintiff began to experience financial difficulty and was unable to make their mortgage payments.

549.    Upon information and belief, Bank of America, N.A. and/or FNMA forwarded payment, on behalf of Plaintiff, to the Holder of Plaintiff's Note, as would be required under the FNMA Master Trust Agreement governing Plaintiff's Mortgage.

550.    Upon information and belief, Bank of America, N.A. and/or FNMA had forwarded, on behalf of Plaintiff, all payments not made by Plaintiff, to the Holder of Plaintiff's Note, as would be required under the FNMA Master Trust Agreement governing Plaintiff's Mortgage.

551.    On or about July 6, 2010, Bank of America Home Loans (a division of Bank of America, N.A.) sent Plaintiff a Notice of Intention to Foreclose said aforementioned Mortgage.

552.    The Plaintiff does not dispute that his mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note is not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

553.    Plaintiffs claim that said foreclosure action is illegal as no default existed to Holder of their Mortgage due to the third party servicer's (BOA) and/or Master Servicer FNMA's payment of their Mortgage to the Holder of their Mortgage as required under the FNMA Master Trust Agreement governing said Mortgage.

554.    Plaintiff further claims that said foreclosure action was illegal as Bank of America, N.A. is not the present Holder of either said Mortgage and/or Note, as those documents were transferred to a FNMA Trust on or about March 2006. Should Bank of America, N.A. have physical possession of either document, it is only as document custodian, not as Holder, as

specified in said FNMA Master Trust Agreement (Exhibit 11 *Id. at pp. 31 sec 3.4(2) Custody of Mortgage Documents - Custodial Capacity*).

555.    As no default of the Note existed to said, as yet unidentified, Trust, which was the lawful Holder of said Mortgage and Note, the intention to foreclose action was invalid.

556.    This type of action is representative of the Bank of America Servicer Defendant and FNMA's behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized and are governed by private label securitized mortgage backed Trusts and/or Single-Family Master Trust Agreements of FNMA sponsored Trusts in the State of Massachusetts and nationwide.

**Jeanine Chhoeum v BAC Home Loans Servicing, LP, Bank of America, N.A., an as yet identified Mortgage Backed Trust and said Trust's as yet identified Trustee**

557.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

558.    Plaintiff, Jeanine Chhoeum is a citizen of the State of Massachusetts residing at and is the owner of 78 Fort Hill Avenue, Lowell, MA 01852, which is the one of the subject properties incorporated and referred to herein.

559.    On or about June 18, 2008, Plaintiff gave a mortgage to Mortgage Electronic Registration Systems, Inc. (MERS) in the original principal amount of $274,811.00. Said Mortgage stated that Franklin American Mortgage Company was the Lender. Said Mortgage was recorded in the Middlesex North County Registry of Deeds on or about June 26, 2008 in Book 22275 at Page 15.

560.    On or about July – September 2008, Plaintiff's Mortgage and Note were pooled and sold to an as yet identified Trust.

561.    On or about January 2010, Plaintiff began to experience financial difficulty and was unable to make her mortgage payments.

562.    Plaintiff made an application to the BAC Home Loans Servicing, LP Servicer Defendant for consideration for her mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home

Affordable Modification Program that included personal financial information, tax information, and a statement attesting to Plaintiff's hardship on or about August 2009.

563.     During the time period of Plaintiff's request for HAMP consideration they suffered extreme emotional and mental distress the BAC Servicer Defendant sent Plaintiff a Notice of Intention to Foreclose, on or about July 2010, while she was still in the application phase of a HAMP Modification request.

564.     On or about October 26, 2011, Bank of America, N.A. sent Plaintiff a Notice of Intention to Foreclose.

565.     Upon information and belief, BAC Home Loans Servicing, LP and/or Bank of America, N.A. forwarded payment, on behalf of Plaintiff, to the Holder of Plaintiff's Note, an as yet identified Trust, to it's as yet identified Trustee, as required under the pooling and servicing agreement governing Plaintiff's mortgage.

566.     Upon information and belief, BAC Home Loans Servicing, LP and/or Bank of America, N.A. had forwarded, on behalf of Plaintiff, all payments not made by Plaintiff to the Holder of Plaintiff's Note, as would be required under the pooling and servicing agreement governing Plaintiff's Mortgage.

567.     The Plaintiff does not dispute that her mortgage provides for the Statutory Power of Sale in the event of a default on the Note. However, upon information and belief, as the Note was not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

568.     Plaintiff claims that said foreclosure actions were illegal as no default existed to Holder of her Note, due to the third party servicer's payment of her mortgage to the Holder of her Mortgage as required under the pooling and servicing agreement governing said Mortgage and Note.

569.     As the records regarding the identification of, the Trust that is the actual Holder of Plaintiff's Mortgage and Note, and the Trustee of said Trust, are in the sole possession of the

Bank of America Servicer Defendants, said identification can only be made through discovery.

**Stephen & Nancy Strauss v BAC Home Loans Servicing, LP, Bank of America – Wilshire, Bank of America, N.A., as an as yet identified Mortgage Backed Trust and said Trust's as yet identified Trustee, and Orlans Moran, PLLC**

570.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

571.     Plaintiffs, Stephen & Nancy Strauss are citizens of the State of Massachusetts residing at and the owners of 90 Pinedale Avenue, Billerica, MA 02821, which is the one of the subject properties incorporated and referred to herein.

572.     On or about January 26, 2005, Plaintiffs gave a mortgage to Mortgage Electronic Registration Systems, Inc. (MERS) in the original principal amount of $255,000.00. Said Mortgage stated that Countrywide home Loans, Inc. was the Lender. Said Mortgage was recorded in the Middlesex North County Registry of Deeds on or about January 31, 2005 in Book 18356 at Page 192. Plaintiffs also gave a Note to Countrywide Home Loans, Inc. regarding said mortgage loan on the same aforementioned date January 26, 2005).

573.     On or about March - April 2006, Plaintiffs' Mortgage and Note were pooled and sold to an as yet identified Trust.

574.     On or about January 2010, Plaintiffs began to experience financial difficulty and were unable to make their mortgage payments.

575.     Plaintiffs made an application to the BAC Home Loans Servicing, LP Servicer Defendant for consideration for their mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to Plaintiffs' hardship on or about January 28, 2010.

576.     On or about December 31, 2010, Orlans Moran, PLLC sent Plaintiff a letter stating that their firm was representing BAC Home Loans Servicing, LP. Said letter went on to state that the Note Plaintiffs had given to Countrywide Home Loans, Inc on January 26, 2005, was

now in default, and that Orlans Moran had been instructed by Bank of America – Wilshire to institute foreclosure proceedings against Plaintiffs.

577.    Upon information and belief, BAC Home Loans Servicing, LP, Bank of America – Wilshire, and/or Bank of America, N.A. forwarded payment, on behalf of Plaintiffs, to the Holder of Plaintiffs' Note, an as yet identified Trust, to it's as yet identified Trustee, as required under the pooling and servicing agreement governing Plaintiffs' Mortgage.

578.    Upon information and belief, BAC Home Loans Servicing, LP, Bank of America – Wilshire, and/or Bank of America, N.A. had forwarded (and still continues to forward), on behalf of Plaintiffs, all payments not made by Plaintiffs to the Holder of Plaintiffs' Note, as would be required under the pooling and servicing agreement governing Plaintiffs' Mortgage.

579.    The Plaintiffs do not dispute that their mortgage provides for the Statutory Power of Sale in the event of a default on the Note. However, upon information and belief, as the Note was not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

580.    Plaintiffs claim that said foreclosure actions were illegal as no default existed to Holder of their Note, due to the third party servicer's payment of their mortgage to the Holder of their Mortgage as required under the pooling and servicing agreement governing said Mortgage and Note.

581.    As the records regarding the identification of, the Trust that is the actual Holder of Plaintiffs' Mortgage and Note, and the Trustee of said Trust, are in the sole possession of the Bank of America Servicer Defendants, said identification can only be made through discovery.

**Marlena Davis v Deutsche Bank National Trust Company and Harmon Law**

582.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

583.    Plaintiff, Marlena Davis, became the owner of the property located at 66 Osceola Street, Mattapan, MA 02126 on October 30, 2003.  The Deed granting Davis the property was

recorded in the Suffolk County Registry of Deeds in Book 33153 Page 258 on October 31, 2003.

584.     On October 30, 2003, Davis executed a mortgage which she believed was to Direct Finance Corporation and which identified Direct Finance Corporation as the Lender (the "Mortgage"). The Mortgage to Davis secured a loan to Davis in the amount of $322,000.00. The Mortgage was recorded in the Suffolk County Registry of Deeds in Book 33153 Page 259 on October 31, 2003.

585.     On October 30, 2003, the Davis Mortgage was assigned from Direct Finance Corporation to RBMG, Inc. The Assignment was recorded in the Suffolk County Registry of Deeds in Book 38876 Page 10 on January 18, 2006.

586.     On or about March 30, 2006, the Davis Mortgage was again assigned, from RBMG, Inc (by its successor NetBank) to MERS, Inc. This second Assignment was recorded in the Suffolk County Registry of Deeds in Book 39339 Page 288 on April 4, 2006. In the upper right corner of said Assignment is a grouping of identification numbers which includes the "Pool Number" for said Mortgage as "MST090104". This number is a coded identification for the Trust that was then, and is now, the actual owner and holder of the Davis Mortgage and Note; i.e. Morgan Stanley Mortgage Loan Trust 2004-9. The "MST" of the "Pool Number" corresponds to Morgan Stanley Trust. The "09" corresponds to the -9 part of the Trusts identification as registered with the Securities and Exchange Commission and is an indicator of this being the ninth trust created in the calendar year indicated which in this case is 0104 which stands for the month and year the original Securities and Exchange Commission registered prospectus of said Trust was filed pursuant to rule 424 (b) (5) SEC which was January 28, 2004. The aforementioned fact is noted in the Prospectus Supplement (to the Original Prospectus dated January 28, 2004), SEC Registration File No.: 333-104283 dated October 27, 2004 (Exhibit 12 *Id. at pp. i – ii*).

587.     On January 15, 2010, the Davis Mortgage was assigned a third time from MERS, Inc. to Deutsche Bank National Trust Company, as Trustee under the Morgan Stanley Mortgage

Loan Trust Agreement for 2004-9. In January of 2004 said Trust was created. Thus the Third Assignment failed to validly assign the mortgage and note into said Trust because the Second Assignment itself was void. The Third Assignment was recorded in the Suffolk County Registry of Deeds in Book 45995 Page 223 on January 25, 2010.

588.     Davis was never told by the Defendants who held the beneficial interest in the loan or the Promissory Note. Furthermore, it appears that the Defendant Deutsche Bank National Trust Company, as Trustee under the Morgan Stanley Mortgage Loan Trust Agreement for 2004-9 went to considerable lengths to conceal the fact that the Morgan Stanley Mortgage Loan Trust 2004-9 would claim to be the holder of the Davis Mortgage as evidenced by the meaningless chain of assignments recorded in the Suffolk County Registry of Deeds over the past seven years.

589.     While RBMG and MERS declared itself the "holder of" of the Davis Mortgage in the Land Evidence Records Suffolk County Registry of Deeds, both entities were merely used to hide the transfer of the beneficial interest in the Davis loan to the Morgan Stanley Mortgage Loan Trust 2004-9 for an undisclosed amount of fees.

590.     Deutsche Bank as Trustee for said Trust, was the holder of the Davis Mortgage and Note since, on or about, the closing date of said Trust, October 29, 2004, as is required by the Assignment Agreement and Mortgage Loan Purchase Agreement regarding said Trust, as noted in the Prospectus Supplement (to the Original Prospectus dated January 28, 2004), SEC Registration File No.: 333-104283 dated October 27, 2004 as registered with the Securities and Exchange Commission (Exhibit 12 *id. at pp. S-37 & S-38"Assignment of Mortgage Loans"*).

591.     Moreover, as stipulated by the legally binding aforementioned Pooling and Servicing Agreement regarding the Morgan Stanley Mortgage Loan Trust 2004-9, (as noted in the Prospectus Supplement to the Original Prospectus dated January 28, 2004, SEC Registration File No.: 333-104283 dated October 27, 2004) the Master Servicer and Servicers of said Trust (Wells Fargo and/or its wholly owned subsidiary Americas Servicing Company a.k.a. ASC) is

required to advance monthly, from its own funds, all payments of principal and interest due but not received by the 15th of each month. This is evidenced in the said Prospectus Supplement regarding the loans held in the Morgan Stanley Mortgage Loan Trust 2004-9 (Exhibit 12 *id. at pp. S-52, S-53*)  under the heading titled "*Advances*".

592.    Upon information and belief, the Master Servicer/Servicer of the Davis loan (Wells Fargo/ASC – Exhibit 12 *Id. at pp. I & S-1*) did in fact meet its contractual obligations under the Pooling and Servicing Agreement regarding the Morgan Stanley Mortgage Loan Trust 2004-9 and therefore has, to date, as a third party, paid on behalf of Davis all of the delinquent payments regarding her loan to the Trust claiming to be the holder of the Davis Mortgage and Note (the Morgan Stanley Mortgage Loan Trust 2004-9) without Davis' knowledge or consent. As such, under Massachusetts Law Davis' Note is not in default to the holder of said instrument.

593.    The Plaintiff does not dispute that her mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note is not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

594.    On October 17, 2011, Deutsche Bank, as Trustee for the Morgan Stanley Mortgage Loan Trust 2004-9 sent Plaintiff a "Notice of Intention to Foreclose", through their attorney Harmon Law, stating their intention to foreclose on Davis' property on November 16, 2011.

595.    The Notice of Intent to Foreclose as well as all publications in which Deutsche Bank stated intent to foreclose on Davis' property on November 16, 2011 is void because the Note claimed to be held by Deutsche Bank, as Trustee for the Morgan Stanley Mortgage Loan Trust 2004-9 was not in default at the time of the publications and foreclosure sale.

596.    Plaintiff Davis claims that said foreclosure action is illegal as no default exists to Holder/Owner of her Note, the Morgan Stanley Mortgage Loan Trust 2004-9, due to the third party servicer's payment of her mortgage to the Holder of his Note, as required under the pooling and servicing agreement governing said mortgage and note.

597.    This type of action is representative of the Deutsche Bank Trustee Defendant's behavior in all cases where foreclosure has be initiated and/or completed, on mortgage loans that were securitized and are governed by industry standard pooling and servicing agreements in the State of Massachusetts and nationwide

**Kolap Im v U.S. Bank, N.A. and Doonan, Graves & Longoria**

598.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

599.    Plaintiff Kolap Im is a citizen of the State of Massachusetts residing at 21 Hillside Street, Lowell, MA 01851, which is the subject property referred to herein.

600.    On or about February 17, 2006, Plaintiff gave a mortgage to New Century Mortgage Corporation in the original principal amount of $323,000.00.

601.    On or about March 28, 2006, Plaintiff's mortgage was pooled and sold to a Trust named MASTR Asset Backed Securities Trust, 2006-NC3. U.S. Bank, N.A. was appointed as Trustee of said Trust.

602.    On or about April 2009, Plaintiff began to experience financial difficulty and was unable to make her mortgage payments.

603.    Upon information and belief, Servicer Defendant HomEq Servicing forwarded payment, on behalf of Plaintiff, to the Note-holder of Plaintiff's Note, MASTR Asset Backed Securities Trust, 2006-NC3, to its Trustee, U.S. Bank, N.A. as required under the pooling and servicing agreement, as referenced in the Prospectus Supplement of said Trust (Exhibit 13 *Id. at pp.14 "Advances"*) which owns Plaintiff's Mortgage and Note.

604.    Upon information and belief, Servicer Defendant HomEq Servicing, had forwarded, on behalf of Plaintiff, all payments not made by Plaintiff to the Holder of Plaintiff's Note, MASTR Asset Backed Securities Trust, 2006-NC3, to its Trustee, U.S. Bank, N.A. as required under the aforementioned Prospectus Supplement and pooling and servicing agreement governing Plaintiff's mortgage.

605.    On October 20, 2009, Defendant Doonan, Graves & Longoria, LLC sent a notice to Plaintiff stating that it had been retained by U.S. Bank, N.A., as Trustee for the MASTR Asset

Backed Securities Trust, 2006-NC3, to foreclose on Plaintiff's Mortgage. Additional foreclosure auction dates were also set by said Defendants on or about March 25, 2010 and May 25, 2010.

606.    The Plaintiff does not dispute that her Mortgage provides for the Statutory Power of Sale in the event of a default on the Note. However, upon information and belief, as the Note was not, nor has it ever been, in default to its Holder, the Statutory Power of Sale could not legally be exercised.

607.    Plaintiff claims that said foreclosure action was illegal as no default existed to Holder of her Note, MASTR Asset Backed Securities Trust, 2006-NC3, due to the third party servicer's payment of her mortgage to the Holder of her mortgage as required under the pooling and servicing agreement governing said Mortgage and Note.

608.     This type of action is representative of the U.S. Bank, N.A. Trustee Defendant's behavior in all cases where foreclosure has be initiated and/or completed, on mortgage loans that were securitized and are governed by industry standard pooling and servicing agreements in the State of Massachusetts and nationwide.

**Vandy & Daovanney Duch v Ocwen Loan Servicing, LLC, an as yet identified Mortgage Backed Trust and said Trust's as yet identified Trustee, and Orlans Moran**

609.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

610.    Plaintiffs, Vandy & Daovanney Duch are citizens of the State of Massachusetts residing at 335 Walker Street, Lowell, MA 01851, which is the one of the subject properties incorporated and referred to herein.

611.    On or about May 22, 2007, Plaintiffs gave a mortgage to First Call Mortgage Company, Inc. in the original principal amount of $305,600.00.

612.    On or about June – July 2007, Plaintiffs' Mortgage and Note were pooled and sold to an as yet identified Trust.

613.    On or about May 2009, Plaintiffs began to experience financial difficulty and were unable to make their mortgage payments.

132

614.    Plaintiffs made an application to the Taylor Bean & Whitaker Servicer Defendant for consideration for Plaintiffs' mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to Plaintiffs' hardship on or about August 2009.

615.    Plaintiffs made another application to the Ocwen Servicer Defendant for consideration for Plaintiffs' mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to Plaintiffs' hardship on or about March 2010, after the servicing rights to Plaintiffs' mortgage had been sold to the Ocwen Servicer Defendant.

616.    During the time period of Plaintiffs' request for HAMP consideration they suffered extreme emotional and mental distress as both Servicer Defendants referred them to foreclosure on or about October 2009, February 2010, April 2010, and May 2010.

617.    On or about September 1, 2009, Defendant Orlans Moran, PLLC. sent Plaintiffs a Notice of Intention to Foreclose on behalf of Taylor Bean & Whittaker stating a scheduled auction date of October 29, 2009. The aforementioned auction date was postponed numerous times to April 1, 2010, and again to May 1, 2010.

618.    Upon information and belief, Taylor Bean & Whitaker and Ocwen forwarded payment, on behalf of Plaintiff s, to the Note-holder of Plaintiffs' Note, an as yet identified Trust, to its as yet identified Trustee, as required under the pooling and servicing agreement governing Plaintiff s' mortgage.

619.    Upon information and belief, Taylor Bean & Whitaker and/or Ocwen had forwarded, on behalf of Plaintiffs, all payments not made by Plaintiff s to the Holder of Plaintiffs' Note, as would be required under the pooling and servicing agreement governing Plaintiffs' mortgage.

620.    The Plaintiffs do not dispute that their mortgage provides for the Statutory Power of Sale in the event of a default on the Note. However, upon information and belief, as the Note was not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

621.    Plaintiff s claim that said foreclosure actions were illegal as no default existed to Holder of their Note, due to the third party servicer's payment of their mortgage to the Holder of their Mortgage as required under the pooling and servicing agreement governing said Mortgage and Note.

622.    As the records regarding the identification of, the Trust that is the actual Holder of Plaintiff's Mortgage and Note, and the Trustee of said Trust, are in the sole possession of the Ocwen Servicer Defendant, said identification can only be made through discovery.

**Moise Fils v U.S. Bank, N.A. and Harmon Law**

623.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

624.    Plaintiff Moise Fils is a citizen of the State of Georgia and owns property in the State of Massachusetts located at 18A Business Terrace, Unit 18A, Hyde Park, MA 02368, which is one of the subject properties referred to herein.

625.    On or about April 28, 2006, Plaintiff gave a mortgage to New Century Mortgage Corporation in the original principal amount of $294,405.00. Said mortgage was recorded in the Suffolk County Registry of Deeds in Book 39517 at Page 326.

626.    On or about June 2006, but not later than August 26, 2006, Plaintiff's Mortgage was pooled and sold to a Trust named J.P. Morgan Mortgage Acquisition Trust 2006-NC2, Asset Backed Pass-Through Certificates Series 2006-NC2. U.S. Bank, N.A. was appointed as Trustee of said Trust, and JPMorgan Chase Bank, N.A. was appointed servicer of said Trust.

627.    On or about January 2010, Plaintiff began to experience financial difficulty and was unable to make his mortgage payments.

628.    On August 16, 2011, Harmon Law Offices, P.C. sent a notice to Plaintiff stating that it had been retained by JPMorgan Chase Bank, N.A. to foreclose on Plaintiff's mortgage. This

notice further states that Harmon Law P.C. has been instructed to bring foreclosure in the name of U.S. Bank, N.A., as Trustee for J.P. Morgan Mortgage Acquisition Trust 2006-NC2, Asset Backed Pass-Through Certificates Series 2006-NC2, to its Trustee.

629.   The aforementioned notice states that under the terms of Plaintiff's Note and Mortgage, there is outstanding $283.263.71 in principal and $7,483.50 in interest and other charges for a total of $290,747.21.

630.   Upon information and belief, JPMorgan Chase Bank, N.A. forwarded payments, on behalf of Plaintiff, to the Note-holder of Plaintiff's Note, as required under the Prospectus Supplement (Exhibit 14 *Id. at pp.120-121 "Advances"*) and pooling and servicing agreement governing the servicing of Plaintiff's mortgage.

631.   Upon information and belief, JPMorgan Chase Bank, N.A. has forwarded and continues to forward, on behalf of Plaintiff, all payments not made by Plaintiff to the Holder of Plaintiff's Note, J.P. Morgan Mortgage Acquisition Trust 2006-NC2, Asset Backed Pass-Through Certificates Series 2006-NC2, to its Trustee, U.S. Bank, N.A. as required under the Prospectus Supplement (Exhibit 14 *Id. at pp.120-121 "Advances"*) and pooling and servicing agreement governing the servicing of Plaintiff's mortgage.

632.   The Plaintiff does not dispute that his mortgage provides for the Statutory Power of Sale in the event of a default on the Note. However, upon information and belief, as the Note is not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

633.   Plaintiff claims that said foreclosure action is illegal as no default exists to Holder of his Note, J.P. Morgan Mortgage Acquisition Trust 2006-NC2, Asset Backed Pass-Through Certificates Series 2006-NC2, due to the third party servicer's payment of his mortgage to the Holder of his mortgage as required under the pooling and servicing agreement governing said mortgage and note.

634.    This type of action is representative of the U.S. Bank and Harmon Law Trustee Defendants' behavior in all cases where foreclosure has be initiated and/or completed, on

mortgage loans that were securitized and are governed by industry standard pooling and servicing agreements in the State of Massachusetts and nationwide.

**Chheang Thy and In Thy v FNMA and Harmon Law, PC.**

635.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

636.    On or about February 19, 1998, Plaintiffs, Chheang Thy and In Thy, purchased the Property located at 55 Geneva Street, Revere, MA 02151 in consideration of $149,000.00.

637.    On or about February 19, 1998 a Quitclaim Deed was recorded in the Suffolk County Registry of Deeds in Book 22167 Page 312 granting the Property to Plaintiff.

638.    On February 13, 2008, a Mortgage in the amount of $386,500.00 was recorded in the Suffolk County Registry of Deeds on Book 43097 Page 253.  The Mortgage identified Plaintiffs Chheang Thy and In Thy as the "borrowers" and Chevy Chase Bank FSB as "Lender".

639.    On or about March 2008, upon information and belief, said mortgage was pooled by Trustee Defendant FNMA, with a large number of other mortgages and sold to an as yet unknown and unidentified FNMA created Trust.

640.    On or about July 2010, the servicing rights regarding Plaintiffs Mortgage were transferred to Capital One via an "Assignment of Mortgage" which was recorded in the Suffolk County Registry of Deeds Book 46647 Page 84, on July 14, 2010, purporting to assign the Mortgage and Note to Capital One

641.    Upon information and belief, the servicing of the Mortgage, and the Note given by Plaintiffs was, from on or about March 2008, governed by a FNMA Master Trust Agreement and their mortgage payments were unconditionally guaranteed, by FNMA, to said Trust, as specified in said Trust Agreement.

642.    On or about January 2010, Plaintiffs began to experience financial difficulty and were unable to make their mortgage payments.

643.    On July 26, 2010, Harmon Law filed Service members' Relief Act Complaint and Order of notice with the Suffolk County Land Court to foreclose on the Property on behalf of Capital One.

644.    On October 5, 2010, Harmon Law sent Plaintiff a Notice of Notice of Mortgage Foreclosure Sale on behalf of Capital One which stated that the foreclosure sale would be held on November 10, 2010.

645.    Upon information and belief, Capital One and/or FNMA forwarded payment, on behalf of Plaintiffs, to the Holder of Plaintiff s' Note, as would be required under the FNMA Master Trust Agreement governing Plaintiffs' mortgage.

646.    Upon information and belief, Capital One and/or FNMA had forwarded, on behalf of Plaintiffs, all payments not made by Plaintiffs to the Holder of Plaintiff s' Note, as would be required under the FNMA Master Trust Agreement governing Plaintiff s' mortgage.

647.    On February 8, 2011, a Foreclosure Deed dated January 10, 2011, was recorded in the Suffolk County Registry of Deeds in Book 47577 Page 18 purporting to grant ownership and title to the property to FNMA.

648.    On March 7, 2011, Harmon Law filed a Summary Process proceeding to evict the Plaintiff from the Property on behalf of FNMA.

649.    The Plaintiffs do not dispute that their mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note is not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

650.    Plaintiffs claim that said foreclosure action is illegal as no default exists to Holder of their mortgage due to the third party servicer's (Capital One) and/or Master Servicer FNMA's payment of their mortgage to the Holder of their mortgage as required under the FNMA Master Trust Agreement governing said mortgage.

651.    Plaintiffs' further claim that said foreclosure action is illegal as Capital One was not the present Holder of either their Mortgage and/or Note as stated in said foreclosure notice, as

those documents were transferred to a FNMA Trust on or about March 2008. Should Capital One have physical possession of either document, it is only as document custodian, not as Holder, as specified in said FNMA Master Trust Agreement (Exhibit 11 *Id. at pp. 31 sec 3.4(2) Custody of Mortgage Documents - Custodial Capacity*).

652.    As no default of the Note existed to said, as yet unidentified, Trust, which was the lawful owner of said Mortgage and Note, the foreclosure and foreclosure proceedings are/were invalid.

653.    This type of action is representative of the Capital One Servicer Defendant, FNMA, and Trustee Defendant Harmon Law's behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized and are governed by private label securitized mortgage backed Trusts and/or Single-Family Master Trust Agreements of FNMA sponsored Trusts in the State of Massachusetts and nationwide.

**Randy and Suzanne Follett v Wells Fargo Bank, National Association, and Harmon Law**

654.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

655.    On or about October 25, 2004, Plaintiffs, Randy and Suzanne Follett, were granted the Property located at 57 Mayflower Lane, Wareham, MA.

656.    The Plaintiffs purchased the Property via financing in the amount of $317,000.00 arranged by former mortgage broker, Mulberry Mortgage located at 350 Woodland St, Holliston, MA.  Mulberry Mortgage arranged for the Plaintiff's to receive 2 loans from Fremont Mortgage in the amount of $254,000.00 and $63,500.00 for the purchase of the property.

657.    On June 9, 2005, Follett executed a mortgage which identified Fremont as Lender on Page 1 Paragraph D ("Mortgage"). The mortgage to Follett allegedly secured a loan to Follett in the amount of $360,000.00.  The Mortgage Deed was recorded in the Plymouth County Registry of Deeds in Book 30709 Page 320.

658.    On or about November 3, 2005, Plaintiff s' Mortgage was pooled and sold to a Trust named**,** Securitized Asset-Backed Receivables LLC 2005-Fr5 Mortgage Pass- Through

Certificates, Series 2005-FR5. Wells Fargo Bank, N.A. was appointed as Trustee of said Trust.  On or about August 2007 the servicing of Plaintiffs' Mortgage was transferred to Countrywide Home Mortgage.

659.    On or about September 2009, Plaintiff s began to experience financial difficulty and were unable to make their mortgage payments.

660.    On December 14, 2009, Wells Fargo filed a Service members' Relief Act Complaint and Order of Notice with the Plymouth County Land Court asking for "authority to foreclose" on the Property on behalf of Wells Fargo as Trustee for Securitized Asset-Backed Receivables LLC 2005-FR5 Mortgage Pass- Through Certificates, Series 2005-FR5.

661.    On or about August 9, 2010 Plaintiffs' aforementioned property was auctioned at foreclosure sale and purchased by Wells Fargo Bank, N.A., as Trustee for, Securitized Asset-Backed Receivables LLC 2005-FR5 Mortgage Pass- Through Certificates, Series 2005-FR5.

662.    Upon information and belief, BAC Home Loans Servicing, LP and/or Bank of America, N.A. forwarded payment, on behalf of Plaintiff s, to the Note-holder of Plaintiffs' Note, Securitized Asset-Backed Receivables LLC 2005-FR5 Mortgage Pass- Through Certificates, Series 2005-FR5, to its Trustee, Wells Fargo Bank, N.A. as required under the Prospectus (Exhibit 15 *Id. at pp. 151 {s-107}, 184-186 {s-124-125} "P&I Advances and Servicing Advances"*) and pooling and servicing agreement governing the servicing of Plaintiff s' mortgage.

663.    Upon information and belief, BAC Home Loans Servicing, LP has forwarded, on behalf of Plaintiff s, all payments not made by Plaintiff s to the Holder of Plaintiffs' Note, Securitized Asset-Backed Receivables LLC 2005-FR5 Mortgage Pass- Through Certificates, Series 2005-FR5, to its Trustee, Wells Fargo Bank, N.A. as required under the Prospectus (Exhibit 15 *Id. at pp. 151 {s-107}, 184-186 {s-124-125} "P&I Advances and Servicing Advances"*) and pooling and servicing agreement governing the servicing of Plaintiffs' mortgage.

664.    The Plaintiffs do not dispute that their mortgage provides for the Statutory Power of Sale in the event of a default on the Note. However, upon information and belief, as the Note is not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

665.    Plaintiffs claim that said foreclosure action is illegal as no default exists to Holder of their Note, Securitized Asset-Backed Receivables LLC 2005-FR5 Mortgage Pass- Through Certificates, Series 2005-FR5, due to the third party servicer's payment of their mortgage to the Holder of their mortgage as required under the pooling and servicing agreement governing the servicing of said Mortgage and Note.

666.     This type of action is representative of the Bank of America Servicing Defendants', the Harmon Law, PC., and Wells Fargo Trustee Defendants' behavior in all cases where foreclosure has be initiated and/or completed, on mortgage loans that were securitized and are governed by industry standard pooling and servicing agreements in the State of Massachusetts and nationwide.

**Chantha Oum v AHMSI, Wells Fargo Bank, N.A., and Ablitt Scofield**

667.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

668.    Plaintiff Chantha Oum is a citizen of, and owns property in the State of Massachusetts located at 18 Bourne Street, Lowell, MA 01852, which is one of the subject properties referred to herein.

669.    On or about April 28, 2006, Plaintiff gave a mortgage to Option One Mortgage Corporation in the original principal amount of $168,300.00.

670.    On or about June 2006, but not later than March 12, 2007, Plaintiff's Mortgage was pooled and sold to a Trust named Option One Mortgage Loan Trust 2007-2. Wells Fargo Bank, N.A. was appointed as Trustee of said Trust, and Option One was appointed servicer of said Trust.

671.    At some unknown point in time after March 12, 2007, American Home Mortgage Servicing, Inc. (hereinafter referred to as "AHMSI") became the servicer of mortgages owned by the Option One Mortgage Loan Trust 2007-2.

672.    On or about April 2009, Plaintiff began to experience financial difficulty and was unable to make her mortgage payments.

673.    On September 1, 2010, Wells Fargo filed a Service members' Relief Act Complaint and Order of Notice with the Middlesex County Land Court asking for "authority to foreclose" on the Property on behalf of Wells Fargo as Trustee for Option One Mortgage Loan Trust 2007-2, through its attorney Ablitt Scofield.

674.    On or about September 22, 2010, Wells Fargo Bank, N.A., as Trustee for Option One Mortgage Loan Trust 2007-2 was granted a Judgment Authorizing Foreclosure action against Plaintiffs aforementioned property, by the Middlesex Superior Court, in civil action # MLCV2010-02771-G.

675.    On or about January 4, 2011 Plaintiffs' aforementioned property was auctioned at foreclosure sale and purchased by Wells Fargo Bank, N.A., as Trustee for, Option One Mortgage Loan Trust 2007-2.

676.    On or about June 24, 2011 a Foreclosure Deed was recorded in the Middlesex North Registry of Deeds purporting to grant the property to Wells Fargo Bank, N.A., as Trustee for the Option One Mortgage Loan Trust 2007-2.

677.    Upon information and belief, AHMSI forwarded payment, on behalf of Plaintiff, to the Note-holder of Plaintiff's Note, Option One Mortgage Loan Trust 2007-2, to its Trustee, Wells Fargo Bank, N.A. as required under the Prospectus (Exhibit 16 *Id. at pp. 86-87 "Advances"*) and pooling and servicing agreement governing the servicing of Plaintiff s' mortgage.

678.    Upon information and belief, AHMSI has forwarded, on behalf of Plaintiff, all payments not made by Plaintiff to the Holder of Plaintiff's Note, Option One Mortgage Loan Trust 2007-2, to its Trustee, Wells Fargo Bank, N.A. as required under the Prospectus

(Exhibit 16 *Id. at pp. 86-87 "Advances"*) and pooling and servicing agreement governing the servicing of Plaintiff's mortgage.

679.    The Plaintiff does not dispute that her mortgage provides for the Statutory Power of Sale in the event of a default on the Note. However, upon information and belief, as the Note is not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

680.    Plaintiff claims that said foreclosure action is illegal as no default exists to Holder of her Note, Option One Mortgage Loan Trust 2007-2, due to the third party servicer's payment of her mortgage to the Holder of her mortgage as required under the pooling and servicing agreement governing the servicing of said Mortgage and Note.

681.     This type of action is representative of the AHMSI Servicing Defendant, and the Ablitt Scofield, and Wells Fargo Trustee Defendants' behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized and are governed by industry standard pooling and servicing agreements in the State of Massachusetts and nationwide.

**Novelette Napier & Natasha Napier v JPMorgan Chase Bank, N.A., EMC Mortgage Corporation and Wells Fargo Bank, N.A.**

682.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

683.    Plaintiffs, Novelette Napier & Natasha Napier are citizens of the State of Massachusetts residing at 30 Sanford Street, Boston, MA 02126, which is the one of the subject properties incorporated and referred to herein.

684.    On or about June 12, 2006, Plaintiffs purchased the subject property at 30 Sanford Street, Boston, MA 02126, and executed a Mortgage and Note to Bear Sterns Residential Mortgage Corporation (Bear Sterns) for $376,800.00 which was recorded in the Suffolk County Registry of Deeds in Book 39790 at Page 96.

685.    On or about July 2006, Plaintiffs' Mortgage was pooled and sold to a Trust named Structured Asset Mortgage Investments II, Inc., Bear Sterns Mortgage Funding Trust 2006-

AR1, Mortgage Pass-through Certificates, Series 2006-AR1. EMC Mortgage Corporation was appointed as one of the Servicers of said Trust, and Wells Fargo Bank, N.A. was appointed as Master Servicer, and JPMorgan Chase Bank, N.A. was appointed Trustee of said Trust. In recent official documents, such as Plaintiffs' modification agreement (dated March 23, 2010), Wells Fargo Bank, N.A. is claimed to be the Trustee of said Trust.

686.    On or about April 2009, Plaintiffs began to experience financial difficulty and were unable to make their mortgage payments.

687.    Plaintiffs made an application to the EMC Servicer Defendant (EMC is a wholly owned subsidiary of JPMorgan Chase Bank, N.A.) for consideration for their mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to Plaintiffs' hardship on or about June 2009.

688.    Plaintiff was granted a HAMP Modification and executed a Home Affordable Modification Agreement with EMC Mortgage Corporation, as servicer for Wells Fargo Bank, N.A., as Trustee for the Certificate-holders of Structured Asset Mortgage Investments II, Inc., Bear Stearns Mortgage Funding Trust 2006-AR1, Mortgage Pass-through Certificates, Series 2006-AR1, on or about March 23, 2010. Said modification adjusted payment terms to $1,787.49 per month.

689.    After making 5 consecutive, on time, monthly payments, as per the agreed upon modification terms as aforementioned, on or about September 2010, Plaintiffs were denied the ability to make further payments, by refusal to acknowledge Plaintiffs' modification, and refusal to accept any payments regarding their mortgage loan, by Servicer Defendants EMC Mortgage Corporation. At the time Plaintiffs' attempted to make their 6th payment under said modification, Servicer Defendant EMC informed Plaintiffs that their mortgage was now in foreclosure.

143

690.    On or about September 14, 2011, Servicer Defendant JPMorgan Chase sent a letter to Plaintiffs claiming that Plaintiffs' EMC mortgage was in foreclosure, and that the servicing of said mortgage was being transferred to Chase.

691.    Upon information and belief, Servicer Defendants EMC Mortgage Corporation and/or JPMorgan Chase Bank, N.A. forwarded payment, on behalf of Plaintiffs, to the Note-holder of Plaintiffs' Note, Structured Asset Mortgage Investments II, Inc., Bear Sterns Mortgage Funding Trust 2006-AR1, to its Trustee, Wells Fargo Bank, N.A., as claimed, or to JPMorgan Chase Bank, N.A., the original Trustee as stated in the Prospectus Supplement, dated February 27, 2006, as required under said Prospectus Supplement (Exhibit 17 *Id. at pp. 120-122 {s-68 - s-69} "Monthly Advances"*) and pooling and servicing agreement governing the servicing of Plaintiff s' mortgage.

692.    Upon information and belief, Servicer Defendants EMC Mortgage Corporation and/or JPMorgan Chase Bank, N.A. have forwarded and continue to forward, on behalf of Plaintiffs, all payments not made by Plaintiff to the Holder of Plaintiff's Note, Structured Asset Mortgage Investments II, Inc., Bear Sterns Mortgage Funding Trust 2006-AR1, to its Trustee, Wells Fargo Bank, N.A. , as claimed, or to JPMorgan Chase Bank, N.A., the original Trustee as stated in the Prospectus Supplement, dated February 27, 2006, as required under said Prospectus Supplement (Exhibit 17 *Id. at pp. 120-122 {s-68 - s-69} "Monthly Advances"*) and pooling and servicing agreement governing the servicing of Plaintiff s' mortgage The Plaintiff does not dispute that her mortgage provides for the Statutory Power of Sale in the event of a default on the Note. However, upon information and belief, as the Note is not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

693.    Plaintiffs' claim that said foreclosure action is illegal as no default exists to Holder of their Note, Structured Asset Mortgage Investments II, Inc., Bear Sterns Mortgage Funding Trust 2006-AR1, due to the third party servicer's payment of their mortgage to the Holder of their mortgage as required under the pooling and servicing agreement governing the servicing of said Mortgage and Note.

694.     This type of action is representative of the Servicer Defendants EMC Mortgage

Corporation and/or JPMorgan Chase Bank, N.A., behavior in all cases where foreclosure has

been initiated and/or completed, on mortgage loans that were securitized and are governed by

industry standard pooling and servicing agreements in the State of Massachusetts and

nationwide.

**Sarun Kim v JPMorgan Chase Servicer Defendants, FNMA, and Harmon Law**

695.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

Plaintiff Sarun Kim is a citizen of the State of Massachusetts and resides at and is the owner

of 1-3 Glidden Avenue, Lowell, MA 01851, which is one of the subject properties referred to

herein.

696.     On or about September 12, 2005, Plaintiff executed a Mortgage which identified TD

Banknorth, N.A. as Lender. Said Mortgage was recorded in the Middlesex North County

Registry of Deeds in Book 19270 at page 60. A short time after executing said mortgage,

servicing of said mortgage was transferred to the Servicer Defendants Chase Home Finance,

LLC and by succession in ownership interest, JPMorgan Chase Bank, N.A.

697.     Upon information and belief sometime on or about October - December, 2005,

Plaintiff's mortgage was purchased by an as yet identified FNMA created Trust (or an as yet

identified private label mortgage backed securitized Trust). At that point in time, that as yet

identified Trust became the true owner of the Plaintiff's Mortgage and Note.

698.     Sometime after the origination of Plaintiff's mortgage, she began to experience a

hardship which caused her to be unable to continue to make her mortgage payments.

699.     Unknown to Plaintiff at that time, upon information and belief, the JPMorgan Chase

Servicer Defendants and /or FNMA,  by virtue of its guarantee, did in fact make Plaintiff's

mortgage payments, on Plaintiff's behalf, as a third party servicer and/or as Master Servicer

with no security interest, to the true Holder of Plaintiff's Mortgage and/or Note (said Trust),

without her knowledge or consent and as such the Note referenced herein is believed to have

not been in default at the time foreclosure was initiated and completed due to the servicing

advances paid by the JPMorgan Chase Servicer Defendants and/or FNMA, on behalf of the Plaintiff to the unknown Note Holder in due course, as is required by the FNMA Amended and Restated 2007 Single-Family Master Trust Agreement (Exhibit 11) and/or an industry standard pooling and servicing agreement.

700.    In said Master Trust Agreement the Direct Servicer (i.e. JPMorgan Chase) is often responsible for *"Delinquency Advances"* (Exhibit 10 *Id. at pp. 4,5)* as specified in their individual Direct Servicer Contracts with FNMA. This clause requires the Direct Servicer (or Sub-Servicer, if applicable) to advance payment on any non-performing loans.

701.    Moreover, FNMA created Trusts are given the additional assurance that if for any reason the Direct Servicer does not or is not required to forward said Delinquency Advances, FNMA guarantees that it will forward said Delinquency Advances to the Trusts it created as stated in said Master Trust Agreement (Exhibit 10 *Id. at pp. 54 Article VII through pp. 59)*.

702.    Regardless of whether the JPMorgan Chase Servicer Defendants or FNMA paid the Plaintiff's mortgage payments on her behalf, if the terms of said Master Trust Agreement and FNMA's well publicized guarantee ( or the "Advance" clause contained in industry standard pooling and servicing agreements) were adhered to, the Plaintiff's mortgage was paid to the true Holder of said instrument.

703.    On or about June 21, 2010, Trustee Defendant Harmon Law, P.C. filed a Service-members' Relief Act Complaint and Order of Notice with the Boston Land Court to foreclose on the Property on behalf of Chase Home Finance, LLC, claiming to be the present holder of the Plaintiff's Mortgage. Said Notice was recorded in the Middlesex North County Registry of Deeds on or about June 29, 2010 in Book 24055 at page 290.

704.    Defendant Harmon Law set foreclosure auction date on behalf of Chase Home Finance, LLC for on or about August 11, 2010. As of the date of this filing the Plaintiff is still under the threat of foreclosure. The actions taken by the JPMorgan Chase Defendants, FNMA, and Trustee Defendant Harmon are without any force or effect relative to the

attempted sale of the property because upon information and belief no default regarding payment of the Note to the actual Note holder exists or existed.

705.    Moreover, upon information and belief, Chase Home Finance, LLC is not the present holder of said Mortgage and/or Note, as stated in all foreclosure notices. Said Holder is, upon information and belief, an as yet identified FNMA Trust or an as yet identified private label securitized mortgaged backed Trust. As the records regarding who the actual Holder of Plaintiff's Mortgage and Note are in the control of the Servicer Defendants JPMorgan Chase Bank, N.A. and Chase Home Finance, LLC, and not properly recorded in the Middlesex North County Registry of Deeds, it is only through discovery that these facts can be ascertained and determined.

706.    The Plaintiff does not dispute that her mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note is not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

707.    As no default of the Note existed to said, as yet unidentified, Trust, which is the lawful owner of said Mortgage and Note, the foreclosure and foreclosure proceedings are/were invalid.

708.    This type of action is representative of the JPMorgan Chase Servicer Defendants, FNMA, and Trustee Defendant Harmon Law's behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized and are governed by private label securitized mortgage backed Trusts and/or Single-Family Master Trust Agreements of FNMA sponsored Trusts in the State of Massachusetts and nationwide.

**Michael Francis v Deutsche Bank National Trust Company, JPMorgan Chase Bank, N.A. and Harmon Law, P.C.**

709.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

710.    Plaintiff, Michael Francis, is a citizen of the State of Massachusetts residing at 172-172A Eliot Street, Milton, MA 02186, which is the one of the subject properties incorporated and referred to herein.

711.    On or about September 7, 2006, Plaintiff refinanced the subject property at 172-172A Eliot Street, Milton, MA 02186, and executed a Mortgage and Note to Washington Mutual for $448,000.00 which was recorded in the Norfolk County Registry of Deeds in Book 24073 at Page 533.

712.    On or about October 12 2006, Plaintiff's Mortgage was pooled and sold to a Trust named Long Beach Mortgage Loan Trust 2006-9. Deutsche Bank National Trust Company was appointed Trustee of said Trust.

713.    On or about March 2009, Plaintiff began to experience financial difficulty and was unable to make his mortgage payments.

714.    Plaintiff made an application to the JPMorgan Chase Bank, N.A. Servicer Defendant for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to Plaintiffs' hardship on or about March 2009.

715.    On or about July 2011, Servicer Defendant JPMorgan Chase instructed Defendant Harmon Law to send a letter to Plaintiff claiming that Plaintiffs' Chase Mortgage was in foreclosure.

716.    Upon information and belief, Servicer Defendants JPMorgan Chase Bank, N.A. forwarded payment, on behalf of Plaintiff, to the Note-holder of Plaintiffs' Note, Long Beach Mortgage Loan Trust 2006-9, to its Trustee, Deutsche Bank National Trust Company, as required under said Prospectus Supplement (Exhibit 18 *Id. at pp. 14-15, 56, 256, & 264 "Advances"*) and pooling and servicing agreement governing the servicing of Plaintiff's Mortgage.

717.    Upon information and belief, Servicer Defendant JPMorgan Chase Bank, N.A. has forwarded and continues to forward, on behalf of Plaintiff, all payments not made by Plaintiff to the Holder of Plaintiff's Note, Long Beach Mortgage Loan Trust 2006-9, to its Trustee, Deutsche Bank National Trust Company, as stated in the Prospectus Supplement, dated February 27, 2006, as required under said Prospectus (Exhibit 18 *Id. at pp. 14-15, 56, 256, & 264 "Advances"*) and pooling and servicing agreement governing the servicing of Plaintiff 's Mortgage

718.    The Plaintiff does not dispute that his mortgage provides for the Statutory Power of Sale in the event of a default on the Note. However, upon information and belief, as the Note is not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

719.    Plaintiff claims that said foreclosure action is illegal as no default exists to Holder of their Note, Long Beach Mortgage Loan Trust, due to the third party servicer's payment of his Mortgage to the Holder of his Mortgage as required under the pooling and servicing agreement governing the servicing of said Mortgage and Note.

720.     This type of action is representative of the Trustee Defendants, Deutsche Bank National Trust Company and Harmon Law, as well as Servicer Defendant JPMorgan Chase Bank, N.A., behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized and are governed by industry standard pooling and servicing agreements in the State of Massachusetts and nationwide.

**Sakum Heng & Sothy Kum v JPMorgan Chase Bank, N.A. and Harmon Law**

721.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

722.    Plaintiff's, Sakum Heng & Sothy Kum, first mortgage loan is serviced by the Servicer Defendants Chase Home Finance, LLC, and by succession in ownership interest, by JPMorgan Chase Bank, N.A.

723.    On or about December 4, 2008, Plaintiffs executed a Mortgage which identified

Mortgage Electronic Registration Systems, Inc. (MERS) as Mortgagee. Said Mortgage was

recorded in the Essex County Registry of Deeds in Book 11413 at Page 319.

Upon information and belief sometime on or about January - February, Plaintiffs' mortgage

was purchased by an as yet identified Trust and servicing of said mortgage was taken over by

Chase Home Finance, LLC. At that point in time, that as yet identified Trust became the true

owner of the Plaintiffs' Mortgage and Note.

724.    Sometime after the origination of Plaintiffs' mortgage, they began to experience a

hardship which caused them to be unable to continue to make their mortgage payments.

725.    Unknown to Plaintiffs at that time, upon information and belief, Defendant Chase

Home Finance, LLC and /or Defendant JPMorgan Chase Bank, N.A., did in fact make

Plaintiffs' mortgage payments, on Plaintiffs behalf, as a third party servicer and/or as Master

Servicer with no security interest, to the true Holder of Plaintiffs' Mortgage and/or Note (said

As yet identified Trust), without their knowledge or consent and as such the Note referenced

herein is believed to have not been in default at the time foreclosure was initiated due to the

servicing advances paid by Defendant Chase Home Finance, LLC and /or Defendant

JPMorgan Chase Bank, N.A., on behalf of the Plaintiff to the unknown Note Holder in due

course, as is required by industry standard pooling and servicing agreements.

726.    Regardless of whether Defendant Chase Home Finance, LLC or Defendant JPMorgan

Chase Bank, N.A. paid the Plaintiffs' mortgage payments on their behalf, if the terms of said

"Advance" clause contained in industry standard pooling and servicing agreements was

adhered to, the Plaintiffs' Mortgage was paid to the true Holder of said instrument.

727.    On or about August 4, 2011, Trustee Defendant Harmon Law, P.C. sent written notice

to Plaintiffs, informing them that Harmon Law had been retained by Defendant JPMorgan

Chase Bank, N.A. to foreclose on the Plaintiffs' subject property located at 15-17 Farley

Street, Lawrence, MA 01843.

728.     The actions taken by the JPMorgan Chase Defendants and Trustee Defendant Harmon Law are without any force or effect relative to the attempted sales of the property because, upon information and belief, no default regarding payment of the Note to the actual Note holder exists or existed.

729.     Moreover, upon information and belief, JPMorgan Chase is not the present holder of said Mortgage and/or Note, as stated in all foreclosure notices. Said Holder is in fact, upon information and belief an as yet identified Trust. As the records regarding whom the actual Holder of Plaintiffs' Mortgage and Note, are in the control of Defendant JPMorgan Chase Bank, N.A, and not properly recorded in the Essex County Registry of Deeds, it is only through discovery that these facts can be ascertained and determined.

730.     The Plaintiffs do not dispute that their mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note is not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

731.     As no default of the Note existed/exists to said, as yet unidentified, Trust, which was the lawful Holder of said Mortgage and Note, the foreclosure proceedings are/were invalid.

732.      This type of action is representative of the JPMorgan Chase Bank, N.A. and Chase Home Finance, LLC Defendant's, and Trustee Defendant Harmon Law's behavior in all cases where foreclosure has been initiated and/or completed, on mortgage loans that were securitized and are governed by mortgage backed Trusts in the State of Massachusetts and nationwide.

**Darick Thin & Chanthol Ly v MidFirst Bank, an as yet identified Mortgage Backed Trust and said Trust's as yet identified Trustee, and Orlans Moran, PLLC**

733.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

734.     Plaintiffs, Darick Thin & Chanthol Ly are citizens of the State of Massachusetts residing at and the owners of 82 Light Street, Lynn, MA 01905, which is the one of the subject properties incorporated and referred to herein.

735.    On or about February 3, 2003, Plaintiffs gave a Mortgage to Union Trust Mortgage

Corporation in the original principal amount of $297,532.00. Said Mortgage was recorded in

the Southern Essex County Registry of Deeds on or about March 3, 2003 in Book 20267 at

Page 193.

736.    Upon information and belief, on or about March - May 2003, Plaintiffs' Mortgage and

Note were pooled and sold to an as yet identified Trust.

737.    On or about January 2010, Plaintiffs began to experience financial difficulty and were

unable to make their mortgage payments.

738.    Plaintiffs made an application to the MidFirst Bank's servicing entity, Midland

Mortgage, for consideration for their mortgage to be modified under the guidelines and

supplemental directives of the U.S. Treasury Department's Making Home Affordable Home

Affordable Modification Program that included personal financial information, tax

information, and a statement attesting to Plaintiffs' hardship. Upon information and belief,

Midland Mortgage denied Plaintiff's application for a HAMP modification unfairly.

739.    On or about June 2, 2011, Orlans Moran, PLLC filed an order of notice in the Boston

Land Court regarding the Service Members Relief Act, in preparation to foreclose Plaintiffs'

aforementioned Mortgage, on behalf of MidFirst Bank, as the claimed present holder of said

Mortgage. Said Notice was recorded in the Southern Essex County Registry of Deeds on or

about June 17, 2011in Book 30472 at Page 330.

740.    On or about October 17, 2011, Plaintiffs' Mortgage was foreclosed and their subject

property was purchased at foreclosure auction by MidFirst Bank, for $306,527.19. Said

foreclosure auction and all foreclosure proceedings were conducted by MidFirst Bank,

claiming to be the present Holder of the Plaintiffs' Mortgage, through their attorney, Orlans

Moran, PLLC.

741.    Upon information and belief, MidFirst Bank, while claiming to be the present Holder

of the Plaintiffs' Mortgage, was in fact, not the present Holder of said Mortgage. Upon

information and belief, an as yet identified mortgage backed Trust was the Holder of the

Plaintiffs' Mortgage since no later than May 2003. Furthermore, upon information and belief, MidFirst Bank was only the servicer of said Mortgage at the time foreclosure action was commenced and subsequently completed. As the records regarding the identity of the Trust that was/is the Holder of the Plaintiffs' Mortgage and Note, are held by the Defendant MidFirst Bank, this information can only be determined through discovery.

742.    Upon information and belief, MidFirst Bank and/or it's servicing subsidiary, Midland Mortgage forwarded payment, on behalf of Plaintiffs, to the Holder of Plaintiffs' Note, an as yet identified Trust, to it's as yet identified Trustee, as required under the pooling and servicing agreement governing Plaintiffs' Mortgage.

743.    Upon information and belief MidFirst Bank and/or it's servicing subsidiary, Midland Mortgage had forwarded, on behalf of Plaintiffs, all payments not made by Plaintiffs to the Holder of Plaintiffs' Note, as would be required under the pooling and servicing agreement governing Plaintiffs' Mortgage.

744.    The Plaintiffs do not dispute that their mortgage provides for the Statutory Power of Sale in the event of a default on the Note. However, upon information and belief, as the Note was not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

745.    Plaintiffs claim that said foreclosure actions were illegal as no default existed to Holder of their Note, due to the third party servicer's payment of their mortgage to the Holder of their Mortgage as required under the pooling and servicing agreement governing said Mortgage and Note.

746.    Plaintiffs have been the subject of extreme mental and emotional distress as the result of these illegal foreclosure actions and, at the time of this filing, are attempting to stay eviction from their property in Housing Court.

**J. Charles Lauture & Melinda Matthews v EMC Mortgage Corporation, Wells Fargo Bank, National Association, and Harmon Law, P.C.**

747.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

748.    On or about January 14, 2005, Plaintiff, J. Charles Lauture, purchased the Subject Property, as noted herein, located at 127 Shirley Street, Boston, MA 02119 for the sum of $322,000. Said purchase is evidenced by a Deed transferring interest in said property to Plaintiff recorded in the Suffolk County Registry of Deeds on January 14, 2005 in Book 36311, at Page 237.

749.    On or about November 4, 2005, Plaintiff Lauture executed a Quit-Claim Deed, transferring his interest in said Subject Property to Himself and his wife, Melinda Matthews. Said Quit-Claim Deed was recorded in the Suffolk County Registry of Deeds on November 9, 2005 in Book 38448, at Page 75.

750.    On or about December 21, 2005, Plaintiffs executed a Mortgage and Note, secured by the Subject Property, which they gave to GreenPoint Mortgage (as Lender) and Mortgage Electronic Registration Systems, Inc./MERS (as Mortgagee) in return for a refinance loan in the amount of $372,800.00. Said Mortgage was recorded in the Suffolk County Registry of Deeds on January 21, 2006 in Book 38751, at Page 295.

751.    On or about March –April 2006, Plaintiffs' Mortgage and Note were pooled and sold to a Trust named**,** the GreenPoint Mortgage Funding Trust 2006-AR3. Wells Fargo Bank, N.A. was appointed as Trustee of said Trust.  On or about March - April 2006 the servicing of Plaintiffs' Mortgage was transferred to EMC Mortgage Corporation, a wholly owned subsidiary of JPMorgan Chase Bank, N.A.

752.    On or about June 2011, Plaintiffs began to experience financial difficulty and were unable to make their mortgage payments.

753.    On or about November 2, 2011, Wells Fargo Bank, N.A. caused an Acceleration Warning (Notice of Intent to Foreclose) to be sent to Plaintiff's through JPMorgan Chase Bank, N.A. (acting solely as servicer of Plaintiff's Mortgage), and Chase's Attorney, Harmon Law, P.C., to foreclose on the Property on behalf of Wells Fargo as Trustee for the GreenPoint Mortgage Funding Trust 2006-AR3.

754.    The aforementioned notice states that under the terms of Plaintiffs' Note and Mortgage, there is outstanding $13,116.71 in past due principal and interest payments, and other charges. Said notice also states that all amounts due must be paid by March, 2012 in order to avoid foreclosure.

755.    Upon information and belief, Servicer Defendants EMC Mortgage Corporation and/or JPMorgan Chase Bank, N.A. forwarded payment, on behalf of Plaintiff s, to the Note-holder of Plaintiffs' Note, the GreenPoint Mortgage Funding Trust 2006-AR3, to its Trustee, Wells Fargo Bank, N.A. as required under the Prospectus (Exhibit 19 *Id. at pp. 69 {s-39}, "Monthly Advances"*) and pooling and servicing agreement governing the servicing of Plaintiffs' mortgage.

756.    Upon information and belief, Servicer Defendant EMC Mortgage Corporation and/or JPMorgan Chase Bank, N.A. has forwarded (and continues to forward), on behalf of Plaintiffs, all payments not made by Plaintiff s to the Holder of Plaintiffs' Note, the GreenPoint Mortgage Funding Trust 2006-AR3, to its Trustee, Wells Fargo Bank, N.A. as required under the Prospectus (Exhibit 19 *Id. at pp. 69 {s-39}, "Monthly Advances"*) and pooling and servicing agreement governing the servicing of Plaintiffs' mortgage.

757.    The Plaintiffs do not dispute that their mortgage provides for the Statutory Power of Sale in the event of a default of the Note. However, upon information and belief, as the Note is not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot legally be exercised.

758.    Plaintiffs claim that said foreclosure action is illegal as no default exists to Holder of their Note, the GreenPoint Mortgage Funding Trust 2006-AR3, due to the third party servicer's payment of their mortgage to the Holder of their mortgage as required under the pooling and servicing agreement governing the servicing of said Mortgage and Note.

759.     This type of action is representative of the Servicer Defendants EMC Mortgage Corporation and/or JPMorgan Chase Bank, N.A., the Harmon Law, PC., and Wells Fargo Trustee Defendants' behavior in all cases where foreclosure has be initiated and/or completed,

on mortgage loans that were securitized and are governed by industry standard pooling and servicing agreements in the State of Massachusetts and nationwide.

**Pros Chhot v Sovereign Bank, an as yet identified Mortgage Backed Trust and said Trust's as yet identified Trustee, and Orlans Moran**

760.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

761.    Plaintiff, Pros Chhot is a citizen of the State of Massachusetts residing and claims to be the rightful owner of 87 Tremont Street, Fall River, MA 02720, which is the one of the subject properties incorporated and referred to herein.

762.    Plaintiff refinanced the subject property and was given a mortgage loan by Sovereign Bank on February 15, 2008. Said Mortgage was recorded in the Fall River Registry of Deeds in Book 6873, at page 79.

763.    Upon information and belief, on or about June – July 2008, Plaintiff's Mortgage and Note were pooled and sold to an as yet identified Trust.

764.    Sometime after receiving said mortgage loan, Plaintiff began to have difficulty making his mortgage payments and fell behind in the payments of said mortgage loan.

765.    Plaintiff made an application to the Sovereign Bank Servicer Defendant for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program that included personal financial information, tax information, and a statement attesting to Plaintiff's hardship on or about January 13, 2010.

766.    On or about May 2009, Plaintiffs began to experience financial difficulty and were unable to make their mortgage payments.

767.    During the time period of Plaintiff's request for HAMP consideration he suffered extreme emotional and mental distress as the Sovereign Bank Servicer Defendant repeatedly threatened him with foreclosure.

768.    On or about August 1, 2010, Defendant Orlans Moran, PLLC. sent Plaintiff a Notice

of Intention to Foreclose on behalf of Sovereign Bank stating a scheduled auction date of

September 16, 2010. The aforementioned auction date was postponed numerous times.

769.    Unknown to Plaintiff at this time, upon information and belief, Sovereign Bank had

forwarded payment, on behalf of Plaintiff, to the Note-holder of Plaintiff's Note, an as yet

identified Trust, and/or to it's as yet identified Trustee, as would be required under a

standardized pooling and servicing agreement and/or FNMA Master Trust Agreement which

would have governed the servicing of Plaintiff's mortgage.

770.    The Plaintiff does not dispute that his Mortgage provides for the Statutory Power of

Sale in the event of a default on the Note. However, upon information and belief, as the Note

was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale cannot

legally be exercised.

771.    Plaintiff claims that said foreclosure actions were illegal as no default existed to

Holder of his Note, due to the third party servicer's (Sovereign Bank) payment of his

mortgage to the Holder of his Mortgage as a standard requirement under the pooling and

servicing agreement and/or FNMA Master Trust Agreement governing the servicing said

Mortgage.

772.    As the records regarding the identification of, the Trust that is the actual Holder of

Plaintiff's Mortgage and Note, and the identification of the Trustee of said Trust, are in the

sole possession of the Sovereign Bank Servicer Defendant, said identification can only be

made through discovery.

**Defendant's Actions Caused Injury to Plaintiffs**

773.    Plaintiffs have suffered injury caused by Defendant's actions, including but not limited

to, the loss of property through foreclosure, legal costs incurred to stay eviction and contest

foreclosure, severe mental and emotional distress intentionally inflicted by Defendants.

## CLASS ACTION ALLEGATIONS

774.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

775.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

776.    So as to the Originator Defendants, the named Plaintiffs sue on behalf of themselves and all Massachusetts homeowners whose loans have been originated by the Originator Defendants using significantly reduced underwriting standards designed to allow borrowers to obtain mortgages without proper verification of income, no-doc and no money down programs, offering extremely risky credit terms to unsophisticated borrowers such as negative amortization, interest only payment options and, adjustable rate mortgage terms that the Originator Defendants knew would be unsustainable for borrowers.

777.    So as to the Servicer Defendants, the named Plaintiffs sue on behalf of themselves and all Massachusetts homeowners whose loans were originated, since January 2000, but not after December 31, 2008, and/or have been serviced by the Servicer Defendants, and who, since March 5, 2009, have requested consideration and/or applied with the Servicer Defendants for a HAMP modification and whereby the Servicer Defendants fraudulently represented it was a participating servicer in the HAMP Program, bound to abide by its rules, guidelines and supplemental directives all while knowing they could not modify Plaintiffs' and others mortgages due to contractual limitations contained in the Prospectus' and/or Pooling and Servicing Agreements they had previously entered into governing the servicing of Plaintiffs' and others mortgages yet fraudulently misrepresented to those Plaintiffs and others that their mortgages could in fact be modified and purposefully hindered the modification process in an effort to enrich themselves, and also Plaintiffs and others who were either;

a.    Referred to foreclosure while being considered for a HAMP modification and/or while under a HAMP Trial Period Plan agreement and/or having been granted a HAMP permanent modification;

or

b.    Foreclosed upon while being considered for a HAMP modification and/or while under a HAMP Trial Period Plan agreement and/or having been granted a HAMP permanent modification;

or

c.    Suffered systematic, redundant and repetitive documentation requests, deceptive claims that documents were lost or never received,  deceptive and misleading claims that request were stalled in underwriting, negotiation and/or quality control, in violation of HAMP Guidelines and Supplemental Directives regarding the timely review of requests, in an effort to keep those mortgage loans in a near perpetual state of default as part of a scheme to increase servicing fees through artificial inflation of principal balance totals, the billing of servicing advances and other illicit mortgage servicing activities as described herein of the pools of mortgages they serviced;

or

d.    Denied a HAMP Modification without due cause;

778.    So as to the Trustee Defendants, the named Plaintiffs sue on behalf of themselves and all Massachusetts homeowners whose loans have been serviced by the Servicer Defendants, that are/were held in Trusts governed by standard Private Label Prospectus' and/or Pooling

and Servicing agreements and/or FNMA Master Trust Agreements, with respect to periodic/delinquent/monthly advances required to be made by the Servicer Defendants and or FNMA, as servicer and/or Master Servicer, regarding all payments not received by the Servicer Defendants and/or FNMA, to the Trusts which owned Plaintiffs' and others Mortgages and/or Notes serviced by the Servicer Defendants and/or FNMA acting in its capacity as Master Servicer and/or Trustee, and had foreclosure proceedings initiated against and/or completed against them by the Trustee Defendants and or the Servicer Defendants acting on behalf of, or at the instruction of, the Trustee Defendants and/or FNMA who were either;

     a.    Referred to foreclosure whereby fraudulent and false representations were made to establish a default of Note to true owner of said Note;

    or

     b.    Foreclosed upon whereby fraudulent and false representations were made to establish a right to chain of title of said Mortgage/Note (i.e. "robo-signing", wrongful and invalid assignments, etc.);

779.    Excluded from the Class are governmental entities, Defendants, their affiliates and subsidiaries, the Defendants' current employees and current or former officers, directors, agents, representatives, their family members, the members of this Court and its staff.

780.    Plaintiffs do not know the exact size or identities of members of the Class, since such information is in the exclusive control of Defendants.  Plaintiffs believe that the Class encompasses tens or hundreds of thousands of individuals whose identities can be readily

ascertained from Defendants' books and records.  Therefore, the Class is so numerous that joinder of all members is impracticable.

781.    All members of the Class have been subject to and affected by the same conduct.  The claims are based on standard form contracts and uniform loan modification processing requirements.  There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the class.  These questions include, but are not limited to the following:

a.    the nature and scope of the Servicer Defendants' misrepresentations regarding its intentions to properly administer and adhere to the guidelines and supplemental directives of the HAMP program and its fraudulent misrepresentations to homeowners regarding HAMP and their ability to obtain a HAMP modification;

b.    whether all Defendants' conduct in the circumstances described herein and in the underlying complaints amounts to fraud;

c.    whether all Defendants' conduct in the circumstances described herein and in the underlying complaints amounts to deceptive and misleading business practices;

d.    whether all Defendants' conduct in the circumstances described herein and in the underlying complaints violates state consumer protection laws;

e.    whether the Originator Defendants' conduct violates applicable predatory lending laws;

f.    whether the Servicer and Trustee Defendants' conduct violates state foreclosure law;

g.    whether Servicer and Trustee Defendants' conduct violates applicable state Commercial Code and corresponding regulations; and

h.      whether the Court can order damages and enter injunctive relief.

782.    The claims of the Named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the class in that the Named Plaintiffs and the other members of the class were subject to the same conduct.

783.    The named Plaintiffs will fairly and adequately represent the interests of the Class. They are committed to the vigorous prosecution of the class claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

784.    A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

785.    This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

786.    The Defendants acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## COUNT I

### *Fraud*

### *Re: Originator Defendants' Representations*

### *Regarding Soundness of its Mortgage Products*

787.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

788.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

789.    Plaintiffs suffered damages as a result of Defendants originating residential mortgage loans using significantly reduced underwriting standards designed to allow borrowers to obtain mortgages without proper verification of income, and no money down programs,

offering extremely risky credit terms to borrowers such as negative amortization, interest only payment options and, adjustable rate mortgage terms that Defendants knew would be unsustainable for borrowers.

790.    Plaintiffs suffered damages as a result of Defendants' fraudulent misrepresentations regarding financial soundness of its mortgage loan products. Defendants knew Plaintiff borrowers had paid no down payment in property purchase transactions, that Plaintiff borrowers did not earn enough income to qualify for mortgage loan transactions, etc., yet had developed high risk lending instruments specifically tailored to the Plaintiffs' and others situations so as to make said loan(s) to enrich themselves by fraudulently misrepresenting the financial soundness of these lending instruments to Plaintiffs (and to others so similarly situated), knowing said loans would cause injury to the Plaintiffs and others.

791.    Plaintiffs have suffered harm and are threatened with additional harm from Defendants' fraudulent, deceptive and misleading statements, including but not limited to longer loan payoff times, higher principle balances, improper negative reporting to credit bureaus; inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, increased accrued interest, the wrongful loss of a property interest for those who have suffered foreclosure, and legal fees for defense of eviction

792.    As a result of these fraudulent misrepresentations, Defendants caused Plaintiffs harm, as alleged above.  Defendants' bad faith was thus to Plaintiffs' detriment.


## **COUNT II**

### ***Violations of Massachusetts Consumer Protection Act and Applicable Regulations And/or Fraud By the Servicer Defendants***

793.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

794.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

795.   Defendants have violated and continue to violate the Massachusetts Consumer Protection Act, G.L. c. 93A, §2(c) including, without limitation;

> a.   940 C.M.R. § 3.16, in that its conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business;
>
> b.   940 C.M.R. § 3.16, in that its conduct violated existing statutes, rules, regulations or laws meant for the protection of the public's health, safety or welfare, as detailed below;
>
> c.   940 C.M.R. § 3.05, in that it made deceptive representations or failed to disclose relevant information as to its intentions regarding its administration of the HAMP program, its contractual obligations under pre-existing Pooling and Servicing Agreements with the Trusts it serviced mortgages for and the misuse of its Loss Sharing Agreement with the FDIC;
>
> d.   940 C.M.R. § 8.06, in that it is a Mortgage Lender and made false or misleading representations to borrowers; and
>
> e.   940 C.M.R. § 25.03, because it offers foreclosure related services within the meaning of 940 C.M.R. § 25.01without adequately describing the services offered.

796.   Plaintiffs have been injured suffering damages as a result of Defendants' fraudulent misrepresentations regarding the defaulted status of their Notes

797.   Plaintiffs and others have suffered harm and are threatened with additional harm from Defendants' fraudulent, deceptive and misleading statements, including the wrongful loss of a property interest for those who have suffered foreclosure.

798.    Defendants conduct as described in this complaint was and is willful or knowing within the meaning of the Massachusetts Consumer Protection Act, G.L. c. 93A, §9.

799.    As a result of these violations of Massachusetts Consumer Protection Act, G.L. c. 93A, §9, Defendants caused Plaintiffs and others harm, as alleged above.  Defendants' bad faith was thus to Plaintiffs' detriment.

800.    Defendants conduct as set forth herein violates established public policy, and the harms caused to consumers greatly outweighs any benefits associated with that conduct.

801.    As a result of Defendants conduct, Plaintiffs and others suffered ascertainable damages and ascertainable losses including:

        a.    wrongful foreclosures;

        b.    otherwise avoidable losses of homes to foreclosure;

        c.    increased fees and other costs to avoid or attempt to avoid foreclosure;

        d.    loss of savings in pointless attempts at modification;

        e.    loss of opportunities to pursue other loss mitigation strategies;

        f.    significant stress and emotional distress, and;

802.    Plaintiffs are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

803.    Since on or about August 16, 2011 to present, various Plaintiffs have sent many of the Defendants in this case demands for relief pursuant to G.L. c. 93A. Those Plaintiffs claiming violations of G.L. c. 93A have been noted in the preceding paragraphs.


### COUNT III

### Violation of Massachusetts – Uniform Commercial Code
### By FNMA and the Trustee & Servicer Defendants

804.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

805.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

806.    As the entity responsible for exercising the statutory power of sale, Defendants owed Plaintiff a duty of good faith and fair dealing in their conduct leading up to the foreclosure proceedings and sale.

807.    Defendants knew that Plaintiffs' mortgage payments had been made to the true holder in due course of the instrument (Note) on behalf of Plaintiffs by third parties (Servicer Defendants and/or FNMA) and as such Plaintiffs' monthly obligations were discharged.

808.    Defendants conduct as set forth herein affects the public interest and is part of a generalized course of conduct affecting numerous consumers.

809.    Defendants have violated and continue to violate the Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603 including, without limitation;

> a.      §3-603 that tender of payment of the obligation to pay the instrument was made to the entity entitled to enforce the instrument yet the default provisions of the instrument were enforced;
>
> b.      §3-602 the instrument was paid on behalf of the party obligated to pay the instrument, and to an entity entitled to enforce the instrument, and as such to the extent of the payment the obligation of the party obliged to pay the instrument should have been discharged, instead Defendants claimed instrument was in default and proceeded to foreclose.

810.    Plaintiffs and others have been injured suffered damages as a result of Defendants' fraudulent misrepresentations regarding the defaulted status of their Mortgage and/or Note

811.    Plaintiffs and others have suffered harm and are threatened with additional harm from Defendants fraudulent, deceptive and unlawful practices, including the wrongful loss of a property interest for those who have suffered foreclosure.

812.    As a result of these violations of Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602 and §3-603, Defendants caused Plaintiffs and others harm, as alleged above.  Defendants' bad faith was thus to Plaintiffs' detriment.

813.    Defendants conduct was likely to induce reliance and to create confusion and misunderstanding.

814.    Defendants conduct as set forth herein is not required, permitted or authorized by any state or federal law.

815.    Defendants conduct as set forth herein violates established public policy, and the harms caused to consumers greatly outweighs any benefits associated with that conduct.

816.    As a result of Defendants conduct, Plaintiffs and others suffered ascertainable damages and ascertainable losses including:

        a.      wrongful foreclosures and/or foreclosure attempts;

        b.      otherwise avoidable losses of homes to foreclosure;

        c.      wrongful evictions

        d.      significant stress and emotional distress, and;

817.    Plaintiffs and others are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

818.    Plaintiffs and others were damaged by this violation of law including without limitation, loss of equity, lost opportunity to work out modification of their mortgages, imposition of inappropriate foreclosure fees, extreme mental and emotional distress, and costs of defending themselves from foreclosure and/or eviction.

819.    The Plaintiffs and others are entitled to a declaratory judgment determining that the foreclosure proceedings and/or sales of their property are void.

820.    Plaintiffs and others are entitled to an injunction requiring that Defendants' take all necessary steps to restore legal title to their property as if no foreclosure sale had ever occurred.

821.    Plaintiffs and others are entitled to an injunction requiring that the Defendants be prevented from foreclosure action against Plaintiff and others so similarly situated, or any eviction action until such time as proper notice is made pursuant to statute.

822.    The Plaintiffs and others so similarly situated are entitled to cancellation of costs and fees assessed to their accounts for wrongful foreclosure, together with additional damages.

823.    Plaintiffs and others have suffered harm and are threatened with additional harm from Defendants fraudulent, deceptive and unlawful practices, including the wrongful loss of a property interest for those who have suffered foreclosure.

824.    Plaintiffs and others are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

a.    Certify this case as a class action and appoint the named Plaintiffs to be class representatives and their counsel to be class counsel;

b.    Enter a judgment declaring the acts and practices of Defendants complained of herein do constitute a fraud, unfair and deceptive acts and practices, breach of duty of good faith and reasonable diligence, violations of state uniform commercial code, violations of state foreclosure law, and violation of state predatory lending laws together with an award of monetary damages and other available relief on those claims;

c.    Grant a permanent or final injunction enjoining Defendants agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Class;

d.      Order Defendants to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

e.      Order specific performance of Defendants obligations together with other relief required by law;

f.      Award actual, exemplary and/or statutory minimum damages;

g.      Award restitution and prejudgment interest;

h.      Award punitive damages;

i.      Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

j.      Award actual and/or statutory minimum damages pursuant to M.G.L. c. 93A, § 9(3) to those Plaintiffs claiming violations of said laws;

k.      Award multiple damages pursuant to M.G.L. c. 93A, § 9(3), and;

j.      Grant Plaintiff and the Class such other and further relief as this Court finds necessary and proper.

Dated:  February 22, 2012

Respectfully Submitted,

___*/s/ Todd S. Dion*____ _____
Todd S. Dion, Esq. (BBO #659109)
1319 Cranston Street
Cranston, RI 02920
Telephone: 401-663-0699
Facsimile:  401-270-2202

toddsdion@msn.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2012, a copy of the foregoing document, filed through the CM/ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies shall be served by first class mail postage prepaid on the parties listed on the NEF as not receiving electronic notice.


_____/s/ Todd S. Dion_____
Todd S. Dion, Esq.